FILED

AUG 27 2019

U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF INDIANAPOLIS

| | | |
|---|---|---|
| WILSON EGWUENU | ) | |
| Plaintiff | ) | **1 : 19**-cv- **3 6 6 1** SEB -TAB |
| v. | ) NO. _____ | |
| HON. MEGAN BRENNAN, | ) | |
| CHARLES SCHWAB & CO., and | ) | |
| St. VINCENT HOSPITAL, INDIANAPOLIS | ) | |
| Defendants | ) | |

### PLAINTIFF'S ORIGINAL COMPLAINT

1. Plaintiff brings this action to recover for damages inflicted and continue to inflict on him by Defendant Brennan, Schwab, and St. Vincent's respective agents and their co-conspirators.  Plaintiff also seeks:

   a) Preliminary injunction to end this prolonged, organized, and ongoing campaign of exploitation, harassment, and impediment to his meaningful access to justice among other abuse against him.

   b) A court appointed counsel so that Plaintiff may access the court meaningfully.

   c) A court appointed master to investigate Defendants' respective agents and their co-conspirators' systematic pattern of unlawful conduct for over 20 years and continuing.  The investigation will deny them the opportunity to interfere, impede, or undermine the working and integrity of this proceeding, ensure fair and just process as well as prevent further delay and unnecessary cost among other things.

### Introduction and Nature of this Matter

2. Defendant Brennan is the US Postal Services' Postmaster General and CEO, is responsible and accountable for the actions of her employees and agents-responsible and accountable for the alleged interference with Plaintiff's mails and other abuse alleged herein.  Schwab was Plaintiff's former broker and St. Vincent was Plaintiff's former employer; therefore, Schwab and St. Vincent are responsible and accountable for the interference with Plaintiff' banking activities and his wrongful termination among other abuse respectively.  Defendants' respective agents' purposeful and intentional actions alleged herein are essential and integral part of the plan and scheme to exploit and defraud Plaintiff, impede his meaningful access to court or justice, and

retaliation against him among other abuse. Defendants' respective agents knowingly acted and continue to act in furtherance of the alleged plan and scheme.

3. Ette and his original co-conspirators targeted Plaintiff for exploitation and abuse. They stalk and surveill Plaintiff 24 hours a day and seven days a week. Then they used and continue to use their knowledge of Plaintiff' movements, activities, and other personal information gained from the said stalking to:

   a) To identify and conspire with some of Defendants' respective agents and other entities, including agent(s) of government agencies or businesses which Plaintiff has actual or potential relationships with to facilitate and further their scheme to exploit Plaintiff, impede or interfere with his meaningful access to court or justice, and retaliation against him among other abuse and deprivations.

   b) Maintain control over Plaintiff through psychological coercion, intimidation, false accusations in order to dehumanize and cause others to see Plaintiff in false light; interference or sabotage of Plaintiff's actual or potential relationships or associations, including interference with his employment, banking activities, communications including mail delivery, and ability to retain a legal counsel among others abuse;

   c) Impeding and continue to impede Plaintiff access to court or justice through interference with his ability to prepare and present his claims to court or seek administrative remedy, and frustration or interference with his ability to do tasks that normally attend litigation, obstructing and altering the course of justice in order to evade liability and to thwart investigation of their misconduct among other things-undermine the working and the integrity of judicial process among others things to gain legal advantage; and

   d) Retaliation against him through harassment, intimidation, tormenting him, and interference or sabotage of every aspect of his life, including interference with his means of livelihood and his ability to live normal life among other abuse and deprivations.

4. Since at least 1999 to present, Plaintiff has repeatedly made Defendants aware of their respective agents' alleged misconduct through their respective established procedure and through multiple lawsuits. Far from taking corrective measure, Defendants ratified and perpetuate the alleged scheme by allowing their respective agents to continue to exploit and abuse Plaintiff, impede his meaningful access to court or justice, and retaliation against him among other abuse for over 20 years and continuing to this day in violation Plaintiff's constitutional rights, legal ethics, and abuse of legal process among other things.

5. In addition, Defendants' respective attorneys, including US Attorney's Office remained silence while their respective client(s) engaged in the alleged misconduct for about a

2

decade in violation of professional and legal ethics among other abuse. Despite the fact that 42 USC Section 14141 specifically authorized US Attorney's Office to seek appropriate relief to eliminate pattern and practice abuse. Defendants' respective attorney's misconduct violated ABA Rule of Professional Conduct (3.3b, Candor towards the tribunal), Southern District of Indiana, Rule 6A, and Indiana Rule of Professional conduct, and 8.3 among things. See Nix v. Whiteside, 475 US 157-175, 106 S. Ct. 988, 89L. Ed.2d 123 (1986); Brady v. Maryland, 373 US 83 (1963).

6. The said exploitation and abuse of Plaintiff started immediately after he arrived in the United States and continue in this present case. Plaintiff was on the line waiting to go through customs when of one the custom's officers took him into a small room where his papers were closely examined and Plaintiff's papers were in order. Then the officer ordered Plaintiff to undress, including taking off his underwear and socks. Again, Plaintiff was not hiding anything. Then the officer dumped the content of Plaintiff's luggage on a table and examined each item individually. Plaintiff was not hiding anything and Plaintiff was allowed to proceed with his journey. The extra search of Plaintiff was among other things, a pretext to gather information on him among other things.

7. Shortly thereafter and unbeknownst to Plaintiff, his immigration record was falsified. In other words, Plaintiff's record was made to appear as if he was in United States illegally. Plaintiff discovered and corrected the falsification years later. The falsification of Plaintiff's INS record was among other things a pretext to exploit and to maintain control over him among other abuse under false pretense. Also at one point, Plaintiff's wife was called at her place of employment and she was instructed to come home immediately because Plaintiff had accident on his job. When she got home, they attempted to recruit her into their scheme not only to exploit Plaintiff but also to get him into trouble among other things. In reality, Plaintiff did not have any accident; it was among other things a pretext to recruit her into their scheme.

8. Upon information and belief, early 1996, Defendant Brennan through her agent(s) provided Ette and his co-conspirators with Plaintiff's mail(s) containing his bank statement to the fund set aside for Plaintiff's education. With the knowledge of how much money Plaintiff has, Ette groomed, enticed, and induced Plaintiff into a sale transaction whereby Ette defrauded Plaintiff by issuing him $50,000.00 bad check for his vehicles.

9. At the time Ette Defrauded Plaintiff, Ette was bonded by Gramercy Insurance Co. For Gramercy issued Ette a $25,000.00 surety bond and one of the conditions of the said bond was that a claimant must obtain a judgment against the bond-holder before a viable claim maybe made against it. In an effort to obtain a judgment against Ette, Plaintiff started gathering evidence to sue Ette to recover at least part of the fund

3

defrauded from him.  Ette impeded Plaintiff's access to court by interfering with Plaintiff's evidence gathering among other things in furtherance of his and his co-conspirators' scheme.

10. After Plaintiff obtained a judgment against Ette and filed a claim against the said $25,000.00 surety bond.  Instead of evaluating Plaintiff's claim on its merit, Gramercy, Ette, Defendant Brennan through her agents, Judge Chambers and others conspired to defraud Plaintiff of his claim.  For example, Defendant Brennan through her agent(s) repeatedly and systematically interfered with the delivery of Plaintiff's legal mails related to the said bond claim proceeding among other things which impeded Plaintiff's meaningful access to court and contributed to the said sham judicial proceedings in Judge Chambers' court.  These interferences with Plaintiff's legal and other mails continued from at least 1996 to present among other things.

11. Due to the above alleged irregularities, including sham judicial proceedings in Judge Chambers' Court, Plaintiff filed a complaint against Judge Chambers with Texas Commission on Judicial conduct.  However, no action was taken on Plaintiff's complaint because Judge Chambers died suddenly and mysteriously about the time Plaintiff was preparing to file the said complaint.  Judge Chambers' sudden and mysterious death appeared questionable and may be a pretext to thwart the investigation of his misconduct and cover-up of his, Ette, and his co-conspirators' misconduct alleged in this complaint among other things.

12. Ette and his co-conspirators, including Defendants' respective agents' systematic pattern of conduct suggest that they subjected Plaintiff to stealthy stalking and surveillance including eavesdropping on Plaintiff's activities through mechanical and electronic device among other things.   Through, the said stalking they gained knowledge of Plaintiff's movements, activities, and other personal information such as Plaintiff's neighbors, co-workers, banker, and mail carrier among others whom Plaintiff have business, social and other relationships with.  Then the conspirators or their private investigators infiltrate or recruit some of them- Plaintiff's neighbor(s), co-workers, and/ or agent(s) of business organization(s) or government agencies that Plaintiff has actual or prospective relationships with among others as accomplice to monitor and facilitate their scheme to defraud Plaintiff, impede his access to justice or court, retaliation against him, and to manipulate events to suit their purposes among other things.

13. However, after the sudden and mysterious death of Judge Chambers and Plaintiff's complaint against him, the harassment, intimidation, impediment to Plaintiff's meaningful access to court, stalking, surveillance and eavesdropping  became overtly intrusive, including stalking Plaintiff in his home and other places where privacy are expected.  If Plaintiff takes action "A" to seek justice or to extricate himself from the

alleged abuse, the conspirators will invariably take "B" to thwart Plaintiff's effort or to retaliate against Plaintiff. The viciousness and maliciousness of the alleged harassment, stalking, and other abuse is a pretext to terrify, terrorize, torment and intimidate Plaintiff into silence and/or to ruin him personally, financially, and professionally to the extent that he may not be able to pursue his claims among other things. Also, if Plaintiff managed to access the court, the allege interference or impediment render Plaintiff's access to this and prior courts inadequate, ineffective, and meaningless for over 20 years and continuing. These harassment, abuse, and interference with Plaintiff's ability to prepare and present his claims to the court continue to this day. For example:

14. On 5/22/17, this court received Plaintiff's complaint and the court sent Plaintiff summons and other related documents that Plaintiff needed to serve the Defendants via US Postal Services mail. Defendant Brennan through her agent, US Postal Services did not deliver this mail to Plaintiff. Then Plaintiff informed this court that he did not receive the said documents and this court, again sent Plaintiff the said summons and other documents via US Postal Services. Again, Defendant Brennan through her agent, US Postal Services did not deliver the said legal documents to Plaintiff. This interference with Plaintiff's mails containing the said legal documents occurred three times in a roll. These interferences with Plaintiff's mails is still ongoing. See Plaintiff's complaint, series "H" for detail.

15. Late 2009, as Plaintiff was being harassed and abused, he filed a lawsuit against US Postal Services, Schwab, and others seeking among other things, injunctive relief to end the alleged ongoing abuse against him. However, on 1/13/10, Plaintiff's complaint was dismissed due to defective pleading, the court said. So early March, 2010, Plaintiff took a few days' vacation to appeal the dismissal of his motion for a court appointed counsel and he did filed the said appeal on 3/10/10. On 3/15/10, Plaintiff returned to work and he was immediately asked to sign a document indicating that he was not meeting his job requirement. This false accusation of poor job performance against Plaintiff immediately after he appealed the dismissal of his lawsuit and his eventual wrongful termination were pretextual and a continuation of retaliation against him. But for the said appeal, St. Vincent would not have asserted the pretextual reason nor St. Vincent would not have terminated Plaintiff. See Plaintiff's complaint, series "E" for detail.

16. On 9/12/12, Plaintiff went to Senator Web's Office seeking assistance in dealing with this ongoing abuse and because the Senator will be retiring soon at that time, one of his aids instructed Plaintiff to submit a written complaint with Senator Warner's Office. Later that day, as Plaintiff was preparing to write the said complaint, he discovered that his computer and printer will not turn on-both has been damaged. This also is a continuation of the conspirators' sabotage and interference with Plaintiff's access to justice.

17. Even to this day, as Plaintiff is writing this this complaint, the conspirators use noise and other distractions to deprive Plaintiff of sleep. In so doing, they induce helplessness in Plaintiff and cause him to loss focus in his effort to seek justice or extricate himself from the said abuse among other things.

18. On or about 9/12/18, Judge McKinney entered an order dismissing Plaintiff's motion for sanction against Defendant Brennan and the decision was based at least in part on the erroneous conclusion by Judge McKinney that the interference with Plaintiff's legal mails three times in a roll were clerical errors. However, Defendant Brennan's agents' interference with Plaintiff's legal mails was not clerical errors at all. The interference was intentional acts designed to deceive the court and Plaintiff among other things. Because since 1999 to present, Defendant Brennan through US Postal Services has repeatedly and systematically interfered with Plaintiff's properly addressed and stamped legal mails to and from the court by not delivering or delaying them outright among other things. As Plaintiff started complaining of the alleged mail delivery interference, Defendant Brennan through her agents attempted to conceal her actions by returning Plaintiff's legal mails to the court, to make it appear as if the mails were improperly addressed among other things. This change in tactics deceived Judge McKinney.

19. As Plaintiff started writing a motion for reconsideration of the said 9/12/18 court' order, pointing out court's error, Judge McKinney died suddenly and unexpectedly in the same manner that Judge Chambers died as Plaintiff was preparing to file a complaint against him. The sudden and mysterious death of both Judge Chambers and Judge McKinney may be a means of thwarting Plaintiff's access to justice among other things. Thus the timing and nature both Judge Chambers and Judge McKinney's death are similar which make their respective death suspicious and maybe effort to thwart Plaintiff's access to justice as well as cover-up of their respective unlawful act(s) among other things.  See exhibits, "E" & "F"; see also Plaintiff's complaint, series "H"; Nader v. General Motors Corp., 25 NY.2d 560-575 (N.Y App. 1970); Pinkerton National Detective Agency, Inc. v. Stevens, 132 S.E.2d  119, 161-171 (Ga. App. 1963); see also Florida v. Jardines, 133 S. Ct. 1412-1419 (Fl. Sup. 2013).

20. Criminally, Defendants' respective agents, and their co-conspirators' misconduct violated 18 USC section 241(conspiracy against rights), 242(deprivation of rights under color of law), 3617(interference, coercion, or intimidation), 1503(obstruction of justice), 1512(tampering with witness or party to federal judicial proceedings), 1513(retaliation against party or witness), 1701(obstruction of mails), 1702(obstruction of correspondence), 1703(delay, or destruction of mail by postal agents), and 42 USC 14141(pattern and practice), among other violation.  Defendants and their co-conspirators' conduct  also amounted to obstruction of justice in violation of 18 USC

section 1503, 1509, 1513, 1701, 1702 & 1703 among other things.  See United States v. Lundwall, 1F.Supp. 2d 249-256 (S.D.N.Y. 1998).

Liability

21.  Defendant Brennan, Schwab, St. Vincent, and other co-conspirators are vicariously, individually, jointly, and severally liable for Plaintiff's injuries and damages because their respective agents' misconduct in furtherance of Ette and his co-conspirators' scheme directly and proximately caused and continue to cause Plaintiff's injuries and damages. In other words, all the actions of Ette and his co-conspirators including Defendants' respective agents and other unnamed and unknown co-conspirators, as set forth above, including defrauding Plaintiff of the fund set aside for his education, impeding his access to court, harassing, intimidating, tormenting, terrorizing him in retaliation, obstructing justice, undermining adversary judicial proceedings' protections, undermining the integrity of judicial process, interference with Plaintiff's legal and other mails, false allegations against Plaintiff, terminating him from his job, framing him, subjecting him to unlawful surveillance and unreasonable intrusion into his own home including other places where privacy are expected, and interference with his ability to retain a counsel, interference with his ability prepare and present his claims to the court, and subjecting him to condition of servitude among other things were done with shared intent of injuring Plaintiff among other things and thereby constituting civil conspiracy with multiple agreements and objectives (continuous and serial  or wheel and spoke conspiracy).

Conspiracy

22. A conspiracy is an unlawful agreement by two or more persons to commit a wrongful act(s). Such an agreement may be orally or in writing. A conspiracy may be inferred from circumstance, including the nature of the act(s) done, the relationships between parties, and the alleged interest of the alleged conspirators among other things. One or more of the conspirators engage in overt act in furtherance of the plan and the object demonstrating the reality of the intention of the conspiracy and Plaintiff is injured.

Conspiracy with Multiple Agreements and Objectives

23. A single conspiracy with multiple agreements and objectives occurs when two or more persons agreed to commit an act(s) and later a third or even fourth person with the knowledge of the existence of the conspiracy assents to it either implied or expressively and engage in an overt act(s) in furtherance of the conspiracy; all three or four persons are in same single conspiracy. In other words, if "A" & "B" conspired to defraud "C" and "A" &/or "B" conspired with "D" to cover it up. Later "A" &/or "B" conspired with "E" to intimidate "C" into remaining silence. "A", "B", "D", and "E" are in single conspiracy with multiple agreements and objectives and are equally liable for "C"'s injuries and damages individually, jointly, and severally in the same manner that Defendants

7

respective agents and their co-conspirators are equally liable for Plaintiff's injuries and damages. See Bluementhal v. United States, 332 US 539 (1944).

24. In this instance case, as outlined above, Defendant Brennan's agent(s) were integral part of Ette and his co-conspirators' scheme to defraud Plaintiff, impede his access to court or justice, and retaliation against him among other things. In furtherance of the conspiracy, Defendant Brennan' through her agent(s) provided Ette with Plaintiff's mail(s) containing bank statement to the fund set aside for his education; Ette used the knowledge of how much money Plaintiff had in that fund to perfect his scheme defraud Plaintiff among other things. In addition, after Plaintiff was defrauded, Defendant Brennan's agent(s) engaged and continue to engage in systematic pattern of interference with Plaintiff's legal mails among other things from at least 1999 to this present case in furtherance of the plain and scheme to impede Plaintiff's access to court to recover at least part of the fund defrauded from him and retaliation against him among other things. Thus Defendant Brennan's agents' systematic pattern of conduct suggest or imply agreement, combination, or conspiracy as well as knowledge of Ette and his co-conspirators' scheme to defraud Plaintiff, impede his access to court to recover the fund defrauded from him, and retaliation against him among other things.

25. Defendant Schwab and St. Vincent's respective agent(s) are also integral part of the conspiracy to retaliate against Plaintiff serially in furtherance of Ette and his co-conspirators' scheme. For the nature, circumstances, and systematic pattern of Ette, the original co-conspirators, and Defendant Schwab and St. Vincent's respective agent(s)' conducts imply or suggest agreements, combination, or conspiracy between them serially as well as knowledge of the ongoing conspiracy. In furtherance of the said scheme, Schwab's agent(s) attempted to fraudulently induced Plaintiff into cashing out his Schwab' Roll-over account in an effort to dirty or conceal the source of the fund in Plaintiff's account to bolster false accusation against Plaintiff that he was/ is getting financial support from questionable sources among things. Also St. Vincent's agent(s) unjustly subjected Plaintiff to hostile work environment, false allegation of misconduct, unjustified scrutiny, and wrongfully terminated among other abuse immediately after Plaintiff appealed the dismissal of his lawsuit against Schwab, US Postal Services, and others in furtherance of their scheme to retaliate against Plaintiff. In addition, the wrongful termination and hostile work environment alleged occurred when it appeared that Plaintiff's claims will be revived by the court of appeal appointing a legal counsel to assist him present his claims to court among other things.

26. Thus Defendants' respective agents were aware of Ette and his co-conspirators' scheme and yet they engaged in act(s) in furtherance of their scheme. Therefore, the named Defendants' respective agents pattern of conduct imply or suggest that the Defendants' respective agents and other co-conspirators are in a single conspiracy with multiple

agreements and objectives linked and coordinated by Ette and his original co-conspirators. So Defendants are vicariously, individually, jointly, or severally liable to Plaintiff's injuries.

### Common Law Aider & Abettor's Liability

27. Defendant Brennan, Schwab, St. Vincent, and other co-conspirators are also vicariously, individually, jointly, and/ or severally liable for Plaintiff's injury under aider and abettor's liability theory.

28. Common Law Aider and Abettor as used with reference to civil liability....has been defined as any person who is present at the commission of a tort, encouraging or exciting the same by words, gestures, looks, or signs, or whom in anyway or by any means countenances and approve the same.

29. Liability for another's wrongdoing is not a new concept to the law. The Bible recognized that it was wrong to help another commit wrong. See Proverbs 1:10-19 (King James). By 1613, English common law recognized joint liability on all who came together to commit the trespass of battery. See Sir John Heydon's case 77 Eng. Rep. 150, 151 (K.B. 1613).

30. Plaintiff alleges that Ette and his co-conspirators, including Defendants' respective agents and others defrauded him, impeded and continue to impede his access to court, and retaliate against him among other things as outlined above and in this complaint. Defendants and their respective agents are responsible for Plaintiff's injury under common law aider and abettor's joint liability. Because a) Defendants' respective agents, including upper level management knew or should have known for at least a decade that the said unlawful conduct were/ are being committed; b) they both conspired and continue to conspire with, aided and abetted them for over 20 years and about a decade respectively by encouraging, supporting, and substantially assisted each other among other things as outlined above and in this complaint; and c) Defendants' respective agents' encouragement, support, and other conduct were substantial factor in causing Plaintiff's injury.

31. Even after Plaintiff filed administrative or/ and actual lawsuit against Defendants or their respective, they continue to aid and abet Ette and his co-conspirators. In addition, each defendant or their respective agent(s) failed to properly investigate Plaintiff's allegations, take remedial or corrective measures among other things. Thus under common law aider and abettor's joint liability Defendants are vicariously, individually, jointly, and severally liable for Plaintiff's injury.

### Vicarious Liability

32. At all times Material, Defendants' respective agents were employed by the respective Defendants and were under direct supervision, employment, and control of the respective Defendants when they committed the wrongful acts alleged herein. The

9

wrongful conduct were and continue to be committed while acting in the course and scope of their respective employment with the respective Defendants and accomplished the wrongful acts by virtue of their respective job created authority. Thus, the named Defendants are vicariously, individually, jointly, and severally liable for their respective agents' conduct and in turn liable for Plaintiff's injuries and damages including under respondeat superior doctrine.

Joinder

33. As outlined above and in Plaintiff's complaint, Plaintiff has provided sufficient facts and allegations of the conspirator's systematic pattern of conduct suggesting that Ette and his co-conspirators including the named Defendants' respective agent(s) and others were and continue be part of a single conspiracy or combination with multiple agreements and objectives as well as aided and abetted each other among other things. The purpose of the conspiracy is to defraud Plaintiff, impede his access to court, and retaliation against him among other abuse. In other words, Defendants respective agents were part of a single conspiracy with multiple objectives, shared intent, and assisted each other substantially to proximately and directly cause and continue to cause Plaintiff's injury among other things.

34. Plaintiff asserts claims against the Defendants and their respective agents and others arising from or related to the said conspiracy, aiding and abetting their respective agents and other co-conspirators' wrongful conduct among other things.

35. Federal Rule of Civil 1Procedure 20(2)(b) provides that Defendants may be joined in a single lawsuit, if: a) Any common rights to relief is asserted against them .b) Any question of law and/or facts common to all Defendants will arise out of the action. Thus Defendant respective agents are part of a single conspiracy with common design and objectives and FRCP permits the court to adjudicate Plaintiff's claims in a single proceeding. For the common question of law and/ or fact here is did Defendants' respective agents and their co-conspirators' nature, sequence of events, circumstances surrounding their actions, and systematic pattern of conduct suggest combination, conspiracy and/ or did they aid and abet each other substantially to cause Plaintiff's injury and damages among other things?

36. Under Rule 20, the impulse is towards entertaining the broadest possible scope of action consistent with fairness to the parties, joinder of a claim, parties and remedies is strongly encouraged. See Mosley v. General Motors Corp. 497 F. 2d 1330 (8th Cir. 1974); United Marine Workers of America v. Gibbs, 385 US 715, 724, 86 S. Ct. at 1138; Lee v. Cook County, IL, 635 F.3d 969 (7th Cir. 2011). In addition, Rule 20 requires liberal construction to promote judicial economy and trial convenience. See Soars v. Paramo, No. 13-cv-2871-BTM-RBB, 2016 W.L. 3022040 1 4 (S.D Cal. 2016).

10

37. By reason of the conspiracy, substantial assistance and support provided to each other, willful, and malicious conduct of the Defendants' respective agents, and other co-conspirators, Defendants are vicariously liable to Plaintiff's injuries and damages individually, jointly, and severally among other things pursuant to conspiracy, aider and abettor's liability doctrine among other things.

## Jurisdiction

38. The court has subject matter and personal jurisdiction under Racketeering Influence and Corrupt Organization Act (RICO), 18 U.S.C. Section 1964(c) which authorize nation-wide services. Also under 28 U.S.C. 1331 and 1367 because this case arises under the laws and Constitution of the United States;-42 U.S.C. Section 1981, 1983, and 1985, as well as First, Fourth, Fifth, and Fourteenth Amendments of the United States Constitution among others. Also the court has supplemental jurisdiction under 28 USC 1367. In addition, under 39 USC 409 because this matter involves officer of the United States Postal Services.

39. The court has personal jurisdiction over the Defendants because Defendants does business, or has office in this district.

40. Venue is proper in this district because substantial part of the events giving rise to this matter occurred in this district.

## Exhaustion of Administrative Remedies

41. At all times material, St. Vincent has been an employer within the meaning of 1964 Civil Rights Act, 42 USC. Section 2000(e) et seq. in that Defendant, St. Vincent Hospital had at least fifteen (15) employees.

42. Plaintiff have complied with all conditions precedent to filing this claim as required by 42 USC section 2000(e)(5) namely: a) complaint of employment discrimination with EEOC and a letter to sue was issued; and b) Plaintiff timely filed a complaint with US District Court. However, Plaintiff's claim was dismissed due to pleading defects.

## Exhaustion of US Postal Services Administrative Remedies

43. Since at least 1999 to present, Plaintiff has made the following good faith effort to settle this matter with Defendant Brennan through established administrative remedy procedure:

   a) On or about 8/23/99, Plaintiff filed a complaint with US Postal Services alleging that his certified mails containing legal documents related to an ongoing legal proceedings were lost, delayed, or not delivered at all twice in a row. See exhibits "D" pages 1-3.

   b) On or about 11/30/02, Plaintiff filed a complaint with the Chief Postal Inspector, Arlington, TX, alleging interference with the delivery of Plaintiff's mails. See exhibit "B-2".

c) In 2008, Plaintiff complained orally to US Postal Services Customers Services Urbana and Champaign, IL, alleging non-delivery of Plaintiff's mails containing his financial statements.

d) On or about October, 2015, Plaintiff filed multiple oral complaints with US Postal Services, Urbandale, IA, regarding non-delivery of his financial statements and other important mails.

e) On 12/26/15, Plaintiff filed a written complaint with US Postal Services, Urbandale, IA, alleging that his mails containing his financial statements were being programmed to be return to the sender and marked "return to sender, not deliverable as addressed. Despite the fact that the said mails were properly addressed to Plaintiff. See exhibit"D-1" & "D-2". Prior to 12/26/15, Plaintiff had oral complaint with the said Urbandale Post Office.

f) On 6/28/17, Plaintiff filed an oral complaint with US Postal Services Inspector General, Des Moines, IA, alleging that three consecutive mails containing legal documents related to this instant matter sent to him by this court were being returned to the court and marked "return to the sender, undeliverable as addressed." Despite the fact that both mails were properly addressed to Plaintiff. The following day, 6/29/17, Plaintiff received the first mail from the court.

g) On 7/18/17, Plaintiff filed a written complaint with US Dept. Of Justice, Coordination and Review Dept. and Plaintiff was informed that DOJ did not jurisdiction over US Postal Services.

h) On 7/21/17, Plaintiff filed a written complaint with US Postal Services' Inspector General, Des Moines, IA.   The unknown US Postal Services' action outlined above violated Plaintiff's right of access to court, First, Fifth, and Fourteenth amendment as well as criminal violations of 18 USC section 1512, 1513, 1701, 1702, & 1703 (obstruction of justice, obstruction of mails, retaliation against witness or party to federal judicial proceedings, obstruction of mails, obstruction of correspondence, and delay or obstruction of mail by postal services agent) among others.  Plaintiff received no response from the US Postal Services.

Other Administrative Remedies Sought By Plaintiff

44. Plaintiff filed a complaint against Judge Chambers with Texas Commission on Judicial Conduct alleging among other things, unlawful relationship with Gramercy and its attorney as well as sham judicial proceedings.  However, Judge Chambers died suddenly and mysterious about the time Plaintiff was preparing to file the said complaint. As a result of Judge Chambers' death, no action was taken on Plaintiff's complaint against him. See exhibit "E", pages 1-2 and Plaintiff's amended complaint, Series "D".  Also in 2017, Judge Larry McKinney of this this court died "very unexpected and very sudden"

on 9/20/17, as Plaintiff was preparing to point out errors in his 9/12/17's decision.  See exhibit "F"; and Plaintiff's complaint, series "H" for detail.

### Parties

45. Plaintiff, Wilson Egwuenu is an African American and a natural person and he resides in Marion County, Indiana.

### Defendants

46. Defendant Brennan, Postmaster General & CEO of US Postal Services in her personal capacity and for service located at 475 L'Enfant Plaza, SW Washington, DC 20590. Brennan is the proper entity to be sued for the wrongful acts of her employee or agents. US Postal Services is a federal government agency that have a national monopoly in mail and related delivery services in the United States.  It delivery services reaches every address in the country.

47. Defendant, Charles Schwab Corporation (Schwab) is a public company and through its subsidiaries provides online stock brokerage and related financial services throughout the United States and around the world and for service is located at 211 Main St., San Francisco, CA 94105.  Schwab is the proper entity to be sued for the wrongful acts of its agents or employees.  Schwab has been Plaintiff's stock broker at least since late 1980's or early 1990's.

48. Defendants, St. Vincent Hospital, Indianapolis (St. Vincent), is the flagship installation of St. Vincent Health which operates twenty-two (22) facilities in 46 counties in Indiana and for service located at 2001 W. 86th St. Indianapolis, IN 46260.  St. Vincent was Plaintiff's employer from 2008, to 2010.

### Other Key Entities Involved

49. Mr. Howie Kennedy, the Director of Schwab Security Loan Program, and his location is unknown to Plaintiff and in that capacity, is an agent or employee of Schwab.

50. Ms. Janet Shultz, the Associate Director, St. Vincent Hospital and in that capacity was agent and employee of St. Vincent Hospital.

51. Ime Ette, in 1996, owned and operation Trans-world Investment, a used car dealership. In 1996, Trans-world Investment and Ette appeared to have the appearance of legitimate and unquestionable successful used car dealership.

52. Gramercy Insurance Company is/was a commercial property and caisalty insurance company in the state of Texas.  At the time, it offered commercial auto insurance product, including contract equipment, motor truck cargo, truck physical damages, commercial liability, and general liability line builder's risk for renovation and surety bond among other things.  It was founded in 1979 and listed location is/was at 5000 Quorum Dr. # 111, Dallas, TX.  Gramercy is now bankrupt.

### Other Government Agency Involved

53. Texas Dept. of Transportation (TXDOT) is a government agency in the state of Texas. (TXDOT) provides vehicle registration among other services in the state; but this service was transferred to Texas Dept. Motor of Vehicle around November 1, 2009.

### Texas Dept. of Motor Vehicle

54. Texas Dept. of Motor vehicles regulates vehicle registration, license new and used car dealerships, keep record of vehicle title and title transfer among other things. For example, it requires each used car dealership to carry at least $25,000.00 surety bond which was intended to protect the public from dishonest dealers.

55. The County Tax Assessor-collector is designed by statue as agent for Dept. of Motor Vehicle and state comptroller for collection of motor vehicle fees. Under the vehicle registration services, every owner of a motor vehicle in the state is required to register it with Tax Assessor in the county in which the owner resides. The County Tax Assessor collector' Office provides among other things, registration renewal and vehicle title transfer.

### Factual Allegation

### Series A- (Ette and His Co-conspirators Fraud)

56. In or around early 1996, Plaintiff was a full-time student and Plaintiff was introduced to Ime Ette by one of Plaintiff's former co-workers. Ette, his wife, Plaintiff's former co-worker represented to Plaintiff that Ette was/ is a used car dealer-he buys salvage vehicles and rebuild them for resale. Ette also represented to Plaintiff that one of his brothers owned a pizza place. Plaintiff and Ette visited the said pizza place at least once. On the surface, Ette appeared to be honest, hardworking, and owned and runs a relatively successful business. Subsequently, Ette gained Plaintiff's trust and confidence in him through the relationship between him and Plaintiff's former co-worker, appearance of Ette's ownership of and running a legitimate business operation as well as other misrepresentations among other things.

57. Shortly thereafter, Ette represented to Plaintiff that buying salvage vehicles and rebuilt them for resale was an excellent investment and Plaintiff could make more money and have more time for his studies if he buys salvage vehicles and repair them for resale instead of working part-time. Subsequently, Plaintiff bought his first car and rebuilt and sold it. At the time, it appeared that it may be a promising venture.

58. As Plaintiff gained more confidence, he bought a few more cars. However, each time Plaintiff advertised his vehicle for sale, his answering machine malfunctioned repeatedly. As a result Plaintiff did not receive any calls from potential buyers. After a while, the fund set aside for Plaintiff's education was tied up in cars and Plaintiff was concerned because he has to pay bills and school fees from the fund now tied up in cars. Based on Plaintiff's years of experience dealing with this matter, the repeated

14

malfunctioning of Plaintiff's answering machine was a pretext to induce economic harm or fear in Plaintiff thereby forcing Plaintiff to sell his vehicles to Ette among other things.

59. In or around February 1996, Plaintiff and Ette met and Ette asked Plaintiff how he was doing with his car business. Then Plaintiff informed Ette about the said repeated problems with Plaintiff's answering machine which interfered with Plaintiff's ability to sell his vehicles. Then Ette offered to help sell his cars. At the time the standard sale commission was $200.00 on each car. But Ette refused the standard sale commission and demanded more money. Subsequently, Plaintiff and Ette could not agree on the sale commission. Then Ette offered to buy Plaintiff's cars out right; in so doing he could make as much money as he would like. Ette refusal to accept the said $200.00 sale commission was a pretext to induce Plaintiff into selling his vehicle to Ette-induced Plaintiff into a sale transaction where Plaintiff was defrauded among other abuse.

60. On or about 5/13/96, Plaintiff and Ette entered into a sale transaction whereby Plaintiff sold his vehicle to Ette and Ette issued Plaintiff two checks -$20,000 and $30,000. However, when Plaintiff presented the checks to Ette's bank, the bank refused to pay Plaintiff due to insufficient fund (bad checks). Then Plaintiff called Ette and he was giving Plaintiff the run around. As it became clear that that Ette never intended to Pay Plaintiff for his cars, Plaintiff started making effort to gather evidence to file a claim on a $25,000.00 surety bond which Gramercy Insurance Company had issued to Ette.

61. Ette, his wife, Plaintiff's former co-worker, and others co-conspirators' actions outlined above were a pretext to defraud Plaintiff of the fund set aside for his education. First, upon information and belief, Ette obtained Plaintiff's mail(s) containing the financial statements to the fund set aside for Plaintiff's education. Then Ette set action in motion to defraud Plaintiff of the said fund. Second, in furtherance of the said scheme, Ette got Plaintiff's former co-worker to introduce him to Plaintiff. Ette and his co-conspirators groomed Plaintiff for exploitation through misrepresentations among other things to gained Plaintiff's trust as well as convinced Plaintiff to use the fund set aside for his education to buy used car for resale. Fourth, upon information and belief, Ette and his co-conspirators interfered with Plaintiff's ability to sell his vehicles giving Ette the opportunity to lured Plaintiff into a sale transaction whereby Plaintiff was defrauded of the said fund among other things.

### Series B
#### The Beginning of Ette and His Co-conspirators Interference with Plaintiff's Access to Court

62. At the time Ette defrauded Plaintiff of the said fund set aside for Plaintiff's education, Ette was bonded by Gramercy Insurance Company. In other words, Granercy issued Ette a $25,000.00 surety bond to Ette. One of the conduction of the said bond was that

a claimant must obtain a judgment against the bond holder which was Ette in this case, before a claim could be made.

63. At the time, Plaintiff was not working and he relied on the fund Ette defrauded from him to pay for school fees and living expenses among other things. In late October, 1996, in an effort to recover at least part the fund Ette defrauded from Plaintiff, Plaintiff started gathering evidence to sue Ette. So Plaintiff applied and paid for certified title history to the vehicles Ette defrauded from him. However, on or about 11/12/96, an employee(s) of Texas Department of Motor vehicle (TDOT) gave Ette, whom Plaintiff was gathering evidence to sue, the said certified title history which Plaintiff had applied and paid for.

64. Eventually, when Plaintiff received the said certified title history, he discovered that on or about 4/17/96, Ette had obtained a duplicate title to one of the vehicles Ette defrauded from Plaintiff from TDOT about thirty days before Plaintiff and Ette entered into the said sale transaction. Ette used this duplicate title to sell the said vehicle to a third party.

65. In addition, the title history to Plaintiff's 1995 Acura which was one the vehicles Ette defrauded from Plaintiff showed that on or about 5/20/96, Ette sold it to Salish Babu for $16,000.00. Babu traded a 1994 Infiniti J30 to Ette; according to Ette and Babu, the trade-in value of the said Infiniti J30 was $15,000.00. In other words, only $1000.00 changed hand.    However, the title history to the said 1994 infiniti J30 showed that Ette owned it. For Ette bought the said 1994 infiniti from Auto insurance Auction on 10/10/95, as a fresh water damaged vehicle. Thus the sale transaction involving the said 1994 infiniti J30 was a fake transaction and a pretext to prevent Plaintiff from repossessing his vehicle. Ette and unknown agent(s) of TDOT's conduct outlined in this section suggested combination or conspiracy between Ette and TDOT's agent(s) to defraud Plaintiff, impede his ability to repossess his vehicles or access the court, and interfere with his ability to prepare and present his claims to the court among other things.

### Series C
### Sabotage of Plaintiff's Claim against Gramercy's Surety Bond

66. Eventually, Plaintiff sued Ette and on or about 8/19/97, Plaintiff obtained a judgment against Ette. With this judgment, Plaintiff filed a claim against the said $25,000.00 surety bond which Gramercy had issued to Ette. Instead of evaluating Plaintiff's claims on its merit, Gramercy and Ette filed a motion for a new trial which was a pretext to buy time. Ette and Gramercy used this time to fabricate a competing claim against the said Gramercy's bond as outlined below.

67. On or about 10/27/97, Ette and Gramercy's motion for new trial was granted.  On or about 10/28/97, the very next day after the said new trial was granted, Gramercy filed an application for authority to dispose the said questionable 1994 infiniti J30 involved in the above said fake transaction between Ette and Babu to a demolisher with TDOT. Grmercy attached an affidavit to the said application claiming under oath that it was unable to obtain the title to the said 1994 infiniti from Ette.  Also attached to the application for the authority to dispose the said 1994 infiniti J30 to a demolisher was a settlement check which Gramercy allegedly issued to Ette.  However, "void unless negotiable title attached" was printed on the said check.  This implied that under Gramercy's Insurance  claim settlement policy, Gramercy and its agents may not settle an insurance claim without first obtaining the title to the vehicle involve to ascertain the ownership of the vehicle involved.  This showed that Gramercy did not even follow its own insurance claim settlement policy.  In reality, the demolition and the withholding of the said questionable 1994 infiniti J30's title from TDOT was a pretext to destroy evidence of fake transaction between Ette and Babu as well as fake insurance claim involving the said 1994 infiniti J30 among other things.

68. Also on or about 10/28/97, again, the very next day after Ette's motion for new trial was granted, Babu filed an uncontested lawsuit against Ette.  The uncontested lawsuit against Ette was pretext to create a judgment against Ette which Babu intended to use to file a competing claim against the said  Gramercy's $25,000.00 surety bond Which Plaintiff had already made a claim against.

69. On or about 12/2/97, Ette's motion new trial was heard and the court upheld Plaintiff's Judgment against Ette.  Again, Plaintiff refiled his claim against the said Gramercy's surety bond.

70. On or about 3/4/98, Babu was granted a defaulted judgment against Ette.  Then Babu used this defaulted judgment to file a competing claim against Gramercy's $25,000.00 surety bond which Plaintiff had already made a claim against.

Series D-Gramercy's InterPleader Petition in Judge Chambers' Court

71. On or about 5/5/98. Gramercy filed an interpleader petition in Judge Chambers' Court-County Court at Law # 1, Harris County, Houston, TX, interpleading Plaintiff's and the fabricated claim.  Gramercy travelled about 200 miles away from Dallas-Forth-Worth area where the events giving rise to Gramercy's interpleader petition occurred and where Grmercy's Headquarters and its attorney's office were located as well as where almost all the party involved lived or worked at the time.  Among other things, Gramercy's attorney travelling four hours to Houston, TX, to file an interpleader petition in Judge Chambers' court was a pretext to judge shopping and where the outcome to Gramercy's interpleader petition was predetermined.

72. Due to the interference with Plaintiff's ability to retain a counsel of his choice at his own expense, Plaintiff started representing himself pro se. Then Plaintiff filed a summary judgment motion on submission, but Judge Chambers demanded oral hearing.

73. In response to Plaintiff's summary judgment motion, Babu's attorney mailed Plaintiff his response to the said Plaintiff's summary judgment motion via US Postal Services' certified mail. US Postal service was supposed to deliver the said certified mail to Plaintiff on 7/6/99, but neither the mail nor delivery attempt notice was delivered to Plaintiff. However, the said certified mail was delivered to Plaintiff on 8/10/99, (over 30 days of delay). As a result, Plaintiff had to reschedule his summary judgment motion hearing.

74. On or about 8/13/1999, Plaintiff mailed a legal document to Judge Chambers' court via US Postal Services' certified mail and on 8/23/1999; Judge Chambers' Court said that they did not received the said mail. Again, Plaintiff had to reschedule his summary judgment motion. This was a continuation of delay or non-delivery of Plaintiff's legal mails containing legal document which amounted to interference with Plaintiff's meaningful access to court. Exhibits "D" & "C".

75. Eventually, Plaintiff's summary judgment motion was scheduled to be heard on 11/15/99. However, Judge Chambers and Gramercy's attorney failed to appear for the hearing. When the visiting Judge called Plaintiff's case, Judge Chambers Court's Clerk informed the visiting judge that Judge Chambers did not want him to hear Plaintiff's case. Again, Plaintiff's summary judgment motion was postponed to 12/13/99, by the court. Then Plaintiff rearranged his work schedule so that he may be able to attend the said hearing on 12/13/99. However, Judge Chambers' Court again, suddenly changed the hearing date without properly notifying Plaintiff and later, Plaintiff received Judge Chambers' order indicating that the penal sum of the said Gramercy's $25,000.00 bond has been awarded to Gramercy and others on 12/6/99. Then Plaintiff requested a new trial to no avail. Ette, Gramercy, US Postal Services, Judge Chambers, and others conduct outlined above was a pretext to defraud Plaintiff, impede his access to court or justice, and to evade liability among other things. In addition, the conducts were unlawful criminally and civilly, and a pretext to undermined the protection, the working, and the integrity of adversary judicial process. The said misconduct infected the entire proceedings rendering the proceedings fundamentally unfair, unjust, and the proceedings did not serve its function as a vehicle for determining the truth among other things sham judicial proceedings.

Series E

Harassment and Intimidation Intensified and Schwab Became Involved

76. Due to the irregularities and sham judicial proceedings in Judge Chambers' court outlined above, Plaintiff filed a complaint against Judge Chambers with Texas

Commission on Judicial Conduct. But no action was taken on Plaintiff's complaint because Judge Chambers died suddenly and mysteriously about the time Plaintiff was preparing to file the said complaint. See exhibits "B-1" & "B-2".

77. Plaintiff discovered the news of Judge Chambers' death in an article in Houston Chronicle 1/25/2000, stating that Judge Chambers died suddenly and mysteriously on 1/24/2000. The article gave a brief history of Judge Chambers' tenure in the court which included that Judge Chambers was nicknamed "sleepy," because a plaintiff had filed a complaint against him complaining that Chambers was sleeping during a legal proceedings and that he was unfair to that plaintiff- sham judicial proceedings.

78. In addition, after Judge Chambers' death, the stalking and surveillance of Plaintiff (following, shadowing, harassment, and eavesdropping on Plaintiff among other abuse) became overtly intrusive, vicious, and malicious. The stalking is a pretext to gather information on Plaintiff which they use to exploit, impede his meaningful access to court, and to terrify, torment, terrorize, intimidate him into giving-up his claims among other abuse. See below for examples.

79. On or about 9/2/01, Plaintiff's supervisor pleaded with Plaintiff to work double shift and Plaintiff agreed. However, after a long day when Plaintiff got home at about 09:00 PM, he was shocked to discover that his front door has been drilled open and left open probably for the entire day. There were metal shavings, brass cap, and inner cylinder cover to the deadbolt lying on the concrete just outside Plaintiff's front door. The only thing keeping the door closed was the deadbolt that wedged between the door and the door frame. The break-in did not look like a burglary attempt. Because the person that drilled the said lock was very careful not to damage the door.

80. Then Plaintiff called the apartment after hour phone number and spoke with the maintenance man on duty. Plaintiff was informed that the apartment did not enter Plaintiff's apartment. Then Plaintiff called the Police and made a police report regarding the said break-in into Plaintiff's apartment. The following day, Plaintiff also spoke with the apartment management and Plaintiff was informed that they did not break-into Plaintiff's apartment.

81. Shortly above incident, each time Plaintiff enters or exits his apartment, getting in or out bed, going to the bathroom even in the middle of the night, working on this complaint, falling asleep, doing other things that requires concentration or quiet environment among other things, strange noise, strategically timed to surprise Plaintiff will appear to be coming from neighbor's apartment; the noise includes, bathroom flush, running shower, thump, furniture dragging, or similar type of household noise. Plaintiff repeatedly reported such noise to apartment management to no avail.

82. Upon information and belief, Ette and his co-conspirators have recruited some of Plaintiff's neighbor into their scheme or hired a private investigator to harass Plaintiff

among other things. In other words, they monitor Plaintiff in his apartment or home and used strangely and strategically timed noise to psychologically terrorize and torment Plaintiff in his own home. The said noise is a pretext to stress Plaintiff out, torment, and psychological torture him in order to distract him, induce helplessness him, and to cause him to loss focus in his effort to seek justice or extricate himself from the said abuse.

83. Furthermore, Plaintiff work in healthcare field and such works long hours and sometime multiple shifts and when he got home, the said psychological torture made it impossible for Plaintiff to relax, sleep, peacefully, or quietly enjoy his home among other abuse and harassment that interfere with Plaintiff's daily activities. This type of harassment against Plaintiff continues to this day and it amounted to unreasonable intrusion into Plaintiff's seclusion and interference with Plaintiff's ability to prepare and present his claims to this and prior courts among other things.

84. In or around 2002, summer, Plaintiff applied for admission to Southern Methodist University's Graduate School and requested and paid for his transcript be forwarded to SMU Admissions Office. However, the transcript was loss by the mail carrier. A few months later, again Plaintiff applied for Graduate school admission to University of North Texas and requested and paid for his transcript be forwarded to UNT Graduate Admission Office. Plaintiff's transcript was lost by the mail carrier. These mail interferences were pretext to interfere with Plaintiff's ability to obtain higher education among other things.

### Incidence in Illinois

85. After years of dealing and enduring blatant abuse outlined above, it became too disrupting, distracting, a waste of time and money, Plaintiff moved to Illinois. Soon after Plaintiff arrived in Illinois, the same type of harassment resumed. In addition, on or about 11/3/06, Urbana, PD entered and searched Plaintiff's apartment under false pretense of doing a wellness check on Plaintiff. In reality, Ette, and his co-conspirators' agent(s) or private investigator stalking, monitoring, and eavesdropping on Plaintiff could not locate Plaintiff because of slight and sudden change in Plaintiff's work schedule. As a result of this sudden change in Plaintiff's work schedule, Plaintiff was not at work on 11/03/06. In a desperate attempt to locate Plaintiff, EMS was called to do a wellness check on Plaintiff. The call to EMS and the wellness check on Plaintiff was a pretext to locate him and it amounted to unreasonable intrusion into Plaintiff's seclusion.

86. On or about 10/26/07, Urbana PD unlawfully entered and searched Plaintiff's residence again. On that day, Plaintiff had just wake up and turned on his light to get ready for work at about 05:00 am when he heard an unusual and very loud banging on Plaintiff's front door. When Plaintiff opened his front door, he saw two Urbana, PD with their gun

20

drawn and pointing at Plaintiff and one of the officers pushed Plaintiff aside, entered, and searched Plaintiff's residence. When Plaintiff asked what was going on, Plaintiff was told that one of Plaintiff's neighbors had called Champaign County Emergency System (EMS) and informed them that Plaintiff was killing somebody in his residence.

87. Later, Plaintiff went to Urbana, PD to get a police report of 10/26/07, incident on the above said unlawful entry and search of Plaintiff's residence. Plaintiff was told that there was no such report. Plaintiff was then referred to the County EMS which gave Plaintiff a call-log related to police calls regarding Plaintiff's residence. The EMS log showed that on 10/25/07, at about 11:00 pm that somebody posing as one of Plaintiff's neighbors called the said EMS and reported suspicious noise coming from Plaintiff's residence. When Urbana PD got to Plaintiff's apartment, Plaintiff's lights were not on and there were no noise coming from Plaintiff's apartment. For Plaintiff was already asleep. Then from 11:00pm on 10/25/07 to about 05:00 am, on 10/26/07, Urbana PD monitored Plaintiff's residence and as soon as Plaintiff wake up and turned on his lights to get ready for work, the officers started banging on Plaintiff's front door; eventually entered and searched Plaintiff's residence. Plaintiff believe that this was a set-up or intentional swatting of Plaintiff which is the harassment tactics of deceiving EMS by hoaxing them into sending a police and other emergency response team to another person's address. Plaintiff is an African American and swatting Plaintiff is equivalent to setting Plaintiff up to be shot by police officer. Based on information, and belief, this was a continuation of intentional and malicious harassment and abuse against Plaintiff by Ette Defendants' respective agents and their co-conspirators' agent(s) or private investigator(s) tracking and monitoring Plaintiff. The said misconduct amounted to unreasonable intrusion and illegal search of Plaintiff's apartment under false pretext among other abuse.

88. According to Schwab's record, Plaintiff notified it of his change of address on or about 6/23/06. Since then, Plaintiff was receiving his regular mails from Schwab except his financial statements. Late January, 2008, Plaintiff received a letter dated 1/25/08, and signed by Howie Kennedy of Schwab thanking Plaintiff for participating in Schwab's Security Loan Program and confirming the term of the loan. Plaintiff had no idea what security loan was. So Plaintiff called 1-800 number included in the said letter. Plaintiff was told in substantial part that Schwab will receive all the appreciation or loss from one of the stock in Plaintiff's Roll-over account and in return Schwab will be paid Plaintiff 2% annual interest (two percent APR) on the total value of the said stock starting from the effective date of the said stock loan program.

89. However, when Plaintiff looked into this Schwab security loan investment offer, he discovered that in order to participate in the said Schwab's security loan, he has to cash-in his Roll-over account, pay 10% (ten percent) early withdrawal penalty, and it will take

21

about ten years (10 years) for Plaintiff to break even. Because Plaintiff will lose money if he invested in Schwab's security loan program and because Schwab's investment offer did not make investment sense to Plaintiff among other things, he declined to invest in Schwab's security loan program.

90. Shortly after Plaintiff declined to invest in Schwab's security loan program, Schwab froze Plaintiff's account. As a result, Plaintiff was not allowed to trade on all his accounts and Plaintiff was losing money because this was during the 2008's down market and stock market was crashing. When Plaintiff called Schwab's agents and requested to know why his account was frozen, Plaintiff received a letter dated 2/19/08, from Schwab, informing him that his accounts were frozen because Schwab did not have Plaintiff's current address on all his accounts. Among other things, the restriction on Plaintiff's Schwab accounts without notifying him of the restriction was retaliation for Plaintiff not investing in Schwab's questionable investment offer and for not cashing out his account in furtherance of Ette and his co-conspirators' scheme to defraud, Plaintiff, impede his access to court, and retaliation against him.

91. The above mentioned, questionable, and unsolicited investment offer from Schwab caused Plaintiff to be concerned about the non-delivery of Plaintiff's financial statements. So, Plaintiff called Schwab and inform them that he has not been receiving his banking statements; but Plaintiff was assured that his statements were being sent to him regularly.

92. On or about 2/13/08, Plaintiff went to Urbana, IL Post Office to inform then that he was not receiving his banking statements. Plaintiff was directed to Champaign, IL Post Office and when Plaintiff got to Champaign Post Office, he was directed back to Urbana, IL Post Office. Again, When Plaintiff got to Urbana, IL Post Office; Plaintiff was referred back to Champaign Post Office. After a while, it became obvious that Plaintiff was being giving the run around.

93. Then Plaintiff went to Urbana, IL PD to see if they could help Plaintiff; but no assistance was offered.

94. On or about 7/31/08, Plaintiff was coming home from a condominium auction and when he got to two intersections he must pass to get to his residence, he saw multiple Urbana, IL PD cars parked at both said intersections. So Plaintiff proceeded cautiously towards the said intersection. Shortly, after Plaintiff past one of the said intersections, Plaintiff was stopped by Urbana, IL PD. Plaintiff was issued three (3) citations: a) for not stopping at a 4 –way stop; b) for not having active auto mobile insurance; and c) for not having a driver license on him. Actually, Plaintiff has active auto mobile insurance on his cars and a driver license but did not have them on him at the time he was stopped; and Plaintiff did stop at the said intersection.

95. On or about 8/1/08, Plaintiff submitted a copy of his active auto insurance card and driver license to Illinois State Attorney's Office and Champaign County Clerk's Office. Plaintiff was informed that he has to appear in court to have at least two citation dropped.

96. On the Traffic court hearing day, Plaintiff was directed to a wrong line and when Plaintiff finally got to the correct court, it was just a few minutes after 9:00 am and Plaintiff was not allowed in. On the same day and immediately after Plaintiff was not allowed in the traffic court, Plaintiff spoke to Champaign County Legal Aid Office which was located next door to the traffic court and in same building. The legal aid agent gave Plaintiff a motion to set aside form which Plaintiff promptly file out and submitted it to the court. The legal aid agent also informed Plaintiff that after filing the said motion to set aside, that traffic court will schedule another hearing.

97. However, as Plaintiff was waiting for the new hearing schedule, Plaintiff received a letter from Illinois Secretary of State, Springfield, IL, on 10/3/08, informing Plaintiff that his driver's license will be suspended on 10/26/08 due to the conviction against Plaintiff for not having active auto insurance. On the same day, 10/3/08, Plaintiff submitted a copy of the said driver license suspension notice and a copy of Plaintiff's active insurance card and driver license to Champaign County Clerk's Office and Illinois State Attorney's Office, Champaign County, Illinois. Plaintiff also reminded them that he had filed motion to set aside the conviction in question. Plaintiff was assured that his driver's license will not be suspended.

98. After about a week, Plaintiff called Illinois State Attorney's Office to inquire about the status of the Plaintiff's driver's license suspension issue and Plaintiff was told that no action has been taken. Then Plaintiff filed a motion for walk-in hearing and Plaintiff did not hear from the traffic court and Illinois State Attorney's Office. So Plaintiff attempted to walk-in into the Traffic court to speak to the Judge, but Plaintiff was allowed into the court. Eventually, Plaintiff driver's license was suspended. Illinois State Attorney's Office and Champaign County Traffic Court suspended Plaintiff's driver's license despite the fact that they had a copy of Plaintiff's active auto-insurance card and Plaintiff's motion to set aside on file. The suspension of Plaintiff's driver's license was a pretext of engaging government's punitive machineries against him, abuse of power, and subjugation of Plaintiff among other abuse in furtherance of the scheme to retaliate against Plaintiff. The suspension of Plaintiff's driver's license imposed undue hardships on Plaintiff, because Plaintiff could not go work and it interfered with Plaintiff's daily activities.

99. However, all the said three traffic citation were later dropped, but defendants, their o-conspirators, and those working in concert with them have succeeded in harassing and

unjustly imposing unnecessary hardship on Plaintiff among other abuse as well as interfered with Plaintiff's ability to buy a condo among others.

100.　　　As Plaintiff was dealing with the above traffic citation issues, he requested copies of Urbana, IL PD's police report on their contact with Plaintiff. When Plaintiff received the said report, he noted that on or about 5/7/08, Officer Shaun Cook of Urbana PD had unofficially contacted his friend Agent Verda of Immigration and custom Services (ICE) and unofficially asked him to look-up Plaintiff's immigration file. In addition, Officer Cook falsely informed Agent Verda that Plaintiff was in United States on work visa. Despite the fact that Officer Cook did not ask Plaintiff any question regarding his citizenship or immigration status. Officer Cook falsely assumed that Plaintiff was in United States on work visa. Officer Shaun Cook and Agent Verda's unlawfully and unofficially accessed confidential government data base to access Plaintiff's information. The access to Plaintiff's information in government confidential data base amounted to unlawful intrusion into Plaintiff's affairs and abuse of power.

101.　　　On or about 7/3/08, Plaintiff bought a car from Honda dealer in Chicago. The car was still under manufacture's warrantee but due to the distance between Chicago and Urbana, IL, Plaintiff could not take his car to Chicago for regular services.

102.　　　On or about 8/20/08, Plaintiff took his car to Walmart Auto for oil change. The attendant instructed Plaintiff to come back in two hours. However, when Plaintiff looked into the oil change area, they were not serving anybody. Then Plaintiff requested to speak with the manager. When the manager arrived, the attendant informed her that somebody claiming to be government agent instruct her not serve Plaintiff. The manager ordered the attendant to serve Plaintiff. This a pretext to continuation of unlawful surveillance (shadowing, following, and eavesdropping) of Plaintiff, unreasonable intrusion, and interference with Plaintiff's business affairs and relationships including interference and frustration of Plaintiff's ability to obtain goods and services from the local community among other things.

103.　　　Early October, 2008, the airbag light in Plaintiff's car started coming on indicating that there may be problem with Plaintiff's airbag. This airbag issue was not related to the airbag recall. So Plaintiff took his car to Twin City Honda Urbana, IL, and they were busy and could not take a walk-in. Then Plaintiff took his car to the nearest Honda dealer-Carmack Honda, Danville, IL. They worked on Plaintiff's car for hours by taking the car apart instead of using computer to diagnose the problem. At the end of their working hour, Plaintiff was told to bring the car back the next day, because they could not find the problem with Plaintiff's airbag. However, because Plaintiff was not happy with their work, Plaintiff did not take his car back to Carmack Honda. Later Plaintiff discovered that there was no record of Carmach Honda working on Plaintiff's car. Upon information and belief, this incident was a continuation of the conspirators' harassment

against Plaintiff, unreasonable intrusion into his private affairs, and interference with Plaintiff's business relationships among other things.

104.     On or about 10/15/08, Plaintiff took his to Twin City Honda for airbag repair and they discovered that Plaintiff's car had a malfunctioning right front impact sensor. However, Plaintiff was instructed to take his back to Carmack Honda, Danville, IL, so that the manufacturer warrantee may cover the work. As stated earlier, Plaintiff was not happy with Carmack Honda and Plaintiff tried many other Honda dealers and Plaintiff was told that manufacturer's warrantee may not cover the work. As the incidents outlined above continued, it became too distracting, a waste of Plaintiff's time and money, Plaintiff Moved to Indianapolis, IN.

105.     As soon as Plaintiff arrived in Indianapolis, IN, similar incident to those outlined above, resumed. In addition, Plaintiff works in healthcare field and at the time, he was working night shift (7:00pm to 7:00am). When he was looking for apartment, he requested a quiet apartment; the reason for this was that Plaintiff works nightshift and sleeps during the day. Then the apartment complex manager assigned Plaintiff to an apartment and Plaintiff liked it.

106.     However, a few months later, the apartment manager assigned her handyman an apartment next door to Plaintiff's apartment and she also assigned the handyman a garage right under Plaintiff's bedroom. The handyman stored his tools in the garage and he was always the apartment complex throughout the day. Also, the handyman comes in out of his apartment and garage every few minutes to gets his tools throughout the day. The noise from the handyman opening and closing his garage and from his ATV interrupted Plaintiff's sleep during the entire day. Moving the apartment's handyman next door to Plaintiff and assigning him a garage under Plaintiff's bedroom was among other things, a pretext to covertly and stealthily harass, frustrate, and to stress out Plaintiff as well as to deprive him of sleep among other abuse; and it amounted to unreasonable intrusion and harassment among other things. The apartment manager's conduct suggests that she was working in concert with Ette and his co-conspirators among other things to harass and abuse Plaintiff.

107.     As stated earlier, Plaintiff works long hours and his shifts are not structured. In other words, Plaintiff did not cloak-in by 7:00 pm and clocks out by 7:00am. Sometime when the hospital is busy, when we are short of staffs, or during emergencies, Plaintiff may work anywhere from a few minutes over time to double shift. So when Plaintiff got home late and have just a few hours to sleep before he goes back work, the handyman invariably will park his car or ATV in front of Plaintiff's garage as a clock work or as if somebody was alerting him when Plaintiff was on his way home. So Plaintiff had to look for the handyman to get him to move his vehicle so that Plaintiff may enter his garage. For the parking space in the apartment complex was very limited and assigned. This

type of minor annoyance over time becomes objectionable and frustrating and a form of harassment intimidation against Plaintiff in furtherance of Ette and his co-conspirators' scheme among things. Also a continuation of using those Plaintiff has relationship with to abuse Plaintiff among other things.

108.    Plaintiff spoke to the handyman and the apartment manager verbally in multiple occasions regarding the said harassing activities to no avail. Then Plaintiff filed a written complaint with the apartment and the harassment activities eased a bit. However, after Plaintiff renewed his lease, the harassing activities intensified. If Plaintiff has an important event or test the noise and the harassment activities will intensified indicating that the harassment was not a coincident and were calculated to have maximum negative impact on Plaintiff among other things.

109.    The apartment charges each tenant a $200.00 one-time administration fees which Plaintiff paid with a credit card. But a few months later, the apartment's manager called Plaintiff and informed him that his credit card company did not pay them the said administration fee. So Plaintiff showed the manager his credit card bill which included the said administration fees; the manager insisted that they were not paid. Then Plaintiff was forced to pay another $200.00 administration fees to avoid eviction. It took several months of Plaintiff demanding the refund of the said $200.00 before it was credited towards Plaintiff's rent. This was a pretext to frustrate and exploit Plaintiff among other things.

110.    As the harassment continued, Plaintiff filed a written complaint with apartment management on 12/8/09, and Plaintiff received no response. On 7/21/10, Plaintiff wrote to the Regional Manager again to no avail. Then Plaintiff requested to be transferred to another unit and Plaintiff was told that there is no vacant unit available. Then Plaintiff filed a harassment complaint with Indiana Civil Rights Commission (ICRC). On or about 12/7/10, ICRC closed Plaintiff's complaint and informed Plaintiff that the apartment management stated that it will better for Plaintiff to move out at end of his lease. On or about 12/31/10, at end of Plaintiff's lease, Plaintiff finds another apartment. However, when the prospective apartment called Plaintiff's landlord, the landlord informed Plaintiff's potential landlord that Plaintiff did not give them notice that he will be moving out. Despite the fact that the move out was an agreed settlement. As a result, Plaintiff lost his new apartment and had to pay his landlord extra $200.00 month to month fee each month until 3/1/11. Again, this was a e continuation of ongoing, systematic, pattern and practice of harassing and interfering with Plaintiff's business and other relationships that started at least in 1996 and continue to this day.

Series F

Continued Impediment to Plaintiff's Access to Court and Retaliatory Termination by St. Vincent

St. Vincent Hospital0188

111.     At all times material to this action, Plaintiff was employed by St. Vincent Hospital Indianapolis as a patient care manager from approximately 2008 to 2010. Ms. Shultz was the Associate Director that oversees the unit where Plaintiff worked.

112.     As outlined in this complaint, Plaintiff has suffered and continues to suffer this ongoing and prolonged campaign of harassment, intimidation, subjugation, and other abuse and deprivations since at least 1996. Plaintiff moved a couple times to avoid the abuse to no avail. Late 2009, Plaintiff filed a lawsuit against US Postal Services, Schwab, and others asking the court for retraining order to end the said abuse against him among other reliefs. Unfortunately, Plaintiff's complaint was dismissed due defective pleading on or 1/13/10.

113.     Because Plaintiff could not find a lawyer to take his case due to Defendants and their co-conspirators' interference with Plaintiff's ability to retain a counsel. Early 2/10, Plaintiff requested a few days' vacation to prepare and filed appeal of the dismissal of his motion for a court appointed counsel. Shultz was reluctant to approve the said Plaintiff's vacation request. So on or about 2/15/10, which was the last day any change could be made on March, 2010, work schedule, Plaintiff spoke to Shultz and informed her that he really needed the said vacation he requested to deal with some legal issues. Plaintiff also called St. Vincent's Employees' Legal Referral Services and requested to be referred to a civil right attorney and Plaintiff told that they did not have civil right attorney in the area. Eventually, she approved the vacation and Plaintiff went on vacation.

114.     On or about 3/10/10, Plaintiff filed the said appeal of the dismissal of his motion for a court appointed counsel; at the time, it appeared that the court of appeal will revive Plaintiff's complaint by appointing him a legal counsel.

115.     Plaintiff returned to work as scheduled on 3/15/10, and immediately, Shultz demanded that Plaintiff sign a document stating that Plaintiff was not meeting his job requirement and if he did not sign it that his employment with the hospital will end. Because Shultz demand was not consistent with St. Vincent's employee coaching or Performance Improvement Program, Plaintiff reported the incident to the Hospital Personnel Dept. Shortly thereafter, Plaintiff, Shultz, personnel staff, and others meet to discuss Shultz demand. After the meeting, Plaintiff felt compelled to signed an amended version of the said document in order to keep his job and Plaintiff was involuntarily transferred to another floor also manage by Shultz.

116.     Plaintiff later learned that when he was on the said vacation preparing the said appeal, Shultz had demanded that each employee in the unit write up and submit to her whatever each one them though that Plaintiff did wrong since the beginning of his employment with hospital-fishing for a reason to terminate Plaintiff which exposed

27

Plaintiff's job performance issues to the entire staff among other things. In so doing, Shultz unreasonably placed in false light, exposed Plaintiff's confidential personnel issue to the entire staff and degraded Plaintiff among other things.

117.    Eventually, Plaintiff was transferred to the new floor and Plaintiff was placed on training through the week-end shadowing his trainer (preceptor); he has not assumed responsibility of any patient. Then the following Monday, Shultz returned to work and immediately called Plaintiff's trainer (preceptor) into her office. After the meeting, Shultz again unjustly accused Plaintiff of poor job performances. Again, this accusation was not consistent with St. Vincent employee training program. St. Vincent's training program is done in an organized and objective manner. For example, if somebody is being trained on how to insert intravenous catheter (IV Cath), that person will be trained on how to introduce herself to the patient, verify patient's identity, explain the procedure to patient, and obtain informed consent if necessary among others both academically and in practice. She will observe somebody insert IV cath., practice how to insert IV Cath, and then her preceptor will observe her insert IV in actual patient. If the individual failed to properly insert the IV catheter, he or she will be corrected in the deficient area. Then the preceptor will sign skill competency checklist to certify the trainee satisfactorily performed each task associated with inserting IV cath. or failed to accurately perform each task related IV cath. insertion; and document it on file. See exhibit "W". Thus Shultz accusing Plaintiff of poor job performances during training is a pretense to harass and to find a reason to terminate Plaintiff among other things. In other words, Shultz was constructively manufacturing reason to terminate Plaintiff among other things.

118.    The next day, before Plaintiff was scheduled to start his shift, he called the hospital personnel dept. and requested to report the previous day's incident to them. However, Plaintiff was informed that nobody was available to speak with him. Throughout that day, Plaintiff called and visited the hospital's personnel dept. and in each occasion, he was informed that nobody was available to speak with him. So Plaintiff called in sick that day. The next day, Plaintiff repeated the process again and in each occasion, Plaintiff was informed that nobody was available to speak with him. Then Plaintiff called in sick again and them Plaintiff was eventually terminated. It appeared that the hospital has made up its mind to constructively terminate Plaintiff. St. Vincent termination of Plaintiff violated 18 USC section 1513 (retaliation against witness or party to federal judicial proceedings), 42 USC 1981, and Title VII among other violation among other abuse.

119.    Upon information and belief, Ette and his co-conspirators, Shultz, and other unknown St. Vincent's agents' sequence and systematic pattern of conduct suggest that the termination of Plaintiff was a continuation, pursuant to, and in furtherance of the

conspirators' scheme and objectives.  For each time Plaintiff makes effort to seek justice or to extricate himself from the conspirators' abuse, the conspirators will invariably take action to thwart or counter, and or to punish Plaintiff for making such efforts among other abuse.

### Hostile Work Environment

120.     As outlined above, between February to March, 2010, Shultz's conduct unreasonably subjected Plaintiff to subjectively, objectively, and unwelcomed hostile work environment by a) demanding that Plaintiff sign a document indication that Plaintiff was not meeting his job requirement; b) threatening termination of Plaintiff; c) falsely accusing Plaintiff of poor job performances; d) involuntarily and constructively transferred Plaintiff; e) involving the entire staff with Plaintiff's confidential personnel issue thereby causing Plaintiff to be isolated, ostracized, humiliated, placed in false light, and undermined his ability to manage and delegate to his subordinates and trust of other team members among other things.  These conditions unreasonably interfered with Plaintiff's ability to do his job among other things.

121.     Defendant St. Vincent's actions outlined above amounted to employment discrimination due to Plaintiff's race, and national origin, as well as retaliation among other things.  In other words, Plaintiff engaged in an activity protected under Title VII and St. Vincent took adverse action against him.  There was a causal connection between Plaintiff's participation in the protected activity and the adverse action as well as connection between the adverse employment action against Plaintiff and Ette and his co-conspirators' effort to impede Plaintiff's access to court or justice and retaliation against him for seeking justice.  In addition, if Plaintiff did not participation in the said protected activity, St. Vincent would have taken adverse action against him.

122.     The unlawful employment acts complained of and actions of Defendant St. Vincent and / or through its agents were willful, wanton, intentional, and with malice or reckless indifference to Plaintiff' statutorily protected right, entitling him to damages in form of compensatory and punitive damages pursuant to Title VII and 42 USC section 1981 among others to punish Defendant for its actions and deter it and others from engaging in such action in the future.

123.     Furthermore, Plaintiff's psychological well-being was and continues to be affected because of false accusation involving job performance issues is stigmatizing to Plaintiff and damaging to his reputation.  Defendant denied Plaintiff the opportunity to clear his name refusing to allow him to enter grievance process.  Plaintiff is now suffering and will continue to suffer, irreparable injuries from defendant unlawful conduct as set forth in this complaint for which Plaintiff is entitled for relief.

**Series G**

**Harassment and Intimidation against Plaintiff Continued**

124.    Even after Plaintiff was terminated, defendants continued to stalk Plaintiff and use their knowledge of his activities gained from the said surveillance to harass, intimidate, exploit, interfere, and preempt Plaintiff from potential employment, business, social, and even family relationships among others. See example below for details.

125.    When Plaintiff moved to another apartment in Indianapolis, IN, similar harassment and abuse against Plaintiff outlined above continued in the new apartment. In addition, on or about 2/28/11, Plaintiff moved into a new apartment in Indianapolis. On or about 3/1/11, the lock to Plaintiff's mail box was removed. Plaintiff reported it to the apartment complex management. Plaintiff was told that United States Postal Services was responsible for mail box repair. However, when Plaintiff got to the US Postal Services, he was told that the apartment complex was responsible for their mail box. Then Plaintiff went back to the apartment complex management and it took a very long time before the said lock was replaced. The removal of Plaintiff's mail box was a pretext for the real reason which was a continuation of the harassment and frustration of Plaintiff's daily activities among other things.

126.                                                                                        In

In Indianapolis, IN, Plaintiff attempted to resume his graduate education, but the said defendants' interference, harassment, intimidation, and exploitation among other abuse made it impossible.

127.                                                                                        On

On or about 5/12/12, Plaintiff discovered a peep-hole device in his garage door-a stalking device capable of being equipped with camera or other stalking device. This peep-hole was not there when Plaintiff move-in. Also Plaintiff checked the entire garage in the apartment complex and none of the apartment unit had a peep-hole device. Upon information and belief, the peep-hole device was being used to monitor and eavesdrop on Plaintiff in his apartment. Then Plaintiff requested that apartment remove the said peep-hole device be removed which the apartment did. However, Plaintiff was concerned for his safety and he felt violated in his own home. Because of Plaintiff's concern for his safety and the safety of his family, given this ongoing stalking, organized and prolonged campaign of harassment, intimidation, and exploitation among other abuse against him, Plaintiff moved to Virginia.

128.    Again, as soon as Plaintiff arrived in Virginia, similar harassment and abuse outlined above resumed. Plaintiff moved into S & S Properties' apartment on 7/7/12, and S & S Properties demanded that Plaintiff give them a copy of his bank statement. Plaintiff offered to give S & S Properties a letter from his bank stating that he has enough

money to cover at least two years of rent; but S & S Properties demanded Plaintiff's actual bank statement. So Plaintiff gave S & S Properties a copy of his bank statement because Plaintiff needed a place to live desperately at the time and Plaintiff paid application fees and deposit with money order.

129.     On or about 7/7/12, Plaintiff paid his first month's rent with a personal check and S & S Properties deposited it into its bank unbeknownst to Plaintiff. On 7/10/12, S & S Properties demanded that Plaintiff pay his July rent with money order on the pretense that S & S Properties does not accept personal check as first month's rent.   It was not true that S & S Properties does not accept personal check as first month's rent; it was among other things, a pretext to defraud, harass, exploit, and to take advantage of Plaintiff and a continuation of using local businesses that Plaintiff has relationships with to exploit and harass Plaintiff. On the same day (7/10/12), Plaintiff issued S & S Properties $1,195.00 money order and again, S & S Properties deposited it into its bank. On or about 7/11/12, Plaintiff asked S & S Properties to return his personal check to him and S & S Properties informed Plaintiff that his personal check has been deposited into its bank. S & S Properties informed Plaintiff that his rent over payment will be refunded to him when his check cleared in a couple of days. About a week later, Plaintiff again, asked for the refund of the said rent over payment and he was told that his check has not cleared. Later, Plaintiff made multiple request for the refund of the said check to no avail. The refusal of S & S Properties to refund Plaintiff his money was among other things, a pretext to defraud Plaintiff among other things. Because Plaintiff's personal check was not returned until the end of the month, Plaintiff allowed S & S Properties to credit the said rent double payment to Plaintiff's following month's rent. However, paying over $2,000.00 or double rent in one month caused financial hardship on Plaintiff.

130.     A few weeks after Plaintiff moved into S & S Properties, he started hearing constant and unusually high pitched sound of running shower or flush that appeared to be coming from his neighbor's apartment 24 hours a day and seven days a week. This said noise prevented Plaintiff from sleeping, relaxing, and distracted him 24 hours a day and seven days a week among other distractions. Plaintiff repotted the said constant noise to S & S properties multiple times to no avail.

131.     After Plaintiff reported above said constant noise to S & S Properties in multiple occasions, the apartment's handyman entered Plaintiff's apartment to fix the problem. After the handy claimed that the said noise has been repaired, each time Plaintiff enters his bathroom, exit, or enters his apartment, getting in and out bed, or doing something that requires concentration among others, the said sound of high pitch shower or flush will resume again. Based on Plaintiff's experiences, this constant noise was a pretext to among other things, to psychologically torture Plaintiff each minutes of the day in order to disorient him, induce fear and helplessness in him, distract and disrupt his litigation

activities as well as to stress him out among other things. In so doing, defendants made it difficult for Plaintiff to focus on his efforts to extricate himself from defendants' abuse among other things.

132.     As the said noise continued and S & S Properties did not do anything to stop it, Plaintiff reported it directly to S & S Properties' manager. The manager instructed Plaintiff to go to the Police.

133.     On 9/12/12, Plaintiff went to Senator Web's office for assistance in this ongoing exploitation, harassment, and abuse against him. Because Senator Web will be retiring in a few months, Plaintiff was instructed to submit a written complaint to Senator Warner's Office. Later that day, as Plaintiff was preparing to write the said complaint, he discovered that his computer and printer will not turn because both have been damaged. Again, Plaintiff felt vulnerable and violated because he was being stalked, followed, tracked, and eavesdropped on among other stalking tactics and they are using their knowledge of Plaintiff's activities gained from the said stalking to interfere with his ability to seek justice. The conspirators conduct amounted to obstruction of justice and unreasonable intrusion into Plaintiff's affairs among other things.

134.     As stated previously, Honda manufacturers' warranty has refused to cover the repair of Plaintiff's airbag even though, Plaintiff's car was still under manufacturer's warranty. This airbag issue is not related to Honda's airbag recall. On or about 11/12/12, Plaintiff took his car to Bill Page Honda, Fairfax County, VA, for the airbag repairs. Bill Page Honda informed Plaintiff that they diagnosed and replaced malfunctioning right impact sensor. Again, Honda manufacturer's warranty refused to cover the repair and Plaintiff was charged $200.00 for the repair. However, Plaintiff was told that the airbag light could not be cleared because Plaintiff's battery was low and Plaintiff was instructed to bring his car back after he buys a new battery.

135.     On or 11/28/12, Plaintiff bought a new battery and took his car back to Bill Page Honda to have them clear the said airbag's light. Bill Page Honda worked on Plaintiff's car and when they finished with the repair, Plaintiff was called to the services desk. He was informed that his airbag light has been cleared at no charge. Then, Plaintiff signed the work order ticket and he was given his key back. Plaintiff's car was brought to customers' waiting area.

136.     However, as Plaintiff was about to enter his car, he was approached by one of Bill Page Honda's mechanics and informed that his car has to be taken back to the garage to finish one thing. Then Plaintiff's car was taken back to the garage. Shortly thereafter, Plaintiff's car was brought to customers waiting area and Plaintiff was informed that his airbag light could not be cleared because the car needed SRS control among other things. It is highly unusual to informed Plaintiff that his airbag light has been cleared at no charge and later informed that he needed SRS control among other things. This was a

pretext for the real reason which was among other things, the defendants' continuation of teir tactics to frustrate Plaintiff and interfere with his business relationships among abuse interference.

137.    On or about 1/29/13, Plaintiff went to Fairfax Police Dept. for assistance. Although, no assistance was given to Plaintiff, but when he got home, his water has been turned off. Also, on 8/6/13, Plaintiff went to Human Rights Watch for assistance and when Plaintiff got home his water has been turned off again. The interference with Plaintiff's water service is again, a pretext to the continuation of the said punishment against Plaintiff for seeking assistance from the police and advocates groups among other things.

138.    On On or about 7/20/13, Plaintiff filed a complaint against Honda with Fairfax County Dept. of cable and customers' Services (County government office that deals with public complaint against local businesses in Fairfax County). After Honda responded to Plaintiff's complaint, Honda agreed to refund Plaintiff $280.00-the money Plaintiff had paid to Honda to repair his airbag light while Plaintiff's car was under warranty. However, Honda still refused to repair Plaintiff's airbag. On or 9/19/13, Plaintiff called Fairfax County Cable & Customer Services and informed them what Honda said and Plaintiff was instructed to file another complaint against Honda. On 9/20/13, Plaintiff discovered that the clutch to his car has been damaged and the damage appeared to be a deliberate act. The damage to Plaintiff's car was a pretext to harass and intimidate Plaintiff as well as to silence him for filing the said complaint among other things.

139.    As the said harassment and interference with Plaintiff's affairs continued, on or about 1/18/14, Plaintiff filed a complaint with Fairfax County PD's Internal Affairs Dept. because Fairfax County PD has refused to offer any assistance to Plaintiff. Following this complaint, Plaintiff met with two Fairfax County PD Internal Affairs personnel.

140.    At the meeting, Fairfax County PD Internal Affairs informed Plaintiff that a family member of his had informed them that Plaintiff was getting financial support from questionable sources. This allegation is false. Plaintiff is not getting financial support from anybody questionable or otherwise. This was a pretext to thwart the investigation of the conspirators' unlawful acts, defamed Plaintiff, and dehumanized him among other things. It worked. Because Fair Fax County PD declined to investigate Plaintiff's complaint.

141.    To prove that Plaintiff was/is not getting financial support from any questionable or unquestionable sources, Plaintiff attempted to make an appointment with Fairfax County PD Internal Affairs in order to show them his financial record. However, Plaintiff was referred to the Dept. Homeland Security.

142.     On or about 10/23/14, Plaintiff wrote DHS's Civil Rights & Civil Liberty Dept. and he received a letter dated 12/22/14, informing him that they have no jurisdiction over Plaintiff's concerns.

143.     As the constant noise and other harassment against Plaintiff continued in Plaintiff's apartment, on or about 10/23/14, Plaintiff wrote Fairfax County Board of Supervisor Chairwoman (Mayor of Fairfax County), asking for her assistance and to look into Plaintiff's complaint. However, before the Chairwoman could respond to Plaintiff's request for assistance, S & S Properties (Plaintiff's landlord)'s handyman entered Plaintiff's apartment on 10/30/14, to repair the said noise in Plaintiff's apartment. However, after the repair, the noise in Plaintiff's bathroom changed from intermittent to constant sound of running water.

144.     On or about 3/9/15, Plaintiff wrote a follow-up letter to Fairfax County Board of Supervisor Chairwoman regarding Plaintiff request for assistance. For the Chairwoman has not responded to Plaintiff request for assistance. On or about 3/12/15, S & S Properties posted a flyer in the apartment complex informing the tenants including Plaintiff that any car parked in the apartment's parking lot without Virginia tag will be towed at the owner's expenses. This sudden packing lot enforcement just three days after Plaintiff wrote a follow-up complaint letter to the Chairwoman was a pretext designed to punish Plaintiff for filing the said complaint and a continuation of retaliation against Plaintiff. For Plaintiff was the only person with out of state tag and Plaintiff has been parking his car on the apartment's packing lot for over a year without any issue.

145.     On or about 3/31/15, Plaintiff asked S & S Properties to delay the said parking enforcement to give Plaintiff time to transfer his car registration to Virginia and S & S Properties declined Plaintiff's request immediately. Because of the prolonged mafia-like covert and overt harassment, intimidation, interference with Plaintiff's civil rights, and civil liberties outlined above as well as Plaintiff's inability to access the court meaningfully or extricate himself from the abuse, Plaintiff moved to Iowa.

146.     As soon as Plaintiff arrived in Iowa, similar incidents outlined above resumed. In addition, on 8/11/15, Plaintiff was staying in a hotel in Des Moines, IA area. At about 9:30 am, Plaintiff was searching for apartment using the hotel's internet; all of a sudden the internet and phone system stopped functioning. The hotel's phone and internet system were down all day. As a result, Plaintiff's apartment search was derailed for the entire day and Plaintiff had to incur more hotel and related expenses. The interruption of the hotel's internet and phone systems were a pretext calculated to frustrate, hinder, and undermined Plaintiff's apartment search among others things.

147.     Plaintiff had rented a storage space from Public Storage in Virginia, to store his belongings while he was looking for apartments in Iowa. There is no Public Storage location in Iowa. Thus Plaintiff paid his Public Storage rent via check (Plaintiff give then

his checking account and routing number and authorized a payment of $163.00) at the suggestion of Public storage representatives. Public Storage did not present the said check for payment. Instead, Public Storage charged Plaintiff $28.00 late payment fees and a $25,00 insufficient fund charge. Public Storage failure to present the said check for payment was a pretext to among other things to frustrate and inflict emotional distress on Plaintiff by inflating the said Public Storage rent among others.

148.      About early September 2015, Plaintiff received a flyer from CenturyLink offering discounted internet connection services. So Plaintiff called the number on the flyer. Plaintiff was offered internet services for $14.95 a month for the first six months and after that $29.00 a month thereafter. However, when Plaintiff received his CenturyLink internet bill, it was almost three times the quoted internet bill. Plaintiff called CenturyLink to question his internet bill. Then CenturyLink customers' service representative informed Plaintiff that he was not familiar $14.95 offer. But if Plaintiff set up automatic payment that his monthly internet service bill will be $20.00 a month for a year. Because automatic payment will take time to initiate, Plaintiff was also told to pay one-month internet bill ($20.00) in advance.

149.      On 10/16/15, Plaintiff paid his CenturyLink $110.00 internet service bill. This payment includes one-month advance payment. On 10/27/15, Plaintiff reported these ongoing harassment incidents against him to West Des Moines Police Dept.  When Plaintiff got home the same day (10/27/15), his internet service has been disconnected. Then Plaintiff called CenturyLink and asked them why his internet service was turned off.  Plaintiff was informed that his internet services were disconnected for non-payment of his bills. Plaintiff reminded the CenturyLink Customers Representative that Plaintiff had paid his bill on 10/16/15, at 1:15 pm at cashier number sxg102167. Then Plaintiff was told that CenturyLink has no record of his payment and Plaintiff submitted a copy of his receipt to CenturyLink. On 11/4/15, Plaintiff went to CenturyLink kiosk located in Marle Hay Mall, Des Moines, IA, to inquire if his payment record has been found. Plaintiff was told that their computers and internet were down just about 5 minutes before Plaintiff got there.  The disconnection of Plaintiff's internet connection was among other things, a pretext to punish Plaintiff for reporting the abuse against him to the police. This retaliation and harassment against Plaintiff is a reoccurring pattern and practice of the defendants and their co-conspirators mafia like attempt to silence and punish Plaintiff for his efforts to seek justice or extricate himself from defendants' abuse among other things.  In effect, if Plaintiff takes action "A" to seek justice or extricate himself from the defendants' abuse, the defendants invariably take action "B" to counter and punish Plaintiff for making such effort among other things.

150.      On or about 9/15/15, Plaintiff went to one of his bank's branches in the area to rent a safe deposit box because his residence has been unlawfully entered in multiple

occasions.  Plaintiff was told that they did not have the box size he was looking for.  Then asked the bank attendant if she could call other branch to find out which location has the correct box size Plaintiff was interested in.  Then Plaintiff was given the address to the branch that has the box size he was interested in.  However, when Plaintiff got to the said address, it was an Automatic Teller Machine (ATM)'S address.

151.    On or about 10/15/15, Plaintiff went to Parish Law Firm to inquire if the law firm could represent him.  After Plaintiff was interviewed, he was told that it will be a couple of days for them to make a decision.  On or about 9/21/15, Plaintiff went to Parish Law Firm to find out if they were going to take his case and he was told that Chris was not available to speak with Plaintiff.  However, that day, Parish law called Plaintiff's bank and informed then that Plaintiff was planning to sue them.  Parish Law Firm did not take Plaintiff's case.

152.    Also on 9/15/15, Plaintiff visited Charles Schwab, Des Moines, IA, location to inquire if it was okay for him to transfer his accounts back to Schwab and to determine the specifics process, any issue that may impact the said transfer, and to know how long the transfer will take.  Plaintiff was told that it was okay and that it will take a couple of days.

153.    On or about 9/20/15, Plaintiff spoke to Schwab representatives in Indianapolis, IN, about transferring his accounts to Schwab again and Plaintiff was told that it was okay to transfer his accounts back to Schwab.  Then on the same day, Plaintiff transferred his account to Schwab, Des Moines, IA location.

154.    On or about 9/21/15, Schwab wrote Plaintiff a letter welcoming him back to a Schwab and confirming his log-in ID set-up.  On 9/23/15, Schwab wrote Plaintiff informing him to contact Schwab within 30 days to verify certain information.  Also on the same day (9/23/15, Schwab wrote Plaintiff to inform him that his accounts were restricted and closed.  In addition, Schwab ordered Plaintiff to liquidate his accounts immediately.

155.    On or about 9/28/15, Plaintiff went to Schwab's branch in Des Moines, IA to make a trade.  At the time Plaintiff has not received the above mentioned Schwab letters and was unaware that his accounts has been frozen and close.  When Plaintiff got to Schwab office, he was unable to log-in into his accounts.  So Plaintiff spoke with Schwab's agent at the front desk to find out why he, (Plaintiff) was unable to log into his accounts.  Then Schwab's agent on the front desk called another individual who spoke to somebody on the phone.  Eventually Plaintiff was informed that his accounts have been frozen and closed and that all they can do was to mail him a check equal to the value of the stocks in his accounts.  Plaintiff pleaded with Schwab agents to give him at least a week to transfer his accounts; in so doing Plaintiff will be able to trade, orderly transfer his accounts to another institution, avoids tax implications, unnecessary loss of

investment opportunity and early withdrawal penalty among other things. But Schwab insisted that Plaintiff must liquidate his accounts immediately. At the same time, Schwab's agent accused Plaintiff of never traded a stock in his life and that Plaintiff was hiding his ill-gotten money in his Schwab accounts. Schwab accusation was not true; it was a pretext to continue their systematic pattern and practices of interference with Plaintiff's business relationships, effort to defame, frustrate, dehumanize, and harassment against Plaintiff among other things. For Schwab has been Plaintiff's stock broker since late 1980's or early 1990's. Thus to avoid unnecessary incident, Plaintiff walked away from Schwab's office and let Schwab and its agents do whatever they wish to Plaintiff's accounts. About a week letter, Plaintiff transferred his accounts to another institution.

156. Plaintiff moved into an apartment in Iowa, in mid-September, 2015. Shortly thereafter, the systematic pattern of harassment and abuse Plaintiff experienced in his previous apartments resumed in Iowa. For example, when Plaintiff moved in into the said apartment complex, his apartment was not cleaned. Plaintiff had to borrow cleaning tools such as broom from Warren Properties Handyman to clean his apartment.

157. Each time Plaintiff goes to the bathroom, enter/exiting his apartment, getting in or out of the bed every morning and evening, or Plaintiff is doing something that requires concentration, if he goes to the bathroom in the middle of the night among others things, a loud thump, furniture dragging, or full blast of running water or the like noise will start coming from Plaintiff's neighbor side of the apartment to annoy, distract, and constantly interfere with Plaintiff's ability to peacefully and quietly enjoy his home. The said noise was a continuation of Defendant's respective agents and their co-conspirators' efforts designed to frustrate, harass, intimidate, torture, and induce helplessness in Plaintiff as well as to distract him and remind him that he is being watched among other things.

158.     When Plaintiff opened a bank account in Iowa, Defendant Brennan through her agent, US Postal Services resumed her interference with the delivery of Plaintiff's bank statements. This time, instead of not delivering Plaintiff's mails containing his bank statement outright, Plaintiff's properly addressed bank statement will be returned to the sender and marked, "return to the sender unable to deliver as addressed." For example, on or about October, 2015, Plaintiff learned that his mails containing his bank statements were being returned to the sender and marked return to the sender, undeliverable as addressed. Despite the fact that the said mails were properly addressed and stamped. Plaintiff complained orally to the US Postal Services in Urbandale, IA, to no avail. On or about 12/26/15, Plaintiff submitted a written complaint to the US Postal Services and again, Plaintiff received no response. This continued interference with the delivery of Plaintiff's bank statements were a pretext for the conspirators to continue to have access to how much money Plaintiff has which they continue to use to perfect their scheme defraud Plaintiff among other things.

159. On or about 10/27/15, Plaintiff reported above incidents to West Des Moines, IA PD and Officer Eric Danielson met with Plaintiff. Plaintiff told him what has been happening since he moved into his current apartment in Iowa and the Officer stated that maybe someone has hired private investigator to harass Plaintiff. Officer Danielson instructed Plaintiff to write down what was happen to him (Plaintiff) and the time it happened for about a week and bring it to him. However, after a week, Plaintiff went back to Officer Danielson, but he was no longer interested.

160. On or about 5/6/16, Plaintiff was on a line to pay for his groceries in Aldi's Groceries' checkout counter. As Plaintiff approached the cashier, a female Aldi's employee whispered something to male cashier who will be attending to Plaintiff. After Plaintiff paid for his groceries, he was stopped by the cashier and asked to open his backpack; and Plaintiff's backpack was search for any stolen groceries items and no stolen item was in Plaintiff's backpack. However, Plaintiff was embarrassed, humiliated, and everybody going through the checkout was looking at Plaintiff as he had stolen grocery item. There were many shoppers with backpack and large purses and none of them was searched. As stated earlier, defendants stalk Plaintiff and use their knowledge of his movements to interfere and sabotage Plaintiff's business relationships among others abuse. Thus Searching Plaintiff's backpack and events outlined above were a pretext to among other things, harass, intimidate, and to frustrate Plaintiff in order to distract and disrupt his efforts to seek justice or extricate himself from the ongoing abuse against him. As stated previously, Defendants' respective agents and their co-conspirators have Goliath like advantage in power and influence as well as federal government's authority as agents of federal government among other things. They used and continue to use this advantage in power and influence to interfere with Plaintiff's relationships and affairs among other things.

161. Late 2016, Plaintiff went to Iowa Civil Rights Commission seeking assistance and Plaintiff was given a list of advocate groups that offer legal assistance in the area. One of the advocate groups on the list was Polk County Bar Legal Assistance Outreach located in a church. On or about 12/23/16, Plaintiff went to the said church to inquire about the time and requirement for the said legal assistance. When Plaintiff got to the said church, it was closed. Then Plaintiff left for grocery. However, the next day, Dept. of Homeland Security (DHS) announced that terrorists were planning to attack churches in United States. Plaintiff was concerned because this maybe a pretext to continue to fabricate false accusation against him to create legal problem for him, defame, put him in false-light (create false impression of Plaintiff), dehumanize, and maintain control over him among other things. For example, previously, Plaintiff has been falsely accused of being in United Sates unlawfully, getting financial support from questionable sources, and of poor

job performances among other things.  In so doing, they falsely justify their misconduct, cover-up their unlawful acts, and evade liability among other things.

162. On or about 12/28/16, Plaintiff travelled from Iowa to Indianapolis, IN, to file complaint with EEOC.  Plaintiff stayed in a local hotel in Indianapolis on 12/28/16, and planned to go to EEOC the next day.  At the hotel, Plaintiff went to bed at about 10:00pm.  But shortly thereafter, loud noise appeared to be from the next room prevented Plaintiff from sleeping; as the noise continued, at about 1:00 am, Plaintiff requested to be transferred to another room and Plaintiff did not have any problem in the said new room.  The said sleep deprivation was a pretext to distract and disrupt Plaintiff's complaint with EEOC-interfere and render his complaint ineffective.

163. On or about 12/29/16, Plaintiff went to EEOC office to file a complaint and Plaintiff got to EEOC at about 02:00 pm.  EEOC attendant informed Plaintiff that he, (Plaintiff) had only ten minutes to complete the complaint form in order to be interviewed that day. Then Plaintiff informed the EEOC attendant that ten minutes may not be enough for Plaintiff to complete the said EEOC complaint form.  Then the attendant informed Plaintiff to come back the next day before 02:00 pm.

164. The next day, 12/30/16, Plaintiff went to EEOC and he got to EEOC by about12:00 pm, with a completed EEOC complaint form.  Plaintiff was instructed by the EEOC attendant to sign-in and wait to be called.  At about 12:30 pm, Plaintiff was told that nobody was available to interview him and Plaintiff informed the attendant that he, (Plaintiff) came all the way from Iowa to file the complaint and had no  place to stay.  The attendant insisted that nobody was available to interview him and he was instructed to come back on Tuesday.  Thus the conspirators succeeded in sabotaging Plaintiff's complaint with the EEOC.

165. As Plaintiff was writing this complaint which he filed with this court on 5/22/17, his printer freezes up (stopped functioning).  So Plaintiff started using public computer at public library.  Also on or about 3/17/17, Plaintiff went to Drake University to print the said complaint and their printers were not working either.  Plaintiff has about three printers and multiple computers that stopped functioning when Plaintiff was working on issues related this matter.  This continued malfunctioning of Plaintiff's printers or computers as Plaintiff work on issues related to this matter is a pretext to frustrate, hinder, or sabotage Plaintiff's efforts to seek justice or extricate himself from defendants' abuse among other things.

Series H

Continued Impediment to Plaintiff' Access to Court

166. On or about 5/22/17, this court received Plaintiff's complaint with three (3) copies of each item Plaintiff filed with the court that day-summons, complaint, motions, and

attachments among others items as well as a postage paid self-addressed priority mail envelop # 9505-5117-8124-7140-1253-36. On or about the same day, 5/22/17, this court mailed Plaintiff his complaint, summons, and other items which Plaintiff was going to serve the Defendants, including Defendant Brennan via US Postal Services. However, Defendant Brennan through her agent, US Postal Services did not deliver this mail to Plaintiff.

167. Then on 6/5/17, this court received a letter from Plaintiff informing the court that Plaintiff did not receive summons, complaint, or any other item from the court and that the tracking number to the priority mail envelope Plaintiff provided to the court has not entered into US Postal Services' tracking system. Again on the same day, 6/5/17, this case's docket indicated that properly addressed mail containing summons, complaint, and other items sent to the Plaintiff by this court was returned to the court (docket 11) by Defendant Brennan through her agent, US Postal Services. According to the court, the said mail was marked, "return to the sender," unable to forward as addressed." Then according to the court, another copy of complaint, summons, and other items were mailed to the Plaintiff via US Postal Services.

168. On 6/26/17, again, a properly addressed mail containing above said summons, complaint, and other items sent to Plaintiff by this court via US Postal Services was returned to the court by Defendant Brennan through her agent, US Postal Services. This is a continuation of interference with Plaintiff's legal and other important mails since 1999, and up the present time and were among other things, a pretext to impeding Plaintiff's access to court and Defendant Brennan effort to evade being served and liability among other things.

169. On or about 6/28/17, Plaintiff went to US Postal Services Inspector, General, Des Moines, IA to complain to them regarding US Postal Services non-delivery of properly addressed mails containing legal documents which Plaintiff intended to serve Defendant Brennan and other defendants. Then on or about 6/29/17, Plaintiff received the first mail from the court but not the three copies of each item Plaintiff sent to the court. These interferences with Plaintiff's mail containing legal documents were a continuation of pattern of Defendant Brennan through her agents' willful, malicious delay, and interference with Plaintiff's mail which is a pretext to among other things, avoid being served as well as intentional and unfairly sabotage of Plaintiff's ability to prepare and Present his claims to the court among abuse. In addition, defendant Brennan's interference with Plaintiff's legal mails amounted to obstruction of justice, violation of Plaintiff's First, Fifth, and Fourteenth amendment rights among other things, including abuse of power.

170.        On or about 11/30/17, this court entered an order and sent a copy to Plaintiff via US Postal Services and this order was not delivered to Plaintiff.

171. On or about 9/1/18, Plaintiff mailed a Notice of Change of Address to this court via US Postal Services and this mail was not delivered to the court.

172.      **Defendant Brennan's agents misconduct violated at least, 18 USC section 1503(general obstruct of justice), 1701(obstruction of mail), 1702 (destruction of correspondence), 1703 (delay or detention of mails by Postal agent), & 22 USC section 7102(abuse of law or legal process) among other violations.**

173. Because of the above said interference with Plaintiff's legal mails, Plaintiff decided to move back to Indianapolis, IN, to avoid the said ongoing unnecessary delay and interference with this proceeding among other things. On or about 7/29/17, Plaintiff drove to Indianapolis and attempted to rent a bigger vehicle from Enterprise Rent A Car. Plaintiff verified through the internet that Enterprise location at Michigan and 465 had a van available. So Plaintiff proceeded to said Enterprise location and when he got there, he was told that they did not have a van available. Then Plaintiff asked if the attendant could verify through their reservation system to check if any nearby location has a van available. The attendant confirmed through their reservation system that Enterprise location at Keystone and 96 St. had a van available.

174. However, when Plaintiff got to the Keystone and 96 St. Enterprise locations, Plaintiff was told that they did not have a van available. Then Plaintiff called Enterprise Reservation center and gave them Plaintiff's payment information; Plaintiff was sent to Airport location to pick-up a van. When Plaintiff got to the Airport, he had to pay for parking and when he got to the Enterprise Desk, Plaintiff was told that they do not accept debt card. Even though Plaintiff had informed Enterprise agent that he will be paying with debt card, before he was sent to the Airport.

175. Then Plaintiff called the Enterprise Customer's Services and explained to them what has happened and the Enterprise representative apologized. Then she told Plaintiff she will have a van reserved for him at Enterprise at keystone and 46 St. the next day.at 9:30am. The next day at 09:30am, when Plaintiff got to Enterprise at Keystone and 46 Street, Plaintiff was told that nobody instructed them to reserve a van for Plaintiff. But Plaintiff was told that Enterprise at Keystone and 96 St. has a van available when they open at12:30pm. When Plaintiff got to Enterprise location at Keystone and 96 Street, he was told that they did not have a van available. So Plaintiff called Enterprise Reservation Center and one the agents told Plaintiff that Enterprise, Shadeland location has a van available. However, the location closes at 01:00pm and it was about 12:45pn at the time. The Enterprise agent added that the shadeland location will not wait for Plaintiff and that Plaintiff has to get there before 01:00pm to be able to rent the said van.

176. Plaintiff rushed to the Enterprise, Shadeland location and fortunately he got there just before 01:00pm. The attendant threw in another road block by requesting that Plaintiff

give him a copy of his recent utility bill to prove that he live at the address Plaintiff gave him. As if people carry their recent utility bills with in their wallet. The attendant also demanded that Plaintiff give him phone number and address of my next of kin. Luckily Plaintiff has the said information and Plaintiff gave it to them. This type of treatment is typical of Plaintiff's experiences when he tries to obtain goods and services from the local community. This was a continuation of interference with Plaintiff's ability to obtain goods and services from local community by Defendants through their agents and their co-conspirators.

177. On or about 9/8/17, Plaintiff filed a motion for sanction against Defendant Brennan. The motion was based on the fact that since 1999, and up to the present time, Defendant Brennan through her agents engaged in intentional and continuous pattern of not delivering, delay, or interfering with Plaintiff's legal mails containing legal documents related to ongoing legal proceedings including this instant case in which she (Brennan) is a defendant among others. The effects of this interference are that among other things, it impedes and unfairly interfere with Plaintiff's ability to prepare and present his claims to the court as well as interfere with the court's ability to impartially adjudicate this matter on its merit; as such Defendant Brennan's actions through her agents amounted to abuse of power, fraud upon the court, obstruction of justice, and a violation of Plaintiff's constitutional rights among other things.

178. On or about 9/12/17, Judge McKinney denied Plaintiff's motion based in part on his conclusion that the said interferences with Plaintiff's legal mails were clerical errors. Immediately after Plaintiff received the said order, he started writing a motion for reconsideration pointing out to the court, among other things, that Defendant Brennan's interferences with Plaintiff's legal mails were systematic pattern of conduct that started at least in 1999 and continue to this present case.   Plaintiff filed the said motion for reconsideration on or about 9/27/17.  However, Plaintiff later learned that Judge McKinney died suddenly and on expectedly on 9/20/17.  See Plaintiff's motion for reconsideration filed on 9/27/17, for detail.

179. The timing and nature of Judge McKinney's death makes his dead suspicious and questionable given that similar incident had occurred in past. As outlined in series "D" of this complaint, Plaintiff had filed a complaint against Judge Chambers for unlawful relationships with Gramercy and sham judicial proceedings involving Plaintiff's claim against Gramercy's $25,000.00 surety bond, Judge Chambers died sudden and mysteriously about time Plaintiff was preparing to file the said complaint against him in similar manner that Judge McKinney died.  Both death appeared questionable and suspicious and may be a means of impeding Plaintiff's complaint against the said judges-cover-up of wrong doing and efforts to thwart any investigation of Judge Chambers' judicial misconducts among other things.

180. After Judge McKinney's death, Judge Pratt was assigned to this case. On 11/30/17, Judge Pratt entered multiple orders including one that gave Plaintiff only two weeks to respond. Otherwise, Plaintiff's claims will be dismissed with prejudice. The court mailed Plaintiff the said order via US Postal Services' first class mail, but Defendant Brennan through her agents did not delivery the said court order to Plaintiff. Plaintiff became aware of the said 11/30/17 order by chance. Plaintiff called one of the Defendants Schwab's attorney to remind them that Plaintiff has not receive their response when he told Plaintiff the court had entered certain orders. See Plaintiff's objection and exceptions filed on 12/28/17 for details.

181. Again, Defendant Brennan through her agents interfered with the delivery of mail containing court's order sent to Plaintiff by this court. This non-delivery of said court's order to Plaintiff was among other things, a pretext to ensure that Plaintiff will not respond to said order which will in turn force the court to dismiss Plaintiff's clams and in turn avail Defendant Brennan of liability related to Plaintiff's injuries and damages among others. Defendant Brennan and US Postal Services intentional and malicious interfere with Plaintiff's legal mail containing the said court's order amounted to fraud on the court; because it unfairly sabotaged Plaintiff's ability to respond to the said court's order which could have led to the dismissal of Plaintiff's claims with prejudice.

182. On or about 8/15/18, Plaintiff walked into Indianapolis PD Office and made a police report. Plaintiff was told that his complaint will be referred to Financial Crime Dept.

183. On or about 9/25/18, Plaintiff received a copy of his IMPD report and the report did not correctly reflect Plaintiff's complaint. In addition, in the letter declining investigation of Plaintiff's complaint and IMPD wrongly classified Plaintiff's complaint as internet crime-phone or e-mail scam. Plaintiff did not complain of internet crime, phone, or e-mail scam. The wrong classification of Plaintiff's report to IMPD maybe a pretext to avoid the investigation of Plaintiff's complaint misconduct.

184. On the same day, 9/25/18, Plaintiff received the said letter, he wrote IMPD informing them that the description or understanding of his complaint was totally wrong and requested an appointment to correct the said record and Plaintiff has not from IMPD.

185. In late 2017, after Plaintiff moved back to Indianapolis, IN, and moved into an apartment, he immediately started experiencing the same systematic pattern of harassment, intimidation, and other abuse including intrusive stalking, tormenting, terrorization, and interference with every aspect of Plaintiff life among other things as outlined above. These harassment, intimidation, and abuse is still continue to this day.

Conspiracy Allegations

186.      All the actions of the Defendants' respective agents, Ette and his co-conspirators, unnamed and unknown co-conspirators as set forth above, including stalking, defrauding

Plaintiff of the fund set aside for his education, impeding or depriving him of his right of access to court, interfering with his ability to retain a counsel, gather evidence, fabrication and destruction of evidence, interfering with his legal mails and other important mails and correspondence between Plaintiff and the court, interfering with his ability to prepare and present his claims to the court and interference with the court's ability to fairly and impartially adjudicate Plaintiff's claims on its merits, multiple attempts to frame Plaintiff, judge shopping and sham judicial proceedings, suspension of Plaintiff's driver license, sabotage of his relationships, harassment, intimidation, and psychological torture of Plaintiff, retaliation against him, deprivations of right of access to court and almost his entire adult life, means of livelihood, income and benefits, subjugation, and interference with every aspect of Plaintiff's live to the extent that Plaintiff hold his live, means of livelihood, any material rights essential to the enjoyment of live at the whim of the conspirators among other things were done with malice, jointly, in concert, and with the shared intent of injuring Plaintiff in violation of his constitutional rights and thereby constituting a continuing civil and criminal conspiracy. Defendants' respective agents and their co-conspirators' conduct were motivated by racial and national origin animus.

1st Cause of Action:

Violation of Due Process and Equal Protection of the Laws-(Brennan)

187. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

188. At all-times material, Defendant Brennan through her agents were acting under federal color of laws. Defendant's agents and employees were under her direction, supervision, and control.

189. Starting in early 1996 to present, Defendant Brennan through her agents and others violated Plaintiff' equal protection of the law, substantive and due process rights. a) Equal protection of the law under Fifth Amendment provides that federal government or its agents must guarantee the same rights, privileges, and protection to all citizens. b) Due process of the Fifth Amendment provides that the government or its agents may not deprive citizen of life, liberty, and property without due process. c) Substantive due process prohibits the government from engaging in so arbitrary and oppressive acts that shock the conscience regardless of the fairness of the process used to implement such act. See County of Sacramento v. Lewis, 523 US 833, 842, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

190. In 1996, Defendant Brennan through her agents conspired with Ette and other co-conspirators to a) deprive Plaintiff of his liberty and property; b) interfere and continue to interfere with Plaintiff's legal mails and abuse related this and prior judicial proceedings

44

to impede Plaintiff's meaningful access to court to recover his property and protect his liberty among other abuse; c) constant stalking and surveillance of Plaintiff.  Then they used and continue to use their knowledge of Plaintiff's movement and activities gained from the said stalking to interfere with Plaintiff's ability to prepare and present his claims to the court, freedom of association, deprive him of his means of livelihood, psychological torture of Plaintiff and engaged in other acts that undermined the integrity of judicial process among other abuse for over 20 years and continuing among other abuse.

191. At least from 1999 to present, Plaintiff has made multiple and repeated oral and/or written complaints through the established procedure alerting Defendant through her agents of the said misconduct.  Far from taking corrective measure Defendant Brennan assented and perpetuated the alleged misconduct from 1999 to present.   Thus Plaintiff's injury was a foreseeable.

192. Defendant Brennan's conduct outlined above were willful, malicious, and undertaken with discriminative intent; the said conduct deprived and continue to deprive Plaintiff of his equal protection of the law, substantive and due process rights among other abuse. Defendant's conduct outlined above were so arbitrary and oppressive because the said conduct are so outrageous that it shocks the conscience or otherwise offensive to human dignity or offends judicial notion of fairness.  See Snyder v. Massachusetts, 291 US 97, 105 (1934); see also Moran v. Clarke, 296 F. 3d 638, 643 (8th Cir. 2002).

193. Defendant Brennan is liable for Plaintiff's injury and other abuse.

194. Defendant violation of Plaintiff's equal protection of the law, substantive and due process among others retaliation and abuse caused and continue to cause Plaintiff to suffer damages and injuries, including mental and emotional pain and suffering as well as costs, expenses, attorney's fees and  compensatory.   Punitive damage is also appropriate in the amount to be determined at the trial.

2nd Cause of Action (Violation of 42 USC 1985(2)-All Defendants)

195.  Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

196. At least starting in early 1996 and thereafter, Defendants' respective agents and their co-conspirators by reason of their respective animus against Plaintiff as an African American Immigrant invidiously discriminated against Plaintiff by willfully and maliciously conspired, planned, and agreed to: a) defraud Plaintiff of the fund set aside for his education, impede his meaningful access to court, and retaliation against him among other abuse and deprivations; b) Pursuant to and in furtherance of the conspiracy, Defendant Brennan through her agents provided Ette and other co-conspiractors the bank statement to the fund set aside for Plaintiff's education which they to perfect their scheme

to defraud Plaintiff among other things; c) After Plaintiff was defrauded, again, Defendant Brennan through her agents impede Plaintiff's meaningful access to court, among other things by interference with Plaintiff's legal mails at least from 1996 to present.

197. Pursuant to and in furtherance the conspiracy, Defendant Schwab and St. Vincent through their respective agents serially retaliated against plaintiff among other abuse.

198. By virtue of the foregoing, Defendants through their respective agents and other co-conspirators intimidation and other abuse directly and indirectly deprived Plaintiff of equal protection and from enjoying equal rights, privileges and immunities under the law among other abuse and deprivations violated 42 USC section 1985(2); Plaintiff was injured.

199. As a direct and proximate result of the above described unlawful acts or omissions of the defendants and their co-conspirators, Plaintiff was injured and he will continue to suffered severe and grievous injuries as outlined in the above count for which Plaintiff is entitled for relief.

3rd Cause of Action (Violation of 42 USC 1985(3)-All Defendants)

200.  Plaintiff re-alleges and incorporates herein by reference all allegation and arguments in this complaint as if set forth herein in full.

201. By virtue of the foregoing, at least two  or more of the defendants through their respective agents and their co-conspirators conspired for the purpose of depriving Plaintiff of a) equal protection of the laws; and b) equal  privileges and immunities under the law; and c) for the purpose of exploiting, retaliating, preventing, impeding, or hindering the constituted authorities from giving and securing to Plaintiff equal protection of the law and deprivation of liberty and property without due process of law, Defendants and their co-conspirators violated 42 USC section 1985(2 & 3).

202. Defendants, through their respective agents or employees, and their co-conspirators each one of them, did and caused to be done, an act or acts in furtherance of the objective of the conspiracy, whereby Plaintiff was deprived of his properties, liberty, rights, and privileges as set forth above-injured.

203. As direct and proximate result of the foregoing, Plaintiff has been damaged as recited above and demands and is entitled to relief for the damages and injuries recited the first and second Cause of Action, but not limited to, general and punitive damages in the amount to be determine at the trial.

4th Cause of Action (Violation of 42 USC 1986 -All Defendants)

204. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

205. Commencing from 1996, to present, Defendants' respective agents or employees, their co-conspirators, each one of them knew and understood that Plaintiff was being subjected to deprivation of constitutional rights under 42 USC 1985 and each one the Defendant through their respective agents and their co-conspirators had the power to frustrate or prevent its commission, and each one of them neglected or refused to prevent it.

206. As direct and proximate result of defendants' agents or employees' inaction, Plaintiff has been damaged as recited above and demands and is entitled to the damages recited in the First to third Cause of Action, including but not limited general compensation and punitive damages.

5th Cause of Action (Common Law Duty of Care-Schwab)

207. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

208. Schwab is an online discount stockbroker and not a full service stockbroker.

209. Plaintiff has been a client of Schwab since late 1980's or early 1990's. Defendant and Plaintiff had a long stockbroker-client relationship in which Plaintiff placed special confidence in Schwab and its agents' financial knowledge as a broker-financial adviser. Thus Defendant Schwab owned Plaintiff a common law duty of care-a duty to act reasonably.

210. These duty includes, but not limited to a) duty of suitability-to ensure recommendation are suitable to Plaintiff in terms of his financial needs, objectives, and unique circumstances; b) duty of candor, good faith, and honest dealing; c) duty of disclosure-inform Plaintiff of potential risk and reward regarding investment recommendations; and d) duty to avoid self-dealing and misrepresentation of material fact related to particular recommendation among others.

211. In addition, Schwab and its agents owed Plaintiff a heightened common law duty of care to ensure suitability especially when making specific recommendation designed specifically for Plaintiff among other things under common law duties of care and suitability.

212. Defendant Schwab through its agents breached above outlined common law and heightened duties of care when making investment recommendation specifically designed for Plaintiff among other duties in engaging in the following acts: a) on or about 1/25/08, during 2008 stock market downturn, Schwab through its agent made specific recommendation for Plaintiff without ensuring that the recommendation was suitable for Plaintiff; b) without disclosing tax implications; and c) without disclosing the risk and/or reward associated with the recommendation among other things. Also when Plaintiff declined to participate, Schwab through its agents frozen Plaintiff's account in such a

way that Plaintiff could not trade when his stock was down without taking into account that Plaintiff may lose money among other things.

213. On or about 9/28/15, Schwab again through its agents frozen Plaintiff's accounts and ordered him to liquidate his accounts immediately without educating Plaintiff on tax implication or concern that Plaintiff may lose money and investment opportunity among other things.

214. On the same day, 9/28/15, Schwab through its agents falsely accused Plaintiff of hiding his ill-gotten money in his Schwab accounts and that Plaintiff had never traded a stock in life. Despite the fact that Schwab had been Plaintiff's stockbroker for over a decade.

215. Defendant Schwab's actions through its agents, Howie Kennedy, and other unknown agents of Schwab breached the said common law duty of care, suitability among others outlined above and Plaintiff was injured financially and he suffered mental anguish as well as emotional pain for which he is entitle for relief.

216. Defendants' actions and omissions were intentional, malicious, reckless, and foreseeable.

217. As direct and proximate result of breach of the said common law duty of care and duty of suitability among others, Plaintiff has suffered injuries and damages to his person and property for which he is entitled for relief including but not limited compensatory and punitive damages among others.

6th Cause of Action (Negligence-Schwab)

218. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

219. By staffing and operating a financial corporation, through its branch and subsidiaries, providing brokerage services, assets management, custody, and financial advisory services among others financial services. Also by advertising and accepting new and existing accounts, Schwab is holding itself out as a safe environment for investment and wealth building company. In doing so, Defendant Schwab entered into an express common law duty of care to provide honest and safe place for wealth building among others without discrimination.

220. . In addition, when Schwab, through its agents and employees designed a special investment recommendation for Plaintiff, Defendants assumed a heightened duty of suitability and duty of care.

221. Defendant Schwab further assumed common law duty of care when by holding out its agents and employees, including Howie and others as competent experienced financial experts and counselors among others. Schwab, Howie Kennedy, and others Schwab's agents breached the said duties described above. See White Paper, Suitability Obligation

in Online Investing, submitted by W. Hardy Caltcot, Sr. Vice President and General Counsel, Charles Schwan & Co. submitted to NASAA Round Table on Internet Investing Issues, November 1, 1999,; also see Gochnauer v. A.G Edward & Son, Inc., 810 F.2d 1042, 1046-47 (11th Cir. 1987); Lieb v. Meril, Lynch, Pierce, Fenner, & Smitt Inc., 461 F. Supp. 951, 953 (E.D Mich. 1978); Thompson v. Smith barney, Hariss Uphan & Co. Inc. 709 F.2d 413, 418 (11th Cir. 1983); and Dupuy v. Dupuy, 551 F.2d 1005 (5th Cir. 1977).

222. Defendant Schwab breached that duty and its actions through its agents were foreseeable, reckless, and negligent among other things.

223. As direct and proximate result of Schwab, and its agents and employees' negligent conduct, Plaintiff has suffered injuries and damages to his person and property for which he is entitled for relief in the amount to be determined at the trial.

7th Cause of Action-Vicarious Liability Defendant St. Vincent Hospital

224. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

225. At all times material, St. Vincent Hospital employed Shultz and other unknown agents of St. Vincent. Shultz and other were under Vincent Hospital's direct supervision, employ, and control when they committed the wrongful and negligent acts or omissions described herein. Shultz and other unknown individual engaged in these conduct while acting in the course and scope of their respective employment with St. Vincent Hospital and /or accomplished the wrongful and negligent acts or omissions by virtue their respective job-created authority.

226. Therefore, Defendant St. Vincent Hospital is liable for the wrongful conduct of Shultz and other under the law of vicarious liability, including the Doctrine of Respondeat Superior.

227. As direct proximate result of conduct described herein, Plaintiff has suffered injuries and damages described herein in the amount to be determine at trial and he is entitle for relief.

8th Cause of Action-Vicarious Liability-Brennan

228. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

229. At all times material, Defendant Brennan and US Postal Services employed the unknown agents US postal Services. The Defendant Brennan's agents were under her direct supervision, employ, and control when they committed the wrongful acts alleged herein. The Defendant Brennan's agents engaged in these wrongful conducts while acting in the course and scope of their respective employment with Defendant Brennan and US Postal Services and /or accomplished the wrongful conduct by virtue of their respective job-created authority.

230. Therefore, Defendant Brennan is liable for the wrongful conduct of Does 1-10 under the law of vicarious liability, including the Doctrine of Respondeat Superior.

231. As direct result of the conduct described herein, Plaintiff has suffered the injuries and damages described herein.

### 9th Cause of Action-Vicarious Liability Charles Schwab

232. Plaintiff re-alleges and incorporates herein by reference all allegation and arguments in this complaint as if set forth herein in full.

233. At all times material, Defendant Schwab employed Howie Kennedy, and other unknown agents of Schwab.  Howie Kennedy and other agents were under the direct supervision, employ, and /or control of Schwab when they engaged in the wrongful conduct and/ or while acting in the course and scope of their employment with Defendant Schwab and /or accomplished the wrongful conduct by virtue of their job created authority.

234. Therefore, defendant Charles Schwab is liable for the wrongful conduct of Howie Kennedy and other agents under vicarious liability, including the Doctrine of Respondeat and under Superior.

235. As direct result of conduct described herein, Plaintiff has suffered the injuries and damages described herein.

### 10th Cause of Action-Negligence-Brennan

236. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

237. By establishing, staffing, or operating US Post Offices, accepting mails and offering related services to the public, Defendant Brennan hold herself and US Postal Services out to provide a reasonably safe and secure mailing and delivery services. Thus Defendant entered into an express and implied duty to provide reasonably safe mail and related deliveries and she assumed common law duty of care to protect and handle mails and other items with care.

238. Defendant further assumed this duty by holding mail careers and her other employees out to the public, including the unknown agents of Defendant Brennan as competent and honest employees or agents of the Postal Services.

239. Defendant Brennan through her agents breached this common law duty of care by knowingly, intentionally, and maliciously sabotage or interfere with Plaintiff's mails as described in this complaint, including mails containing legal documents related to legal proceedings in which US Postal Services or Defendant Brennan and 'her agents were defendant; and Plaintiff was damaged.

240. Defendant Brennan's actions through her agents were foreseeable, negligent, and reckless.

241. As direct and proximate result of defendant Brennan's action and omissions through her unknown agents' acts or omissions, Plaintiff has suffered injuries and damages for which he is entitle for relief in the amount to be determined at the trial.

11th Cause of Action: Negligent Supervision and Training-Brennan

242. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

243. The action of Defendant Brennan and her agents' actions as alleged above in count 10 were done pursuant to one or more inter-related de-facto policies, practices, and/or customs of US Postal Services.

244. At all times material to this complaint, Defendant Brennan and through her management level agents or counsels, and officers had the following inter-related de facto policies, practices, and custom among others:

   a) Failing to properly investigate customers' complaint and/or take corrective action as needed or otherwise ignore customer dissatisfaction because she has nation monopoly in mail and related services in the United States.  For example, since 1999 and to present Plaintiff has filed multiple complaint with US Postal Services and no corrective action was taken to date-over 20 years of failing to take corrective measures among other things.

   b) Failing to properly train, supervise, discipline, transfer, monitor, counsel, and/or otherwise control employees or mail carriers who engage in misconduct, including but not limited to mail carriers who mishandle, delay, lost, or intentional interference with mails delivery among other things. .

245. The inter-related policies, practices, and custom, as set forth above, both individually and together, were maintained and implemented with deliberate indifference to mail mishandling, delay, lost, and/or non-delivery of Plaintiff's legal mails and other communication to and from the court among others.

246. Defendant Brennan had a duty to train and supervise the said unknown agents of hers not to discriminate against any of its customers, including Plaintiff or intentionally delayed or interfere with normal delivery process or otherwise deliver mails with discriminative intent among other things.

247. Defendant Brennan through her agents breached this duty by failed to prevent or take corrective measure for over 20 years and after multiple Plaintiff's administrative complaint giving her numerous opportunities to remedy the said defective services.

248. The breach was foreseeable misconduct and preventable, negligent, and reckless among other things.

249. As direct and proximate result of Defendant's acts or omissions and negligence, Plaintiff has suffered injuries and damages described herein for which he entitled for relief in the amount to be determined at the trial.

12th cause of Action: Negligent Supervision and Training-Charles Schwab

250. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

251. At all times material, Defendant Schwab employed Howie Kennedy and other unknown agents of Schwab.  Howie and other agents of Schwab were under direct control and supervision of defendant Schwab when the wrongful conducts alleged herein were committed and/ or the wrongful acts or omissions were committed while acting in the course and scope of their respective employment with Defendant Schwab and/ or accomplished the wrongful conduct by virtue of their respective job-created authority as financial advisor among others.

252. Defendant Schwab had a duty to train and supervise defendant Howie Kennedy and other of its employees not to discriminate or treat Plaintiff with care and to comply with all applicable laws and regulations among other abuse.

253. Defendant Schwab breached that duty and were negligent when it failed to exercise ordinary care in training and supervising Howie Kennedy and other agents not to treat Plaintiff differently among other abuse.

254. Defendant Schwab and its agents' conducts were foreseeable, negligent, reckless, and it failed to prevent the foreseeable misconduct of Howie Kennedy and other agents of Schwab's wrongful conducts described herein.

255. As direct and proximate result of defendants' negligent acts or omissions, Plaintiff has suffered injuries and damages for which he is entitled for relief in the amount to be determined at the trial.

13th Cause of Action: Interference with Plaintiff's meaningful access to Court-Brennan

256. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

257. Defendant Brennan through her agents and other co-conspirators interfered and continue to interfere with Plaintiff's fundament rights of meaningful access to court.

258. Plaintiff is entitled to meaningful access to court to pursue a claim with reasonable basis in law and fact and any act or omission that interferes or rendered such access to court ineffective, inadequate, or meaningless violated Plaintiff's meaningful access to court guaranteed by free speech, First, Fifth, and Fourteenth Amendment among others.

259. Defendant Brennan through her agents and co-conspirators has knowledge of existing, pending or probable litigations, or should have known that such litigation exists or is

probable. In fact, Defendant Brennan was a defendant in some of the cases alleged herein.

260. As more fully described above, at least from 1996 to present, Defendant Brennan through her agents and other co-conspirators interfered and continue to interfere with Plaintiff's meaningful access to court by among things interference with Plaintiff's legal mails, evidence gathering, Plaintiff's ability to retain a legal counsel, Plaintiff's means of livelihood(deprive Plaintiff of resources to sustain himself and pursue his claims among other things), and sham judicial proceeding among other interferences.

261. The said interference and impediments were undertaken, among other things with the intent or knowledge that it would obstruct, hinder, or interfere with Plaintiff's meaningful access to court to vindicate his rights or redress or with reckless disregard for same. In so doing, Defendants' respective agents and their co-conspirators violated Plaintiff's free speech rights to seek redress under First, Fifth, and Fourteenth amendment among other violations. As a result of the outlined misconduct, Plaintiff has not been able sustain his claims from 1996 to present.

262. Defendants' wrongful, intentional, and malicious acts and omissions through her agents and other co-conspirators rendered Plaintiff's meaningful access to court ineffective, inadequate, and meaningless and amounted to interference with Plaintiff's meaningful access to court.

263. As proximate and direct result of the defendants' intentional, unlawful, and malicious acts and omissions, Plaintiff has suffered injuries and damages in his property, freedom, and liberty for which he is entitled for relief in the amount to be determined at the trial, including compensatory, punitive, and a court appointed counsel to ensure that Plaintiff accessed the court meaningfully.

14th Cause of Action: Infliction of Emotional Distress-All Defendants

264. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint and count 25th as if set forth herein in full.

265. As described more fully above, Defendants' through their respective agents and their co-conspirators' acts or omissions set forth herein are extreme and outrageous, beyond all bounds of human decency, and are to be regarded as utterly intolerable in a civilized society. The conduct were under taken with the intention of cause severe emotional and mental anguish in Plaintiff, or acted with disregard of high probability that their respective actions or omissions would inflict such severe harm on Plaintiff.

266. Plaintiff suffered severe humiliation, emotional and mental anguish as a result of Defendants' respective agents and their co-conspirators' intentional, unlawful, and malicious acts or omissions. The defendants' outrageous conducts constituted intentional infliction of emotional pain, severe mental anguish, and emotional distress in Plaintiff

and it is actionable under Unites States laws. Plaintiff is entitled to relief in the amount to be determined at the trial.

267. As proximate and direct result of Defendants' and their co-conspirators' acts or omissions, Plaintiff suffered injuries and damages including emotional distress, mental anguish, and other damages. He will continue to suffer such injuries until this court intervene. Plaintiff is entitled for relief in the amount to be determined at trial.

15th Cause of Action-Conspiracy to Infliction of Emotional Distress

268. Plaintiff re-alleges and incorporates herein by reference all allegations and argument in this complaint and count 25th as if set forth herein in full.

269. As described more fully above and in count 25th, Defendants Brennan, Schwab, and St. Vincent through their respective agents, each and every Defendant, unknown and unnamed co-conspirators in this complaint, together reached an agreement, combination, or in conspiracy to engage in a common venture, and otherwise jointly acted and/or conspired among themselves to engage in extreme and outrageous conduct as outlined in this complaint and in count 25th, including defrauding, impeding or frustrating Plaintiff's right of access to court, and punishing him for access the court among others. As fully described above and in count 25th, they did this, among other things, by engaging in action and omission outlined in count 25th and above.

270. These extreme and outrageous conspiratorial conducts were with the intent, and/or had effect of, directly and proximately causing Plaintiff severe emotional distress and mental anguish and each and every defendant, their respective agents, and their co-conspirators know or should have known, that their conduct would likely cause Plaintiff severe emotional distress and/or mental anguish among others.

271. As direct and proximate result of this conspiracy and conspirators' conduct, Plaintiff was injured and damaged, he experiences and continues to experience, severe emotional distress and mental anguish, among other things, including but not limited to physical and psychological injury and damages. Plaintiff is entitled for relief in amount to be determined at trial.

16th Cause of Action: Interference with Prospective Contractual Employment and Other Beneficial Contractual Relationships (All Defendants)

272. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

273. Pursuant to and in furtherance of the scheme to defraud, impede, and to punish Plaintiff for seeking justice, Defendants' respective agents and their co-conspirators, and those working in concert with them stalked and continued to stalk Plaintiff and use their knowledge of Plaintiff's activities and movement to interfere, preempt, and sabotage

Plaintiff's existing and/ or potential employment, legal counsel, business and other beneficial contractual relationships.

274. Defendants and their co-conspirator have knowledge that Plaintiff was employed, was/ is looking for a job, a legal counsel, business, and other beneficial contractual relationships and Defendants' respective agents and their co-conspirators interfered with such existing or potential contractual relationships, or prevented its performance, or made the performance more expensive singly, and in any combination; the conspirators intended to disrupt the performance of Plaintiff's existing or potential contractual relationships or knew that disruption of such performance was certain or substantially certain to occur.

275. Defendants' actions or omissions were/are intentional, unlawful, malicious, and unethical and were designed to punish Plaintiff for his litigation activities against Defendants and their co-conspirators among other things.

276. As proximate and direct result of Defendants' respective agents and their co-conspirators' intentional and malicious action and omissions, Plaintiff was and will continue to be injured and damages in his property and liberty for which he is entitled for relief in the amount to be determined at the trial, including a court appointed counsel to help Plaintiff protect his liberty among others.

17TH Cause of Action: Retaliation in violation of Indiana Law against Employment Discrimination (Indiana Code 22-9-1-16) (St. Vincent Hospital)

277. Plaintiff re-alleges and incorporates herein by reference all allegations and Arguments in this Complaint as if set forth herein in full.

278. Indiana's law against employment discrimination makes it unlawful for an employer to take adverse action against any employee for engaging in a protected activity or interfere with any person in the exercise or enjoyment thereof, or having participated in such protected activity.

279. Plaintiff engaged in or participated in a protected activity and St. Vincent Hospital through its agents, Shultz and other agents of St. Vincent were aware of it, and they took adverse employment action against Plaintiff.   In other words, Plaintiff was defrauded of his property, his access court impeded, and he was being retaliated against among other things.  So Plaintiff filed a lawsuit against US Postal Services and others to protect his liberty and property.

280. As a result of Plaintiff participation in such protected activity, Defendant St. Vincent, through Shultz, and others of its agents took adverse action against Plaintiff.  The adverse actions include but not limited to the followings, threat of termination, harassment, unjustified reprimand, overly critical of Plaintiff's work, unjust or constructive transfer,

hostile work environment, false report of poor job performances, not allowing Plaintiff to enter grievances process, and wrongful termination among others abuse.

281. There was a causal connection between Plaintiff's participation in the protected activity and defendants' adverse action against Plaintiff as well as the conspirators' retaliation against Plaintiff because of his legal activities against them. The said adverse actions occurred immediately after Plaintiff filed the lawsuit.

282. The said adverse action would deter a reasonable employee from engaging in such protected activity.

283. As direct legal and proximate result of Defendants' adverse actions against Plaintiff, Plaintiff has sustained injuries and damages and Plaintiff will continue to sustain emotional and economics injuries in the amount to be determined at the trial.

18th Cause of Action: Violation of Title VII 42 USC 2000e-2a

National Origin and Race Discrimination (Against Defendant, St. Vincent Hospital)

284. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

285. Plaintiff is an African American and based on his race and national origin he is a member of protected citizens under Title VII.

286. St. Vincent Hospital, through its agents, Shultz, and other agents of St. Vincent Hospital treated Plaintiff less favorably than his similarly situated non-African Americans.

287. Between 3/15/10 to 4/10, Plaintiff was subjected to harassment conduct or hostile work environment because of his race and national origin among other things. As more fully described above, Plaintiff was and continue to be exploited, defrauded, his meaningful access to court impede, and retaliation against him at least from 1996 to present. So Plaintiff filed a lawsuit against US Postal Services seeking restraining order among other things, to end the abuse against him. In response, St. Vincent through its agents subjected Plaintiff to harassment conduct outlined above among other things.

288. Defendant harassment conduct or subject Plaintiff to hostile work environment through its agents includes but not limited to the following: fabricated poor job performance accusations, threatened termination, involuntary transfer, not allowing Plaintiff to enter grievance process, exposed Plaintiff's personnel issue to entire staffs thereby undermining his ability to delegate work and supervise subordinates and trust in his peers, humiliated and isolating him from other team members and eventual wrongful termination among other things.

289. Defendant, its agents and employees' conduct were not welcomed by Plaintiff and the conduct was subjectively and objectively hostile environment. In addition, the conduct unreasonably interfered with Plaintiff's ability to do his job among other things.

290.. The said conducts were undertaken because of Plaintiff's race and national origin. The effect of the practices complained of above has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affected Plaintiff statues as an employee and led to the eventual wrongful termination among other things.

291. The unlawful employment practices complained of above were intentional, malicious, and done with reckless disregard to federally protected rights of Plaintiff. Under Title VII.

292. The conduct was severe enough that reasonable persons in Plaintiff's position would find their work environment to be hostile or abusive.  Plaintiff believed that his work environment was hostile and abusive due to the said harassment conduct.

293. Management level employees knew or should have known, of the abusive conduct. Plaintiff provided management level employees including personnel dept. with information sufficient to raise a probability of national origin and race based harassment in the mind of reasonable employer.  Moreover, the harassment was overt and open that a reasonable employer would have had to have been aware of it.  Indeed, management level employees were themselves complicit in the adverse and discriminative conduct.

294. Defendant did not exercise reasonable care to prevent harassment in the workplace on the basis of national origin and race, and did not exercise reasonable care to promptly correct any harassing behavior that did occur.

295. Defendant's action and omission did cause and will continue to cause Plaintiff to suffer economic losses as well as severe emotional distress and other significant irreparable, damages and losses.

296. The unlawful employment practices of St. Vincent and its agents and associates directors, and other employees directly and proximately resulted in such injuries and damages as may be proven at the trial, including but not limited to lost income and benefits, lost employment opportunities, psychological, emotional, and mental anguish, distress, humiliation, embarrassment, and degradation, pain, and suffering; attorney's fees, cost, expenses and other damages.

19th Cause of Action: Violation 42 USC Section 1981 as Amended (Race Discrimination against St. Vincent Hospital and Its Agents

297. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

298. Plaintiff is an African American and thus a member of protected class under 42 USC 1981.  See Francis Coll. v. Al-Khazraji, 481 US, 604, 611(1987); Monzannares v. Safeway Stores, Inc. 593 F.2d 968, 970 (10th Cir. 1979); Zapata v. BP, Inc. No. Civ. A. 93-2366-EEO, 1998 WL 717621, at *3(D. Kan. Sept. 1998).

299. Defendant St. Vincent through its agents and employees, Shultz, and other St. Vincent's agents discriminated against Plaintiff in violation of 42 USC 1981 based on Plaintiff's race.

300. Defendant through its agents and employees, Shultz, and other St. Vincent's agents subjected Plaintiff to hostile work environment or harassment conduct as outlined in count 18th.

301. Defendant through it agents, Shultz, and other agents of St. Vincent Hospital treated Plaintiff less favorably than his similarly situated non-African Americans counterparts.

302. The effects of the practices complained of above has been to deprive Plaintiff of equal employment opportunities, otherwise adversely affect his status as employee, deprive him of his right to make and enforce contract, and deprive him of full and equal benefits of the laws, because of his race.

303. As set forth above and in count 18th, Defendant through its agents' discrimination, abusive, and harassment conduct against Plaintiff was sufficiently severe enough that it created hostile work environment and Plaintiff was wrongfully terminated among other abuse in violation of 42 USC section 1981.

304. Defendant's conduct through its agents was unwelcomed by Plaintiff and was subjectively and objectively hostile. Another employee in Plaintiff's position would find the said harassment conduct to be hostile or abusive.

305. The unlawful employment practices complained of above were malicious, intentional, done with reckless indifference to the federally protected rights of Plaintiff.

306. Defendant through its agents and employees, Shultz, and other agents of St. Vincent Hospital discriminatory actions and omissions did cause and will continue to cause Plaintiff to suffer economic losses as well as severe emotional distress and other significant injuries, damages, and losses.

307. The unlawful conduct of Defendant, St. Vincent Hospital through its agents and employees, Shultz, and other St. Vincent's agents directly and proximately resulted in such damages as may be proven at the trail, including but not limited to lost income, and benefits; lost employment opportunities; psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and degradation; pain, and suffering; and attorney's fees, cost, and expenses.in the amount to be determined at the trial.

20th Cause of Action: .42 USC Section, 1981 Retaliation (St. Vincent Hospital

308. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

309. Defendant, St. Vincent Hospital, through its agents and employees, Shultz, and other agents of St. Vincent retaliated against Plaintiff in violation of his right to be free from discrimination under 42 USC, section 1981.

310. Plaintiff engaged in a protected activity by filing a lawsuit against US Postal Services and others seeking restraining order to end the said ongoing abuse against him among others things. Plaintiff also calling St. Vincent's Employees Legal Referral Services' 1800 number and requested to be referred to a civil rights attorney and requested a few days' vacation to deal with said legal issues.

311. In response, to Plaintiff's protected conduct activity under 42 USC section 1981, Defendant through its agents and employees, Shultz and other agent of St. Vincent retaliated against Plaintiff through adverse employment actions, including termination as outlined in count 18th above. This adverse action, is a continuation of Defendants and their co-conspirators' pattern and practice of impeding and punishing Plaintiff each time he attempts to access the court or justice among other things.

312. Plaintiff engaged in the said protected activity and St. Vincent and its agents were aware of it. As a result of the said Plaintiff's participation in the protected activity, he was subjected to adverse employment action as outlined in count 18th. The adverse action includes termination of Plaintiff.

313. Defendant's action amounted to retaliatory workplace harassment and termination. The effect of the Defendant's conduct was to deprive Plaintiff of his rights to receive full and equal benefit of laws as guaranteed by 42 USC section 1981.

314. The retaliatory actions were sufficient to deter a reasonable person from engaging in protected activity under 42 USC 1981.

315. Defendant through its agents and employees, Shultz and other agents of St. Vincent treated Plaintiff more adversely than similarly situated non-African Americans counter parts who did not participate in in protected activities.

316. The unlawful employment practices complained of above were intentional and were done with malice or reckless indifferent to the federally protected rights of Plaintiff.

317. There was a causal connection between Plaintiff's participation in the protected activity and the said Defendant's adverse action against him.

318. Defendant through its agents and employees, Shultz and other agents of St. Vincent's retaliatory actions and omissions did cause and will continue to cause Plaintiff to suffer economic losses as well as severe emotional distress, significant injuries, damages, and losses among others.

319. The unlawful retaliatory practices and other acts or omissions of Defendant's agents and employees, Shultz, and other agents of St. Vincent directly and proximately resulted in

such damages as may be proven at trial, including but not limited to loss income, and benefits: lost employment opportunities: psychological, emotional, and mental anguish, distress, humiliation, embarrassment, and degradation; pain and suffering; attorney's fees, cost, and expenses among other damages.

21tht Cause of Action: Retaliation in Violation of Title VII, 42 USC Section 2000e-3(a)
(St. Vincent Hospital)

320. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

321. Plaintiff also, re-alleges and incorporates herein Plaintiff's retaliation claim under 42 USC section 1981 outlined in count 18th above as if set forth herein in full.

322. Defendants' action and omissions as outlined in count 18th above, constituted retaliatory workplace harassment under Title VII, 42 USC 2000e-3(a).

323. Plaintiff engaged in a protected activity when he filed and pursue his lawsuit against US Postal Services and others seeking restraining order among other things, to end the said ongoing harassment against him and St. Vincent through it agents were aware of it.

324. In retaliation for Plaintiff's lawsuit, St. Vincent subjected Plaintiff to hostile work environment, harassing conduct, and termination among other things, as outlined in count 18th above.

325. There was a causal connection between Plaintiff's protected activity and the Defendants' material adverse actions taken against Plaintiff under Title VII as well as connection between the adverse action, Ette, and his original co-conspirator's scheme to defraud Plaintiff, impede his meaningful access to court, and retaliation against Plaintiff.

326. St. Vincent retaliation against Plaintiff for engaging in protected activity violation Title VII, 42 USC section 2000e-3(a).

327. Defendant's adverse action against Plaintiff would likely deter a reasonable person from engaging in such protected activity.

328. As direct and proximate result of Defendants' retaliation, Plaintiff have sustained and will continue to sustain, economic and emotional injuries as outlined in 42 USC section 1981 retaliatory claim above for which is entitled for relief.

22st cause of Action: Violation of Civil Rights Act of 1866, 42 USC Section 1981as Amended (Race Discrimination-Brennan)

329. Plaintiff re-alleges and incorporates herein by reference allegations and arguments in this complaint as if set forth herein in full.

330. Plaintiff is an African American and thus member of protected class under 42 USC Section 1981. See, Kinnon v. Arcoup, Gopman, & Associates, Inc., F.3d 866 (11th Cir. 2007).

331. At all times material, Defendant Brennan and her agents were acting under the color of law.

332. Plaintiff had a clearly established right under the law of the United States to the full and equal benefit of the laws, including making and enforcing contract.

333. Defendant Brennan through her unknown agents intentionally and systematically discriminated and continue to discriminate against Plaintiff by interfering with the delivery of Plaintiff's mails from at least 1999, to present among other things in violation of 42 USC section 1981-race based discrimination. For example: a) on or about 7/6/1999, a certified mail containing legal documents was delayed for more than 30 days; b) on or about 8/23/99, Plaintiff certified mail was not delivered at all; c) from 2005 to the end of 2017, Plaintiff's financial statements correctly addressed were not being delivered to Plaintiff and were marked return to the sender and unable to deliver as addressed; d) On 3/10/10, legal documents sent to Plaintiff by US Seventh Court of Appeal was not delivered; e) On 5/22//17, US Postal Services' priority mail paid by Plaintiff and sent to him by this court was not delivered by Brennan's agents; f) on 6/5/17, and 6/26/17, properly addressed mails sent to Plaintiff by this court were returned to the court and marked "return to sender, unable to deliver as addressed; even though the said mails were properly addressed; and g) on 11/30/17, this court sent Plaintiff its 11/30/17's order via US Postal Services' mail and this mail was not delivered to Plaintiff.

334. By Plaintiff Paying Defendant Brennan through US Postal Post Office to deliver mail or package and her acceptance of the payment through Postal Services is a contractual relationship between Plaintiff and Defendant. Defendant Brennan through her agents deprived Plaintiff of his right to make, enforce, and to enjoy the benefit of suck contractual relationship and full and equal benefits of the laws in violation of 42 USC section 1981 by interfering with the delivery of plaintiff's mails among other things.

335. Defendant's conduct through her agents was motivated by racial and national origin animus among other things.

336. Defendant Brennan's conduct were intentional and malicious and interfered and continue to interfere with the delivery of Plaintiff's mails or accepting payment from Plaintiff for mail delivery and intentionally failed to accomplish the services which Plaintiff had pay for. Plaintiff's race is a major contributing factor and Defendant Brennan through her agents acted with discriminative intent among other things.

337. Defendant Brennan through her agents' discriminatory actions did cause and will continue to cause Plaintiff to suffer economic loss, as well as emotional and other significant injuries and damages. More importantly, it impeded Plaintiff's meaningful access to court in multiple occasions including this instant case.

338. Defendant Brennan through some her agents' discriminatory actions directly and proximately resulted in such damages as may be proven at the trial, including but not limited to economic loss, psychological, emotional, and mental anguish, and distress, pain and suffering, attorney's fees, cost and expenses among others.

23nd Cause of Action: Schwab and Its Agents Violation of the Civil Rights Act of 1866, 42 USC Section 1981, as Amended (Retaliation)

339. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

340. Plaintiff is an African American and thus a member of protected class under 42 USC section 1981, as amended.

341. Defendant Schwab through its agents Howie Kennedy and other agents of Schwab discriminated and retaliated against Plaintiff in violation of 42 USC section 1981.

342. Plaintiff engaged in a protected activity by refusing to invest in an unsolicited, worthless, and potentially money losing investment offered to him by Schwab through its agent, Howie Kennedy because the investment offer was was not suitable for plaintiff financial objectives.

343. In response to Plaintiff's protected activity (refusing to invest) in Schwab's Security Loan Program, Defendants, Schwab through Howie and other unknown Schwab's agents blocked Plaintiff's trading activities in retaliation. This was during the 2008, bear market under false pretext and as a result Plaintiff lost money and investment opportunities.

344. Defendant Schwab through Howie Kennedy and other agents of Schwab's adverse actions or retaliatory and discriminatory acts were intentional and done with malice or reckless indifferent to the federally protected right of Plaintiff in violation of 42 USC section 11981.

345. Defendant Schwab through Howie Kennedy and other Schwab's agents' retaliatory and discriminatory actions did cause and will continue to cause Plaintiff to suffer economic losses and severe emotional distress and other significant injuries.

346. There were causal connection between Plaintiff's participation in the said protected activity and Defendant Schwab's adverse action against Plaintiff.

347. The said adverse were sufficiently severe that it would deter a reasonable person from engaging in the said protected activity. Defendants' actions were intentional and malicious.

348. The retaliatory acts or omissions of Defendant Schwab through its agents directly and proximate result in such damages as may be proven at trial including loss of investment and investment opportunities, psychological, emotional, and mental anguish, attorney's fees, costs, and expenses as well as compensatory and punitive damages.

24rd Cause of Action: Psychological Torture of Plaintiff- (All Defendants)

349. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

350. Defendants through their respective agents and employees and other unknown or unnamed subjected Plaintiff to psychological torture and inhuman treatment in violation of customary international law banning torture.  The intended result of this psychological torture through noise harassment, sleep deprivations, and frustration of Plaintiff's daily activities among other acts were designed to strike fear in Plaintiff, induce helplessness in him, disorient him, and to stress him out in an effort to silence him, cover-up defendants and their co-conspirator's unlawful conduct as well as to retain Plaintiff's property among other abuse.

351. Defendants' psychological torture of Plaintiff from at least 2001, and up to the present time, was intentional, malicious, unlawful, inhuman, degrading, oppressive, and subjugated Plaintiff among other abuse including interference with Plaintiff's ability to live normal live and self-actualized.

352. As proximate and direct result of Defendants' action and omissions, Plaintiff suffered and will continue to suffer injuries and damages including but not limited to emotional and mental anguish and distress as well as economic loss among others and should be punished by award of punitive or exemplary damages in the amount to be determine at the trial.

25th Cause of Action: Retaliation against Plaintiff in violation of Plaintiff's First Amendment Right- (Defendant Brennan)

353. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

354. At all times material, Plaintiff had a clearly established right to access the court which is grounded in First Amendment and petition clause to petition the government for redress.

355. In 1996, Ette and his co-conspirators conspired with Defendant Brennan's agents to defraud Plaintiff.  As Plaintiff started to accessing the court or justice to at least recover part of his property, Defendant Brennan through her agent (US Postal Services) impede Plaintiff's meaningful access to court and cover-up their oppressive and exploitive conduct.  However, as Plaintiff continue to pursue justice, Defendant Brennan through her agents interfere with Plaintiff's legal and other mails in retaliation among other abuse.

356. The retaliatory conduct and other abuse against Plaintiff as described above and in this complaint were retaliatory conduct among other things.

357. Plaintiff engaged in a series of protected activities by filing lawsuit Defendant Brennan and others from at least 1996, to present.  Defendant Brennan through her agents

intentionally, knowingly, and maliciously took adverse action against Plaintiff as described in this complaint.

358. The adverse actions constituted retaliatory actions against Plaintiff for accessing the court in violation of Plaintiff's First Amendment rights to petition the court for redress.

359. The defendants' retaliatory acts were intentional, willful, malicious, and unlawful and done with reckless disregard to for Plaintiff's rights. In other words, Plaintiff engaged in a protected activity and Defendant Brennan through her agents took adverse action against him.

360. There were causal connections between Plaintiff's protected conduct and Defendants' adverse actions against him. If Plaintiff did not engage the said protected acts, defendants will not have taken retaliatory adverse action against him.

361. Defendants' retaliatory adverse actions were sufficient to deter a reasonable person from engaging in such protected conduct or activity under First Amendment.

362. As direct legal and proximate result of Defendants' retaliatory adverse actions, Plaintiff has sustained and will continue to sustain such injuries and damages, including but not limited to economic, emotional, and psychological anguish, distress, and pain as well as punitive and compensatory damages in the amount to be determine at the trial.

26th Cause of Action-Deprivation of Plaintiff's right of Access to Court

363. Plaintiff re-alleges and incorporates herein by reference all allegation and arguments in this complaint as if set forth herein in full.

364. Defendants' respective agents and other co-conspirators individually, jointly, and in conspiracy among and between themselves to deprive, impede, frustrated, and/or sabotage Plaintiff's access to court or justice meaningfully.

365. Plaintiff has rights of access to court or justice meaningfully to pursue a legal claim with reasonable basis in law and fact. This right of access to court, includes among other things, the opportunity to prepare, serve, and file whatever pleading or documents that are necessary or appropriate in order to commence or prosecute court proceedings affecting one's personal liberty or to assert or sustain defense therein and to send and receive communications to and from the court, judge, and lawyers concerning such matter. See Hatfield v. Bailleaux, 290 F. 2d 632, 637 (9th Cir. 1961); see also Vasquez v. Hernandez, 60 F. 3d 325, 328 (7th Cir. 1995).

366. Furthermore, the First, Fifth, and Fourteenth Amendment' substantive due process rights forbid the government or its agents from frustrating or erecting barrier that impede the individual's right of access to court. See Snyder v. Nolen, 380 F. 3d 279, 291 (7th Cir. 2004).

367. Defendants respective agents and other co-conspirators have conspired continuously and/or serially from at least 1996 to present to engage in the following conduct that impeded and continue to impede Plaintiff's right of meaningful access to court among other things: a) interference with Plaintiff's ability to gather evidence, fabricate, and destroyed certain evidence; b) interfere with Plaintiff's ability to retain a legal counsel; c) interfere with Plaintiff's legal mails to and from the court and other parties among other things; d) interfere and/ or sabotage Plaintiff's business social and other relationships and in turn interfere with Plaintiff's ability to obtain assistance from the community, including retaining a counsel, or assistance from advocate groups to pursue justice and to protect his liberty and property among other things; e) engage in sham judicial proceedings; f) deprive Plaintiff of his means of livelihood and in turn deprive him the resources he needed to protect his liberty and property among other things; g) interfere with Plaintiff's ability prepare and present his claims to the court; and h) psychologically torture, harass, intimidate, and frustrate Plaintiff's daily activities with the intent of inducing helplessness in him, distracting, and disrupting his efforts and focus among other things;

368. Defendants respective agents and other co-conspirators' conduct outlined above and in this complaint were undertaken with the intent, or knowledge that it would impede or sabotage or obstruct Plaintiff's rights of access to court meaningfully to vindicate his rights, protect his liberty and property among other things through judicial redress or reckless disregard for the same. In so doing Defendants through its respective agents and co-conspirators cover-up their unlawful and oppressive act as well as retain Plaintiff's property among other things in violation of Plaintiff's First, Fifth, and Fourteenth Amendment's substantive due process rights among other things.

369. Defendants' respective agents and other co-conspirators conduct have delayed and continue to delay this matter from at least 1996 to present, increased litigation cost for Plaintiff and this and prior courts, and led to dismissal of Plaintiff's multiple claims from 1996 to present among other things. In addition, the conspirators' conduct undermined and continue to undermine the working, protection, and the integrity of the adversary judicial process or proceedings among other things.

370. As direct and proximate result of Defendants, intentional and willful actions and omissions, Plaintiff has been injured and damaged including expense, inability to sustain his claims, emotional, and mental anguish and distress for which he is entitle to relief in the amount to be determine at the trial. Plaintiff also seeks restraining order to end Defendants' respective agents and other co-conspirators misconduct and abusive acts against Plaintiff and a court appointed counsel. In so doing, Plaintiff may access the court meaningfully.

27th Cause of Action: Defamation- Per se (St. Vincent and Schwab)

371. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

372. Defendant Schwab on or about 9/28/15, through its agents intentionally, maliciously, and negligently made the following false statements about Plaintiff, a private individual: that Plaintiff was "hiding his ill-gotten money in Plaintiff's Schwab account" among other things.

373. Defendant, St. Vincent through its agent, Shultz on or about 3/15/10, intentionally, maliciously, and negligently made the following false statement about Plaintiff, a private individual :to entire staff that Plaintiff was not meeting his job requirements among others things. Also Defendant respective agents or their conspirators intentionally and malicious made the following false statements to the authorities, including Fair Fax County PD Internal Affair Dept. that Plaintiff was getting financial support from questionable sources.

374. Schwab, St. Vincent, and others' statements through their respective agents were intentional, maliciously made and were defamatory, libel, and slandered Plaintiff with the knowledge that their respective agents' statements were false or made with reckless disregard to the truthfulness of their statements.

375. The words of the Defendants through their respective agents were defamatory, libel, and slanderous per se in that they degraded Plaintiff, rendered him odious, subject him to public ridicules, and put him in legal problems among others difficulties. The Defendants through their respective agents intended to and indeed did, has injured and damaged Plaintiff in his trade, professional work, reputation, business, exposed him to contempt, and deprived and continue to deprive him of his public confidence among others.

376. The said per se defamatory, slanderous, and libel statements were intentional and maliciously made with the intent to damage Plaintiff's good name, character, professional work, and to lower his reputations in the relevant community and the statements were knowingly false. The Defendants have cause false statements to be made to a variety of third party.

377. The false and defamatory statements or communications of the Defendants were not privileged; or in the alternative, if they were subjected to privileges, the privileges were exceeded or abused in that the actions of the defendants went far beyond their respective duty, if any and were done in a manner not justified by the occasion(s) and continued after Defendants through their respective agents knew or should have known that the defamatory statements or communications were unjustified.

378. The damages and injuries to Plaintiff's reputations maybe implied by law from the nature of the defamatory statements or communications made by the Defendants regarding Plaintiff.

379. As direct and proximate result of the above said defamatory, slender, and libel statements, Plaintiff suffered loss of professional work, reputation, and injuries to his feelings, person, and property for which his entitled for relief in the amount to be determined at the trial.

28th Cause of Action: Defamation (St. Vincent and Schwab)

380. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

381. Upon information and believe, members of medical and financial communities reasonably understood that the statements of St. Vincent and Schwab's respective agents outlined above and in this complaint were about Plaintiff as the statement were made of, concerning, and mentioned him expressly.

382. All the statements were entirely false as they pertain to Plaintiff and are defamatory, slanderous on their face, and expose Plaintiff to hatred, contempt, ridicule, and obloquy because Plaintiff is neither getting financial support from questionable sources nor performing his professional job poorly or hiding any money from any one. These statements were understood by those who heard and saw them as a way to defame the reputation of Plaintiff as well as damage his good professional work, name, and character as well as to put him into legal trouble among others.

383. The statements were heard by members of the medical, financial, law enforcement communities and they were intentionally and maliciously made.

384. As direct and proximate result of Defendants' statements and communications, Plaintiff was injured and damaged in his reputations, shamed, mortified, and his feelings hurt, all to his general damages and is entitled to compensatory and punitive damages in the amount to be determined at trial.

29th Cause of Action-unreasonable intrusion Into Plaintiff's seclusion

385. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

386. Defendants' respective agents and their co-conspirators intentionally and constantly intruded upon Plaintiff's seclusion, solitude, and/ or private affairs or concerns among other things from at least 1996 to present. The intrusion would be highly offensive to a reasonable person and were unwarranted and unjustified.

387. Specifically, a) Defendant Brannan's agents intruded upon Plaintiff's seclusion and affairs by interfering with the delivery of Plaintiff's mails with the intent of impeding

Plaintiff's access to court and let others gained access to Plaintiff's banking statements among other things. b) The conspirators broke into Plaintiff's residence and search it in multiple occasions without authorization. c) The conspirators subjected and continue to subject Plaintiff to vicious, malicious, and very intrusive stalking and surveillance-following, tracking, and eavesdropping on Plaintiff's activities. Planting electronic and/ mechanical device used it to track and monitor Plaintiff in his home. Then they used and continue to use strategically timed loud and weird noise to terrorize, torment, and terrifying Plaintiff inside his own home. The conspirators also used and continue to their knowledge of Plaintiff's activities gained from the said stalking and surveillance to interfere with Plaintiff's education, employment, business, social, and even family relationships among other including contractual and non-contractual relationships among others.

388. The purpose of the said intrusion includes, among other things, to gain access to Plaintiff's private and confidential information such as movements, activities, and other personal information among other things. Then they their knowledge of such information to further their scheme to a) defraud him, b) impede his access to court by engaging in conduct designed to interfere with his ability to prepare and present his claims to court, including efforts designed to induce helplessness in him, distract and disrupt his efforts to access the court or justice, and c) retaliation against him among other efforts calculated to deprive him of his means of livelihood, terrify, torment, and terrorize him with the extent that he would drop his lawsuit among other abuse.

389. Defendants' through their respective agents and their co-conspirators intrusion into Plaintiff's seclusion, affairs, home among other things would be offensive and objectionable to a reasonable person. Then intrusion was intentional and malicious.

390. As a result, Plaintiff suffered and continues to suffer emotional and mental anguish as well as other injuries directly and proximately cause by such intrusion among other things. Plaintiff is entitled to relief in the amount to be determined at the trial. See Nader v. General motor Corp., 25 N.Y. 560 (NY. App. 1970); see also Pinkerton National Detective Agency, Inc. v. Stevens, 132 S.E.2d 119, (Ga. App. 1963).

30th Cause of Action-Invasion of Privacy

391. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

392. By Defendant Brennan through her agents, US Postal Services Ette and their co-conspirators conspired to interfere with Plaintiff's legal and others mails, including mails containing Plaintiff's banking statement(s) and returning Plaintiff's properly addressed and stamped mails to sender in such a way that others may gain access to Plaintiff's

banking statements; and then use such private information for nefarious purposes among other things.

393. Defendant Brennan through her agents intentionally intruded upon Plaintiff's solitude or seclusion or private affairs and exposure of Plaintiff's financial records to the conspirators and others constituted an invasion privacy right under fourth Amendment.

394. Defendant's misconduct outlined above would be offensive and objectionable to a reasonable person and were intentional and malicious.

395. This privacy intrusion was severe and it exposed Plaintiff to exploitation and fraud and was objectively unreasonable. Defendant Brennan through her agents acted with actual malice in the perpetrating of such conduct.

396. As a direct result, Plaintiff suffered damages, including economic and non-economic injuries including mental anguish and emotional distress among other things for which Plaintiff is entitled for relief in amount to be determined at the trial.

### 32st Cause of Action: Punitive Damages

397. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

398. The Defendants through their respective agents and other co-conspirators working in concert with them continuing acts or omissions, singly, or in any combinations starting at least from 1996, to present (over 20 years) were willful, malicious, outrageous, oppressive done in a bad faith and wanton disregard to Plaintiff's rights; the misconduct were calculated to cause maximum injury and damages to Plaintiff and his family. The award of punitive damages is appropriate and necessary because it will punish and deter Defendants' agents and others from engaging similar conduct in the future as well as force the Defendants to properly train and monitor their respective agents and institute appropriate policies. Public interest will be served by such award.

### 33nd Cause of Action: Joint Liability

399. Plaintiff re-alleges and incorporates herein by reference all allegation and arguments in this complaint as if set forth herein in full.

400. Defendant Brennan, Schwab, and St. Vincent are vicariously liable for Plaintiff's injury and damages under conspiracy theory. The basic tenet of traditional conspiracy theory provides that each co-conspirator is liable for acts of co-conspirators during the existence of and in furtherance of the conspiracy. Because the said Plaintiff's injuries and damages were directly and proximately caused and continue to be cause by Defendants' respective agents and other co-conspirators, Defendants are vicariously liable for Plaintiff's injuries individually, jointly, and vicariously under respondeat superior doctrine.

34th Cause of Action: Violation of Substantive Due Process (All Defendants)

401. Plaintiff re-alleges and incorporates herein by reference all allegation and arguments in this complaint as if set forth herein in full.

402. Defendants through their respective agents and their co-conspirators violated Plaintiff's substantive due process rights. Substantive due process rights prevents govt. from engaging in conduct that shock the conscience, or interfere with rights implicit in the concept of ordered liberty regardless of the fairness of the process. See Moran v. Clerke, 296 F. 3d 638, 643 (8th Cir. 2002). Fifth and Fourteenth amendment prohibit conduct that is so outrageous that it shocks the conscience, or otherwise offends judicial notion of fairness, or is offensive to human dignity. Id.

403. Defendants' and other co-conspirators and others conduct were carried out under color of law because of Defendant Brennan's agents' participation in the said ongoing conspiracy among other things.

404. Defendants through their respective agents and other co-conspirators conspired serially to defraud Plaintiff, impede his access to court, and retaliated against him among other abuse. Among other things, they engaged and continue to engage in actions calculated to terrify, torment, terrorize, psychologically, and to subject Plaintiff into condition of servitude with the intent to intimidate him into giving up his claims against them or if he manage to access the court, to render his access meaningless, ineffective, and inadequate. In addition, they subject Plaintiff to vicious and intrusive stalking, including stalking him in his own home where privacy is traditionally expected. Then they use their knowledge of Plaintiff's movements to impede Plaintiff's access to court by interfering with his ability to prepare and present his claims to the court, engage in sham judicial proceedings, deprive Plaintiff of means of livelihood, and interfere with his legal and other mails among other things and retaliated against him among other abuse.

405. Defendants' conduct through their respective agents were done with discriminative intent, are so outrageous that it shock the conscience, or interfere with Plaintiff's rights implicit in the concept od ordered liberty, or offend judicial notion of justice and fairness as well as undermined the working, protection, and the integrity of adversary judicial process among other things. Defendants' respective agents and their co-conspirators' conduct were intentional and malicious and such misconduct violated Plaintiff's substantive due process rights.

406. As a direct and proximate result of Defendants' action through their respective agents and their co-conspirators, Plaintiff was and continues to be injured and damaged for which he is entitle to relief in the amount to be determined at the trial.

## Count 35 (Mandamus Relief)

407.   Plaintiff re-alleges and incorporates herein by reference all arguments and allegations in this complaint as if set forth herein full.

408.   The provision of 28 USC section 1361 provide a statutory basis for jurisdiction in cases seeking relief in the nature of mandamus against federal officers, employees, and agencies, and they provide for an independent cause of action in the absence of any other available remedies.

409.   Defendant Brennan's actions through her agents as set forth above, constitute an unlawful refusal to investigate and correct alleged official fraud or misconduct alleged in Plaintiff's multiple administrative complaint filed with US Postal Services since at least 1999 to present.

410.   Plaintiff has a clear right to have his administrative complaint be investigated and alleged misconduct corrected; for Plaintiff has a right under First, Fourth, Fifth, and Fourteenth amendment to be free from Defendant Brennan's abuse against Plaintiff through her agents for over 20 years and continuing.

411.   Defendant Brennan have a clear non-discretionary duty to investigate Plaintiff's administrative complaint through the US Postal Services' inspector General Office. Thus Plaintiff is entitled to relief in form of mandamus compelling Defendant Brennan to refer Plaintiff's complaint to the US Postal Services' Inspector General Office for investigation and prevent her employees or agents from abusing Plaintiff.

412.   WHEREFORE, Plaintiff request that this court in the interest of justice, equity, and fairness that the court enter an order, ordering Defendant Brennan to refer Plaintiff's administrative complaints to the Office of US Postal Services' Inspector General for investigation and to order her to cease from interfering with Plaintiff's mails and other abuse against Plaintiff.

### Status of Limitation

413. The status of limitation in a conspiracy claim or tort action claim begins to run on the last overt act in furtherance of such conspiracy. The conspiracy giving rise to this action is still ongoing.

### Declaratory Relief Allegations

414. A present and actual controversy exists between Plaintiff and defendants concerning their rights and respective duties. Plaintiff contend that Defendant violated his rights under at least Fifth and Fourteenth Amendment, 42 USC 1981, 1983, 1985 (2 & 3), and 1986 as well as under RICO among other violations. Defendants have denied these allegations. Declaratory relief is therefore necessary and appropriate.

415. Plaintiff seeks a judicial declaration of the rights and duties of the respective parties.

### Injunctive Relief Allegation

416. No plain, adequate, or complete remedy at law is available to Plaintiff to redress the wrong addressed herein. If the court does not grant the injunctive relief sought herein, Plaintiff will continue to be irreparably harmed. Thus Plaintiff submit his motion injunctive relief, a court appointed counsel, and a master to investigate the alleged unlawful conduct and wrong doing.

Prayer for Relief

WHEREFORE, Plaintiff pray for relief as follows:

a) For a declaration and injunctive relief as well as a court appointed counsel and a court appointed master;

b) Reinstatement, actual economic damages, including but limited to back pay, front pay, lost benefits, and expenses;

c) Compensatory damages, including but not limited to those future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and other non- pecuniary losses;

d) Liquidated damages for all claims as allowed by law, in an amount to be determined at trial;

e) Actual, punitive damages and liquidated damages in the amount to be determined at the trial;

f) For lost interest on wages, compensation, and punitive damages including pre- and post –judgment and upward adjustment of for inflation;

g) Imposing upon the defendants the payment of all costs and expenses associated with this lawsuit and all other equitable reliefs;

h) The return of the fund defrauded from Plaintiff;

i) A judgement in favor of Plaintiff on all of the causes of the actions in this complaint;

j) For an order enjoining defendants from engaging in the unlawful acts complained herein, appoint Plaintiff a legal counsel, and a court appointed master.

Plaintiff demands jury trial on all issues so trialble;

Other relief that the court may deems fair and proper.

Respectfully submitted on this day-_____of _____ 2019.

W. Egwuenu

Wilson Egwuenu

P.O. Box 441675

Indianapolis, IN 46244