# EXHIBIT M

IN THE UNITED DISTRICT COURT

FOR SOUTHERN DISTRICT OF INDIANA

WILSON EGWUENU                    :

    Plaintiff                  :         Case NO. 1:17-cv-1691-TWP-MPB

    v.                         :

HON. MEGAN BRENNAN               :

St. VINCENT HOSPITAL,            :

CHARLES SCHWAB & Co.                       :

    Defendants

PLAINTIFF'S FIRST AMENDED PETITION

Nature of the Action

1.   Pursuant to 11/30/17, court's order, Plaintiff files this first amended complaint and would show onto the followings:

2.   This is a complex civil action under RICO, 18 USC 1961 et seq., 42 USC Section 1981, 1985, & 1986, as well as under Title VII, Fifth and Fourteenth Amendment among others.  Plaintiff seeks redress for the illegal acts of the defendants through their respective agents and other unknown or unnamed co-conspirators which have resulted in loss of Plaintiff's properties, freedom, and liberty and for declaratory and injunctive relief to end defendants and their co-conspirator's abuse and subjugation of Plaintiff as well as to prevent further losses and abuse.  Plaintiff also seeks a court appointed master to investigate defendants' wrongful acts and cover-up through their respective agents and others working in concert with them among other abusive conduct; and a court appointed counsel, so that Plaintiff may access the court meaningfully.  For Plaintiff has been struggling to meaningfully access the court for the past 20 years to no avail.

3.   The primary cause of this action is a widespread and prolonged enterprise engaged in a pattern of racketeering activities involving numerous RICO predicates acts from at least 1996, to present.  The predicates acts alleged herein clustered around defrauding Plaintiff, impeding his meaningful access to court to at least protect his property, freedom, liberty, and retaliation against him in form of continuous and series of wheel and spoke conspiracies linked and coordinated by Ette and his co-conspirators in an effort to cover-up their wrong-doing and to retain Plaintiff's property.  In other words, the objective of the racketeering enterprise has been to defraud Plaintiff, impede his meaningful access to court, inflict severe and sustained economic and emotional hardships on him with the intent to make him homeless, starve him of fund or resources he needed to seek justice or to extricate himself from defendants agents' abuse, obstructing, preventing, and

1

discouraging him from seeking meaningful access in order to cover-up their wrongdoing and retain Plaintiff's property among other abuse.

4. From at least 1996, and up the present time, Defendants' respective agents and their conspirators (the enterprise) accomplish their objective stated above by stalking and monitoring Plaintiff 24 hours a day and seven days a week. Then they used and continue to use their knowledge of Plaintiff's movement and activities to identify Plaintiff's frequent contacts such as neighbors, landlords, co-workers and employers, mail carrier's, bankers, or businesses that Plaintiff frequents among others. Ette and his co-conspirators then, solicit and recruit some of the said Plaintiff's frequent contact including Defendants, Shultz, and other unknown agents of St. Vincent, unknown US Postal Services' agents, Howie Kennedy, and others unknown agents of Schwab into their scheme. Then they knowingly, intentionally, and unlawfully, agreed and engaged and continue to engage in act(s) in furtherance of the conspirators' scheme. Thus if Plaintiff takes action "A" to seek justice, the co-conspirators will take action "B" to counter Plaintiff's efforts or to punish him for seeking justice or accessing the court among other abuse and subjugation of Plaintiff.

5. In addition, defendants' respective agents and their co-conspirators used their knowledge of Plaintiff's movement and activities to interfere, sabotage, and preempt Plaintiff from employment, educational, and business opportunities as well as social and even family relationships among others. Furthermore, Defendants' respective agents and their co-conspirators interfere with Plaintiff's legal mails, Plaintiff's ability to retain a legal counsel, obtain goods and services from local community, among others interference and sabotages outlined in this complaint. Defendants' respective agents and their co-conspirators also in multiple occasions attempted to frame Plaintiff-with the intent to get him into legal trouble to justify their use of use of government punitive machineries against Plaintiff and to cover-up their wrongful conduct among others.

6. Plaintiff have suffered ongoing discrimination, exploitation, harassment, and subjugation among other abuse starting from at least 1996, and up to the present time due to his race and national origin in violation of RICO, 18 USC 1961 et seq., 42 USC 181, 1983, 1985, & 1986, as well as Fifth and Fourteenth Amendment among other violations. Plaintiff requests declaratory, preliminary, and permanent injunction. The injunction will guarantee that Defendants' respective agents and their co-conspirators permanently desist from engaging in the abusive conduct described herein as well to prevent them from engaging in act that may harm or jeopardize Plaintiff or his family life.

7. Plaintiff is informed and believed and thereon alleges that, at all times material herein, each of the Defendant, Brennan's agents, John or Jane Does (Does 1-10); St. Vincent Hospital's agents or employees Does 11-20, and Schwab's agents, (Does 21-31) were in

some manner responsible for the occurrences and injuries alleged herein in this complaint. Their names and capacities are currently unknown to Plaintiff. Plaintiff will amend this complaint to show such true names and capacities when the same have been ascertained.

## Jurisdiction and Venue

8.  The court has subject matter and personal jurisdiction under Racketeering Influence and Corrupt Organization Act (RICO), 18 U.S.C. Section 1964(c) which authorize nation-wide services. Also under 28 U.S.C. 1331 and because this case arises under the laws and Constitution of the United States; under 28 U.S.C. 1348, and because this action seeks redress and damages under 42 U.S.C. Section 1981, 1983, and 1985, due process and equal protection provision of Fourteenth and Fifth Amendments of the United States Constitution among others.

9.  The court has personal jurisdiction over the defendants because at least one of the defendants resides, does business, or has office in this district as well as under the conspiracy and long-arm statute theory of personal jurisdiction. In addition, defendants knew that he/her does business in this district as such expect that impact of their actions would be felt in this district. Furthermore, a resident of this district should not be forced to go to another district to seek redress from a person who knowingly cause injury to resident of this district. For this state maintains a strong interest in providing effective means of redress for its residents tortiously injured in this state. In addition, under conspiracy theory, each defendant acts as an agent of each other and acts in furtherance of the said conspiracy occurred in this district. One of the defendants is an agent of the United States.

10. Venue is proper in this district under conspiracy and long-arm statue theory of personal jurisdiction as well as under 28 U.S.C. 1391, because as stated above at least one of the defendants resides or does business in this district. For conspiracy exists and named, unnamed, or unknown defendants are members of the said conspiracy. Substantial acts and substantial effects in furtherance of the said conspiracy occurred and continued to occur in this district. Defendants knew or had reason to know that their acts and its effects in this

## Exhaustion of Administrative Remedies

11. At all times material, St. Vincent has been an employer within the meaning of 1964 Civil Rights Act, 42 USC, section 2000(e) et seq. in that Defendant, St. Vincent Hospital had at least fifteen (15) employees.

12. Plaintiff have complied with all conditions precedent to filing this claim as required by 42 USC section 2000(e)(5) namely: a) complaint of employment discrimination with EEOC and a letter to sue was issued; and b) Plaintiff timely filed a complaint with US District

Court. However, Plaintiff's claim was dismissed due to pleading defects. The said pleading defects were due to Plaintiff's self-represent because defendants intentionally interfere and sabotaged Plaintiff's ability to retain a legal counsel as outlined this complaint.

Exhaustion of US Postal Services Administrative Remedies

13. As outlined in this complaint, since 1999, and up to present time, Plaintiff has been exploited and subjugated and continue to exploited and subjugated as outlined in this complaint. Over the years, Plaintiff has filed the following complaint with US Postal Services:

a) On or about 8/23/99, Plaintiff filed a complaint with US Postal Services complaining that his certified mails containing legal documents related to ongoing legal proceedings were intentionally lost, delayed, or not delivered at all twice in a row. Plaintiff did not receive any response. See exhibits "D", & "C".

b) In 2008, Plaintiff complained orally to US Postal Services Customers Services Urbana and Champaign, IL, regarding the non-delivery of his financial statements and no action was taken by the US Postal Services. Based on Plaintiff's experiences, Plaintiff's mails containing his financial statements were being marked "non-deliverable as addressed and unable to forward."

c) On or about October, 2015, Plaintiff filed multiple oral complaints with US Postal Services, Urbandale, IA, regarding the non-delivery of his financial statements and other important mails. Plaintiff received no response.

d) On 12/26/15, Plaintiff filed a written complaint with US Postal Services, Urbandale, IA, complaining that his financial statements were deliberately programmed to be return to the sender and marked "return to sender, not deliverable as addressed. Despite the fact that the said mails were properly addressed to Plaintiff. Again, Plaintiff received no response. See exhibit"D-1 & "D-2".

e) On 6/28/17, Plaintiff filed an oral complaint with US Postal Services Inspector General, Des Moines, IA, complaining that two consecutive mails containing legal documents related to this instant proceedings sent to him by the court were being returned to court and marked "return to the sender, undeliverable as addressed." Despite the fact that both mails were properly addressed to Plaintiff. The following day, 6/29/17, Plaintiff received the first mail from the court. However, Plaintiff received no response from the Inspector General. It should be noted that US Postal Services and its agents were defendants in the said legal proceedings.

f) On 7/18/17, Plaintiff filed a written complaint with US Dept. Of Justice, Coordination and Review Dept. and Plaintiff was informed that DOJ did not jurisdiction over US Postal Services.

4

g) On 7/21/17, Plaintiff filed a written complaint with US Postal Services' Inspector General, Des Moines, IA, and Plaintiff has yet to receive any response.

### Other Administrative Remedies Sought By Plaintiff

14. Early 2000, Plaintiff filed a complaint against Judge Eugene Chambers with Texas Commission on Judicial Conduct. However, Judge Chambers died suddenly and mysteriously on 1/24/2000, about the time, Plaintiff was preparing to file the said complaint. As a result, no action was taken on Plaintiff's complaint. See exhibit "B-1", "B-2,

15. Judge McKinney died suddenly and unexpectedly on 9/20/17, about time Plaintiff filed for his recusal. Is Judge Chambers and Judge McKinney's death a way to thwart Plaintiff's complaint? See exhibits "B-3". This question must be investigated. As shown here Plaintiff had made every effort to settle this matter administratively to no avail for over 20 years.

### Legal Framework for Action against Brennan as US Postmaster General

16. Plaintiff named Megan Brennan (Brennan) one of the defendants because she is the US Postmaster General and CEO and throughout the period during most of the event described herein occurred and continue to occur. Defendant Brennan is sued in her individual capacity.

17. Plaintiff's constitutional claims arise under Fifth and Fourteenth Amendment to the United States constitution which prohibits any person acting under the color of laws from depriving any person of life, liberty, or property in the absence of due legal process. It also prohibits any state or federal government or their respective agency from treating individuals similarly situated differently. Defendant, Brennan, through her agents and employees violated Plaintiff's due process and equal protection rights giving rise to this cause of action for damages under Fifth and Fourteenth pursuant to Biven v. Six Unknown Named Agents of Federal Bureau of Narcotic, 403 US 388 (1971).

18. Furthermore, Defendant Brennan is the officer charged with the duty of developing and promulgating policies, customs, and practices of the US Postal Services as Postmaster General and all US Postal Services agents and employees are under her direct control and supervision. It is her duty to ensure that her agents and employees are properly trained and supervised to ensure proper implementation of her policies.

19. However, under her watch, US Postal Services has maintained and continue to maintain longstanding policies, customs, and practices of mercilessly abusing and discriminating against Plaintiff, other vulnerable members of the public and some of her employees. This is largely due to defendant Brennan's failure to properly train and supervises her agents and employees to ensure proper implementation of her policies as well as her failure to train her agents on avoiding and preventing retaliation against those like

Plaintiff who has been complaining of merciless abuse and discrimination since 1999, and to present time.

20. Because defendant Brennan has failed to correct or prevent abuse, discrimination, and other unlawful acts and omissions outlined herein and in this complaint, she is liable for her agents and employees' unlawful acts and omission under laws of vicarious liability, including the doctrine of repondeat superior as well as under Biven, Fifth & Fourteenth Amendment among others.

## Parties

21. Plaintiff, Wilson Egwuenu is an African American and a natural person and he resides in Marion County, Indiana.

22. Defendant Brennan, Postmaster General & CEO of US Postal Services in her personal capacity and for service located at 475 L'Enfant Plaza, SW Washington, DC 20590. Brennan is the proper entity to be sued for the wrongful acts of her employee or agents.

23. Defendant, Charles Schwab Corporation (Schwab) is a public company and through its subsidiaries provides online stock brokerage and related financial services throughout the United States and around the world and for service is located at 211 Main St., San Francisco, CA 94105. Schwab is the proper entity to be sued for the wrongful acts of its agents or employees. Schwab has been Plaintiff's stock broker at least since late 1980's or early 1990's.

24. Defendants, St. Vincent Hospital, Indianapolis (St. Vincent), is the flagship installation of St. Vincent Health which operates twenty-two (22) facilities in 46 counties in Indiana and for service located at 2001 W. 86th St. Indianapolis, IN 46260. St. Vincent was Plaintiff's employer from 2008, to 2010.

## Other Key Entities Involved

25. Mr. Howie Kennedy, the Director of Schwab Security Loan Program, and his location is unknown to Plaintiff and in that capacity, is an agent or employee of Schwab.

26. Ms. Janet Shultz, the Associate Director, St. Vincent Hospital and in that capacity was agent and employee of St. Vincent Hospital.

## Introduction

27. Plaintiff has been targeted for exploitation since he arrived in the United States. Plaintiff was being exploited, harassed, intimidated, manipulated, and his daily activities sabotage among other abuse. Even at one point, the conspirators called Plaintiff's wife at her place of employment and demanded that she come home immediately; because Plaintiff had an accident at his work. When she got home the conspirator attempted to recruit her into their scheme not only to exploit Plaintiff, but also get him into legal trouble. In reality Plaintiff did not have accident at his work; it was a ruse or pretext to speak to wife alone.

28. On an advice an attorney, Plaintiff requested a copy of his INS file through Freedom of Information Act. When Plaintiff received the said file he discovered forged letter his file. So 1991, Plaintiff contacted INS and got the issue resolved.

29. In 2014, Plaintiff learned through Fair Fax County PD Internal Affair that somebody claiming to Plaintiff's family member informed then that Plaintiff was getting financial support from questionable. This is another fabrication and Plaintiff strongly believed that the conspirators or those working in concert with them were behind the said false allegations.

30. Shortly after Plaintiff resolved the above said falsification of his INS file, the events giving rise to this legal proceedings started.

## Factual Allegation

### Series A

31. In or around early 1996, Plaintiff was a full-time student and he worked part time. A former co-worker introduced Plaintiff to Ette and his wife. Plaintiff's former co-worker, Ette, and his wife represented to that Ette was a used car dealer-he buys salvage vehicles and repaired them for resale. Ette also represented to Plaintiff that one of his brothers owned a pizza place. Plaintiff and Ette visited the said pizza place at least once. On the surface, Ette appeared to be honest and hardworking.

32. Shortly thereafter, Ette represented to Plaintiff that buying salvage vehicles and rebuilt them for resale was an excellent investment and Plaintiff could make more money and have more time for his studies if he buys salvage vehicles and repair them for resale instead of working part-time. Subsequently, Plaintiff bought his first car and rebuilt and sold it. At the time, it appeared that it may be a promising venture.

33. As Plaintiff gained more confidence, he bought a few more cars. However, each time Plaintiff advertised his vehicle for sale, his answering machine will malfunctioned repeatedly. As a result Plaintiff did not receive any calls from potential buyers. After a while, the fund set aside for Plaintiff's education were tied up in cars and Plaintiff was concerned because he has to pay bills and school fees from the money now tied up in cars. Based on Plaintiff's years of experience dealing with this matter, the repeated malfunctioning of Plaintiff's answering machine was a pretext to induce economic harm or fear in Plaintiff thereby forcing Plaintiff to sell his vehicles to Ette.

34. In or around February 1996, Plaintiff and Ette met and Ette asked Plaintiff how he was doing with his car business. Then Plaintiff informed Ette about the said repeated problems with his Plaintiff's answering machine which interfered with Plaintiff's ability to sell his vehicles. Then Ette offered to help sell his cars. At the time the standard sale commission was $200.00 on each car. But Ette refused the standard sale commission and demanded more money. Subsequently, Plaintiff and Ette could not agree on the sale commission. Then Ette offered to buy Plaintiff's cars out right; in so doing he could

make as much money as he would like. Ette refusal to accept the said $200.00 sale commission was a pretext to induce Plaintiff into selling his vehicle to Ette.

35. On or about 5/13/96, Plaintiff and Ette entered into a sale transaction whereby Plaintiff sold his vehicle to Ette and Ette issued Plaintiff two checks -$20,000 and $30,000. However, when Plaintiff presented the checks to Ette's bank, the bank refused to pay Plaintiff due to insufficient fund (bad checks). Then Plaintiff called Ette and he was giving Plaintiff the run around. As it became clear that that Ette never intended to Pay Plaintiff for his cars, Plaintiff started making effort to gather evidence to filed a claim on a $25,000.00 surety bond which Gramercy Insurance company had issued to Ette.

Series B

36. As stated above, Ette was bonded by Gramercy and one of the conditions of the bond was that a claimant must obtain a judgment against the bond holder before a claim can be against it. So In preparation to file a lawsuit against Ette, on or around October, 1996, Plaintiff applied and paid for the certified title history to vehicle Plaintiff sold to Ette. However, on 11/12/96, an employee(s) of Texas Department of Motor vehicle (TDMV), gave Ette, whom Plaintiff was gathering evidence to sue, the said certified title history which Plaintiff had applied and paid for. Ette's interference with Plaintiff's evidence gathering gave indication that Ette was getting some assistance from certain employee(s) of TDMV to exploit Plaintiff.

37. When Plaintiff got hold a of the said certified title history, he was not sure if it was complete or not; and Plaintiff discovered that on or about 4/17/96, (about a month before Plaintiff and Ette entered into a sale transaction), Ette obtained a duplicate title to Plaintiff's car from TDMV which Ette used to sell Plaintiff's vehicle to a third party. This again indicated that Ette had insider tie TDMV.

38. Also on 5/20/96, a week after Plaintiff sold his vehicle to Ette, Ette sold Plaintiff's 1995 Accura to Salish Babu for $16,000.00 and Babu traded a 1994 infiniti J 30 to Ette. According to the said title history, the trade-in value of the said 1994 infiniti J30 was $15,000.00. However, the title history to the said 1994 infiniti J30 showed that Ette owned it. For Ette bought the said 1994 infiniti from Auto insurance Auction on 10/10/95, as a fresh water damaged vehicle. Thus the sale transaction involving the said 1994 infiniti J30 was a pretext to prevent Plaintiff from repossessing his vehicle from Ette.

39. Eventually, Plaintiff sued Ette and on 8/19/97, Plaintiff obtained a judgment against Ette. With this judgment, Plaintiff filed a claim against the $25,000.00 surety bond which Gramercy had issued to Ette. Instead of evaluating Plaintiff's claims on its merit, Gramercy and Ette filed a motion for a new trial which was a pretext to buy time which Ette and Gramercy used to fabricate a competing claim against the said bond as outlined below.

Series C

40. On 10/27/97, Ette and Gramercy's motion for new trial was granted.  On 10/28/97, the very next day after the said new trial was granted, Gramercy filed for authority to dispose the said questionable 1994 infiniti J30 to a demolisher with TDMV.  Grmercy attached an affidavit to the said application claiming under oath that it was unable to obtain the title to the said 1994 infiniti from Ette.  Also attached to the application for the authority to dispose the said 1994 infiniti J30 to a demolisher was a settlement check which Gramercy allegedly issued to Ette.  However, "void unless negotiable title attached" was printed on the said check.  This implied that under Gramercy's insurance claim settlement policy, Gramercy and its agents may not settle an insurance claim without first obtaining the title to the vehicle involve to ascertain the ownership.  This showed that Gramercy did not even follow its own insurance claim settlement policy.  In reality, the demolition and the withholding of the said questionable 1994 infiniti J30's title from TDMV was efforts and pretext to destroy evidence of fake transaction between Ette and Babu involving the said 1994 infiniti J30.

41. On or about 10/28/97, again, the very next day after Ette's motion for new trial was granted, Babu filed an uncontested lawsuit against Ette.  The sole purpose of this uncontested lawsuit against Ette was to create a judgment against Ette which Babu intended to use to file a claim on the Gramercy's $25,000.00 surety bond Which Plaintiff had already made a claim against.

42. On or about 12/2/97, Ette's new trial was heard and the court upheld Plaintiff's Judgment against Ette.  Again, Plaintiff refiled his claim against the dais Gramercy's surety bond.

43. On or about 3/4/98, Babu was granted a defaulted judgment against Ette.  Then Babu used this defaulted judgment to file a competing claim against Grapery's $25,000.00 surety bond which Plaintiff had already made a claim against.

44. On or about 5/5/98. Gramercy filed an interpleader petition in Judge Chambers' Court-County Court at Law # 1, Harris County, Houston, TX.  This is a judge shopping because, Gramercy's Headquarter and its attorney's office were located in Dallas, TX, but Gramercy's attorney travelled 4 hours to Houston, TX, to file an interpleader petition in Judge Chambers' court where outcome was predetermined as outlined below.

45. Due to the interference with Plaintiff's ability to retain a counsel of his choice at his own expense, Plaintiff started representing himself pro se.  Then Plaintiff filed a summary judgment motion on submission, but Judge Chambers demanded oral hearing.

46. In response to Plaintiff's summary judgment motion, Babu's attorney mailed Plaintiff his response to the said Plaintiff's summary judgment motion via US Postal Services' certified mail.  US Postal service was supposed to deliver the said certified mail to Plaintiff on 7/6/99, but neither the mail nor delivery attempt notice was delivered to

Plaintiff. However, the said certified mail was delivered to Plaintiff on 8/10/99, (over 30 days of delay). As a result, Plaintiff had to reschedule his summary judgment motion hearing.

47. On or about 8/13/1999, Plaintiff mailed a legal document to Judge Chambers' court via US Postal Services' certified mail and on 8/23/1999; Judge Chambers' Court said that they did not received the said mail. Again, Plaintiff had to reschedule his summary judgment motion. This was a continuation of delay or non-delivery of Plaintiff's legal mails containing legal document which amounted to interference with Plaintiff's meaningful access to court. Exhibits "D" & "C".

48. Eventually, Plaintiff's summary judgment motion was scheduled to be heard on 11/15/99. However, Judge Chambers and Gramercy's attorney failed to appear for the hearing. When the visiting Judge called Plaintiff's case, Judge Chambers Court's Clerk informed the visiting judge that Judge Chambers did not want him to hear Plaintiff's case. Again, Plaintiff's summary judgment motion was postponed to 12/13/99, by the court. Then Plaintiff rearranged his work schedule so that he may be able to attend the said hearing on 12/13/99. However, Judge Chambers' Court again, suddenly changed the hearing date without properly notifying Plaintiff-the court and Gramercy intentionally created confusion which allowed them to defraud Plaintiff of his claim on the $25,000.000 surety bond. Then Plaintiff requested a new trial to no avail. This was a typical example of how Ette and his co-conspirators worked hand in hand with the court and others to exploit and abuse Plaintiff from at least 1996, and up to present time.

### Series D

49. Then Plaintiff filed a complaint against Judge Chambers with Texas Commission on Judicial Conducts. Later Plaintiff received a letter from the said commission informing Plaintiff that Judge Chambers died and no action was taken on Plaintiff's complaint as a result. See exhibits "B-1" & "B-2".

50. By chance, Plaintiff ran into an article in Houston Chronicle 1/25/2000, stating that Judge Chambers died suddenly and mysteriously on 1/24/2000. The article gave a brief history of Judge Chambers' tenure in the court which included that Judge Chambers was nicknamed "sleepy," because a plaintiff had filed a complaint against him complaining that Chambers was sleeping during a legal proceedings and that he was unfair to that plaintiff- sham judicial proceedings. Judge chambers died about the time Plaintiff was preparing to file the said complaint against him and the timing, nature, and manner of his death appeared suspicious at best and at worst effort to thwart the investigation of wrongdoing outlined in Plaintiff's complaint. As a result Chambers death, Plaintiff was concerned for his safety and the safety of his family and Plaintiff attempted to public, but was unsuccessful due to defendants' interference. However, the harassment,

intimidation, stalking of Plaintiff, efforts to get Plaintiff into trouble among other abuse intensified and continued to this day.

51. Since then, Plaintiff has been subjected to an intrusive stalking and surveillance and with their knowledge of Plaintiff's activities and movement, they impede, frustrate, sabotage, or interfere with Plaintiff's efforts to seek justice or extricate himself from defendants' abuse.  In other words, if Plaintiff takes action "A", defendants will invariably take action "B" to counter Plaintiff' efforts as outlined below.

52. On or about 9/2/2001, Plaintiff supervisor pleaded with Plaintiff to work an unscheduled double shift (16 hours) that day and Plaintiff agreed.  However, after a long day when Plaintiff got home at about 9:00 pm, he was alarmed to find his front door drilled out and left unlocked for the entire day.  There were metal shavings, brass cap, and inner cylinder cover to the deadbolt lying on the concrete just outside Plaintiff's front door. The only thing keeping the door closed was the deadbolt that wedged between the door and the door frame.  Plaintiff called the apartment complex after hour phne number and spoke to maintenance-man and Plaintiff was told that they did not enter Plaintiff's apartment.  Then Plaintiff called Arlington, TX PD and Arlington PD came and took incident report.  It appears that this break-in into Plaintiff's apartment was coordinated with Plaintiff's employer or supervisor.

53. The above mentioned break-in did not look like a burglary attempt.  Because the person that drilled the said lock was very careful not to damage the door.  This was a pretext among other things, to enter, search Plaintiff's apartment to find something to charge Plaintiff with, and to plant some type of stalking and monitoring device in Plaintiffs' apartment to monitor Plaintiff and to harass him in his own home.  Because after the said incidence, each time Plaintiff enter/exit his apartment, getting in and out of bed, sleeping, or if Plaintiff gets up in the middle of the night, or he is doing something that requires concentration, getting from one side of his apartment to the other, a loud thump, or furniture being drag, sound of running shower or flush will appear to becoming from the neighbors side of the apartment among others which amounted to psychological torture of Plaintiff.  The said psychological torture of Plaintiff were designed to induce helplessness in Plaintiff, distract, and disrupt his ability to prepare, and present his claims to the court as well as to stress out and strike fear in him in order to cause him to loss focus in his effort to seek justice among other abuse.

54. Plaintiff is a registered nurse and worked long hours and sometime multiple shifts and when he got home the said psychological torture made it almost impossible for Plaintiff to relax, sleep peacefully in his own home or quietly enjoy his home among other abuse as well as a continuation of frustration of Plaintiff's daily activities.

55. In or around 2002, summer, Plaintiff applied for admission to Southern Methodist University's Graduate School and requested and paid for his transcript to forwarded to

SMU Admissions Office. However, the transcript was loss by the mail carrier. A few months later, again Plaintiff applied for Graduate school admission to University of North Texas and requested and paid for his transcript be forwarded to UNT Graduate Admission Office. Plaintiff's transcript was lost by the mail carrier. These mail interferences were pretext to interfere with Plaintiff's ability to obtain higher education.

### Incidence in Illinois

56. After years of dealing and enduring blatant abuse outlined above, it became too disrupting, distracting, a waste of time and money, Plaintiff moved to Illinois. Soon after Plaintiff arrived in Illinois, the same type of harassment resumed. In addition, or about or about 11/3/06, Urbana, PD entered and searched Plaintiff's residence under false pretense of doing a wellness check on Plaintiff. In reality, Ette and those working in concert with them (some of Plaintiff's co-worker) posed as Plaintiff's employer and called Urbana, IL, PD to do a wellness check on Plaintiff in order to find out where Plaintiff was that day. On that day, 11/3/06, there was a sudden change in Plaintiff's work schedule; as a result Plaintiff was not at work. Then Ette and those working in concert with them who were stalking Plaintiff posed as Plaintiff's employer and called Urbana PD to do a wellness check on Plaintiff under false pretext in order to determine Plaintiff's where about.

57. On or about 10/26/07, Urbana PD unlawfully entered and searched Plaintiff's residence. On that day, Plaintiff had just wake up and turned on his light to get ready for work at about 05:00 am when he heard an unusual and very loud banging on Plaintiff's front door. When Plaintiff opened his front door, he saw two Urbana, PD with their gun drawn and pointing at Plaintiff and one of the officers pushed Plaintiff aside, entered, and searched Plaintiff's residence. When Plaintiff asked what was going on, Plaintiff was told that one of Plaintiff's neighbors had called Champaign County Emergency System (EMS) and informed them that Plaintiff was killing somebody in his residence.

58. Later, Plaintiff went to Urbana, PD to get a police record of 10/26/07, incident on the above said unlawful entry and search of Plaintiff's residence. Plaintiff was told that there was no such report. Plaintiff was then referred to the County EMS which gave Plaintiff a call-log emanating from Plaintiff's residence. The EMS log showed that on 10/25/07, at about 11:00 pm that somebody posing as one of Plaintiff's neighbors called the said EMS and reported suspicious noise coming from Plaintiff's residence. Then from 11:00pm on 10/25/07 to about 05:00 am, on 10/26/07, Urbana PD monitored Plaintiff's residence and as soon as Plaintiff wake up and turned on his lights to get ready for work, the officers started banging on Plaintiff's front door; eventually entered and searched Plaintiff's residence. This was an intentional swatting of Plaintiff which is the harassment tactics of deceiving EMS by hoaxing them into sending a police and other emergency response team to another person's address. Plaintiff is an African

American and swatting Plaintiff is equivalent to setting Plaintiff up to be shot by police officer. Based on information, experience and believe, this was a continuation of intentional and malicious harassment and abuse against Plaintiff by Ette and those working in concert with them.

59. On or about 6/23/06, Plaintiff notified Schwab of his new current address. Since then Plaintiff has been receiving normal correspondence from Schwab except Plaintiff's financial statements.

60. Late January, 2008, Plaintiff received a letter dated 1/25/08, and signed by Howie Kennedy thanking Plaintiff for participating in Schwab's Security Loan Program and confirming the term of the loan. Plaintiff had no idea what security loan was. So Plaintiff called 1-800 number included in the said letter. Plaintiff was told in substantial part that Schwab will receive all the appreciation or loss from one of the stock in Plaintiff's Roll-over account and in return Schwab will be paid Plaintiff 2% annual interest (two percent APR) on the total value of the said stock starting from the effective date of the said stock loan program.

61. However, when Plaintiff looked into this Schwab security loan investment offer, he discovered that he has to cash-in his Roll-over account, pay 10% (ten percent) early withdrawal penalty, and it will take about ten years (10 years) for Plaintiff to break even. Because Plaintiff will lose money if he invested in Schwab's security loan program, he declined to invest in Schwab's security loan program. In addition, Schwab is a discount stock broker and does not normally solicit investment from its clients.

62. Shortly after Plaintiff declined to invest in Schwab's security loan program, Schwab frozen Plaintiff's accounts and marked them accounts abandoned. As a result, Plaintiff was not allowed to trade on all his accounts and Plaintiff was losing money because this was during the 2008's market down turn and stock market was crashing. When Plaintiff called Schwab's agents and demanded to know why his account was frozen, Plaintiff received a letter dated 2/19/08, from Schwab, informing him that his accounts were frozen because Schwab did not have Plaintiff's current address on all his accounts.

63. The above mentioned, questionable, and unsolicited investment offer from Schwab caused Plaintiff to be concerned about the non-delivery of Plaintiff's financial statements. So, Plaintiff called Schwab to inform them that he has not been receiving his banking statements; but Plaintiff was assured that his statements were being sent to him regularly.

64. On or about 2/13/08, Plaintiff went to Urbana, IL Post Office to inform then that he was not receiving his banking statements. Plaintiff was directed to Champaign, IL Post Office and when Plaintiff got Champaign Post Office, he was directed back to Urbana, IL Post Office. Again, When Plaintiff got to Urbana, IL Post Office; Plaintiff was referred back to

Champaign Post Office.  After a while, it became obvious that Plaintiff was being giving the run around.

65. Then Plaintiff went to Urbana, IL PD to see if they could help Plaintiff; but no assistance was offered.  Thus Schwab's 2/19/08, letter informing Plaintiff that his Address did not appear on all his accounts did not make any sense; because Plaintiff was receiving was trading on all his accounts and was receiving all others correspondence from Schwab except financial statements.

66. On or about 7/31/08, Plaintiff was coming home from a condominium auction and when he got to two intersections he must pass to get to his residence, he saw multiple Urbana, IL PD cars parked at both said intersections.  So Plaintiff proceeded cautiously towards the said intersection.  Shortly, after Plaintiff past one of the said intersections, Plaintiff was stopped by Urbana, IL PD.  Plaintiff was issued three (3) citations:  a) for not stopping at a 4 –way stop; b) for not having active auto mobile insurance; and c) for not having a driver license on him.  Actually, Plaintiff has active auto mobile insurance on his cars and a driver license but did not have them on him at the time he was stopped; and Plaintiff did stop at the said intersection.

67. On or about 8/1/08, Plaintiff submitted a copy of his active auto insurance card and driver license to Illinois State Attorney's Office and Champaign County Clerk's Office.  Plaintiff was informed that he has to appear in court to have at least two citation dropped.

68. On the Traffic court hearing day, Plaintiff was directed to a wrong line and when Plaintiff finally got to the correct court, it was just a few minutes after 9:00 am and Plaintiff was not allowed in.  On the same day and immediately after Plaintiff was not allowed in the traffic court, Plaintiff spoke to Champaign County legal Aid Office which was located next door to the traffic court and in same building.  The legal aid agent gave Plaintiff a motion to set aside form which Plaintiff promptly file out and submitted it to the court.  The legal aid agent also informed Plaintiff that after filing the said motion to set aside, that traffic court will schedule another hearing.

69. However, as Plaintiff was waiting for the new hearing schedule, Plaintiff received a letter from Illinois Secretary of State, Springfield, IL, on 10/3/08, informing Plaintiff that his driver's license will be suspended on 10/26/08 due to the conviction against Plaintiff for not having active auto insurance.  On the same day, 10/3/08, Plaintiff submitted a copy of the said driver license suspension notice and a copy of Plaintiff's active insurance card and driver license to Champaign County Clerk's Office and Illinois State Attorney's Office, Champaign County, Illinois.  Plaintiff also reminded them that he had filed motion to set aside the conviction in question.  Plaintiff was assured that his driver's license will not be suspended.

70. After about a week, Plaintiff called Illinois State Attorney's Office to inquire about the status of the Plaintiff's driver's license suspension issue and Plaintiff was told that no action has been taken. Then Plaintiff filed a motion for walk-in hearing and Plaintiff did not hear from the traffic court and Illinois State Attorney's Office. So Plaintiff attempted to walk-in into the Traffic court to speak to the Judge, but Plaintiff was allowed into the court. Eventually, Plaintiff driver's license was suspended. The suspension of Plaintiff's driver's license imposed undue hardships on Plaintiff, because Plaintiff could not go work and it interfered with Plaintiff's daily activities.

71. However, all the said three traffic citation were later dropped, but defendants, their o-conspirators, and those working in concert with them have succeeded in harassing and unjustly imposing unnecessary hardship on Plaintiff among other abuse as well as interfered with Plaintiff's ability to buy a condo among others. This abuse amounted to intentional and malicious engagement of government punitive machineries against Plaintiff.

72. As Plaintiff was dealing with the above traffic citation issues, he requested copies of Urbana, IL PD's police report on their contact with Plaintiff. When Plaintiff received the said report, he noted that on or about 5/7/08, Officer Shaun Cook of Urbana PD had unofficially contacted his friend Agent Verda of Immigration and custom Services (ICE) and unofficially asked him to look-up Plaintiff's immigration file. In addition, Officer Cook falsely informed Agent Verda that Plaintiff was in United States on work visa. Despite the fact that Officer Cook did not ask Plaintiff any question regarding his citizenship or immigration status. Officer Cook falsely assumed that Plaintiff was in United States on work visa. Officer Shaun cook and Agent Verda's unlawfully and unofficially accessed confidential government data base to access Plaintiff's informing in order to find what to charge Plaintiff with.

73. On or about 7/3/08, Plaintiff bought a car from Honda dealer in Chicago. The car was still under manufacture's warrantee but due to the distance beween Chicago and Urbana, IL, Plaintiff could not take his car to Chicago for regular services.

74. On or about 8/20/08, Plaintiff took his car to Walmart Auto for oil change. The attendant instructed Plaintiff to come back in two hours. However, when Plaintiff looked into the oil change area, they were not serving anybody. Then Plaintiff requested to speak with the manager. When the manager arrived, the attendant informed her that somebody claiming to be government agent instruct her not serve Plaintiff. The manager ordered the attendant to serve Plaintiff. However, this is a continuation of interference and frustration of Plaintiff's business relationships and his ability to obtain goods and services from the local community.

75. Early October, 2008, the airbag light in Plaintiff's car started coming on indicating that there may be problem with Plaintiff's airbag. This airbag issue was not related to the

airbag recall.  So Plaintiff took his car to Twin City Honda Urbana, IL, and they were busy
and could not take a walk-in.  Then Plaintiff took his car to the nearest Honda dealer-
Carmack Honda, Danville, IL.  They worked on Plaintiff's car for hours by taking the car
apart instead of using computer to diagnose the problem.  At the end of their working
hour, Plaintiff was told to bring the car back the next day, because they could not find
the problem with Plaintiff's airbag.  However, because Plaintiff was not happy with their
work, Plaintiff did not take his car back to Carmack Honda.  Later Plaintiff discovered
that there was no record of Carmach Honda working on Plaintiff's car.  Plaintiff believe
that this was a continuation the conspirators' interference with Plaintiff's business
relationships.

76. On or about 10/15/08, Plaintiff took his to Twin City Honda for airbag repair and they
    discovered that Plaintiff's car had a malfunctioning right front impact sensor.  However,
    Plaintiff was instructed to take his back to Carmack Honda, Danville, IL, so that the
    manufacturer warrantee may cover the work.  As stated earlier, Plaintiff was not happy
    with Carmack Honda and Plaintiff tried many other Honda dealers and Plaintiff was told
    that manufacturer's warrantee may not cover the work.  As the incidents outlined above
    continued, it became too distracting, a waste of Plaintiff's time and money, Plaintiff
    Moved to Indianapolis, IN.

77. As soon as Plaintiff arrived in Indianapolis, IN, similar incident to those outlined above,
    resumed.  For example, Plaintiff is a Registered Nurse and at the time, he was working
    night shift (7:00pm to 7:00am) at the time.  When he was looking for apartment,
    requested a quiet apartment; the reason for this was that Plaintiff works nightshift and
    sleeps during the day.  Then apartment complex manager assigned Plaintiff an
    apartment and Plaintiff liked it.

78. However, a few months later, the apartment manager assigned his handyman an
    apartment next door to Plaintiff's apartment.  The handyman was always the apartment
    complex throughout the day.  Also, the handyman's garage where he stored his tools
    was under Plaintiff's bedroom and he comes in out of his apartment and garage every
    few minutes to gets his tools throughout the day.  The noise from the handyman
    opening and closing his garage and from his ATV interrupted Plaintiff's sleep during the
    entire day.  Moving the apartment's handyman next door to Plaintiff was among other
    things, a pretext and a covert means of harassing, frustrating, and to stress out Plaintiff
    among other abuse.

79. As stated earlier, Plaintiff works long hours and nursing shifts are not structured.  In
    other words, a nurse does not clock-in by 7:00 pm and clocks out by 7:00an.  Sometime
    when it is busy, short of staffs, or during emergencies, a nurse may work anywhere a
    few minutes over time to double shift.  So when Plaintiff works overtime and got home
    late as well as have just a few hours to sleep before he goes back work, the handyman

invariably will park his car or ATV in front of Plaintiff's garage as clock work or as if somebody was alerting him when Plaintiff was on his way home.. So Plaintiff had to look for the handyman to get him to move his vehicle so that Plaintiff may enter his garage. For the parking space in the apartment complex was very limited and assigned.

80. Plaintiff spoke to the handyman and the apartment manager verbally in multiple occasions regarding the said harassing activities to no avail. Then Plaintiff filed a written complaint with the apartment and the harassment activities eased a bit. However, after Plaintiff renewed his lease, the harassing activities intensified. If Plaintiff has an important event or test the noise and the harassment activities will intensified which indicated that the harassment was planned and directed to maximum negative impact on Plaintiff. Based on Plaintiff's experience for the past 20 years, this was a continuation of harassment and interference with Plaintiff's business relationships using Plaintiff's landlord among others.

81. The apartment charges each tenant a $200.00 one-time administration fees which Plaintiff paid with a credit card. But a few months later, the apartment's manager called Plaintiff and informed him that his credit card company did not pay them the said administration fee. So Plaintiff showed the manager his credit card bill which included the said administration fees; the manager insisted that they were not paid. Then Plaintiff was forced to pay another $200.00 administration fees to avoid eviction. It took several months of Plaintiff demanding the refund of the said $200.00 before it was credited towards Plaintiff's rent.

82. As the harassment continued, Plaintiff filed a written complaint with apartment management on 12/8/09, and Plaintiff received no response. On 7/21/10, Plaintiff wrote to the Regional Manager again to no avail. Then Plaintiff requested to be transferred to another unit and Plaintiff was told that there is no vacant unit available. Then Plaintiff filed a harassment complaint with Indiana Civil Rights Commission (ICRC). On or about 12/7/10, ICRC closed Plaintiff's complaint and informed Plaintiff that the apartment management stated that it will better for Plaintiff to move out at end of his lease. On or about 12/31/10, at end of Plaintiff's lease, Plaintiff find another apartment; However, when prospective apartment called Plaintiff's landlord, the landlord informed Plaintiff's potential landlord that Plaintiff did not give them notice that he will be moving out. Despite the fact that the move out was an agreed settlement. As a result, Plaintiff lost his new apartment and had to pay his landlord extra $200.00 month to month fee each month until 3/1/11. Again, this is the continuation of ongoing, systematic, pattern and practice of harassing and interfering with Plaintiff's business and other relationships that started at least in 1996, through a third party.

Series E

83. As outlined above, Plaintiff had suffered ongoing discrimination, harassment, psychological torture, retaliation, sabotage and interference with Plaintiff meaningful access to court among other abuse and subjugation since 1996. So in an efforts to extricate himself from the said abuse, vindicates his rights, and seek redress, late 2009, Plaintiff filed a lawsuit against US Postal Services and Charles Schwab asking the court among other things for a court appointed counsel, injunction order, and to order the FBI to investigate the interference and deprivation of Plaintiff's civil rights, and civil liberties among other abuse.

84. On or about 1/13/10, Plaintiff's lawsuit was dismissed due to defective pleading. Plaintiff did not have legal representation. Plaintiff figured that the conspirators did not retaliate against him because they knew that Plaintiff's lawsuit was defective. At the time, Plaintiff was employed by St. Vincent Hospital at the time. Early February, 2010, Plaintiff called the hospital's legal referral services (legal referral services that helps employees with legal matters) and requested to be referred to civil rights attorney. Plaintiff was asked what type of legal matter he had; and Plaintiff informed the legal referral services' representative that he needed a civil rights attorney. Again, Plaintiff was asked if the legal matter was against the hospital and Plaintiff said no. Plaintiff was told that they did not have a civil rights attorney to refer him to in the area.

85. Plaintiff was unable to find an attorney to represent him. Then Plaintiff requested a few days' vacation to appeal the dismissal of his motion for a court appointed counsel. 2/15/10, was the last day to make change in the March 2010's work schedule; so on or about 2/15/10, Plaintiff was not sure if his vacation request was granted. Then on or about 2/15/10, Plaintiff met with Shultz and at the meeting, Plaintiff informed her that he, Plaintiff really needed the said vacation to attend to a legal matter. The director assured Plaintiff that she will speak to the individual in charge of the schedule.

86. On 2/17/10, a co-worker who was not scheduled to work that day came to work and she uncharacteristically offered to assist Plaintiff with Plaintiff's assignments. Unbeknownst to Plaintiff at the time, the offer of assistance to Plaintiff was a pretext to create a way to get close to Plaintiff and Plaintiff's patients which allowed her to falsely accuse Plaintiff of poor job performance among other things. Eventually, the said vacation was granted. On or about 3/10/10, Plaintiff filed the said appeal. At the time, it appeared that Plaintiff's lawsuit will be revived because the Court of Appeal may appoint a counsel to represent Plaintiff which may expose the conspirators' wrongdoing. This concern caused the conspirators to conspire with Shultz and others to retaliate against Plaintiff which was a continuation of pattern of using Plaintiff's frequent contacts such employers, co-workers, landlords, neighbors and other intermediaries to harass Plaintiff among other abuse.

87. When Plaintiff returned to work on 3/15/10, Schultz immediately demanded that Plaintiff sign a document indicating that Plaintiff was not meeting his job requirements.  At the same time, Ms. Schultz informed Plaintiff that if he did not sign the said document that his employment with the hospital will cease.  Plaintiff refused to sign the said document and he, Plaintiff reported the incident to the hospital personnel department immediately.  For Plaintiff had no job performance issue prior to requesting the said vacation.  Ms. Shultz demanding that Plaintiff sign the said document was contrary to the hospital employee coaching and discipline policy as well.

88. Furthermore, when Plaintiff was on vacation, Ms. Schultz had asked the entire hospital unit's employees to write up whatever each one of them thought that Plaintiff did wrong since the beginning of Plaintiff's employment with the hospital to March, 2010.  Among other things, asking the entire staff to write-up whatever each one of them thought Plaintiff did wrong was a pretext to find something to charge Plaintiff with.  Plaintiff reported the said incident to the hospital's personal department the same day (3/15/10).

89. Following Plaintiff's activation of grievance process, Plaintiff, a personnel department staff, Ms. Schultz, and one other individual met the next day (3/16/10).  At the meeting, Ms. Schultz and the hospital personnel department's staff insisted that Plaintiff signed the amended document which Plaintiff did in order to keep his job.  Then Plaintiff was transferred to another unit also manage by Ms. Schultz.

90. As Plaintiff was on training for his new unit through the week-end and there was no issue.  However, on or about the following Monday, Ms. Schultz came back to work and she called the individual who was training Plaintiff into her office; shortly thereafter after, Ms. Schultz falsely accused Plaintiff of making poor decisions.  Even though, Plaintiff was on training and was only shadowing his trainer; and has not yet assumed responsibility for any patient which indicted that termination of Plaintiff did not have anything to do with Plaintiff's job performances.

91. The next day Plaintiff went to the hospital personnel department to report the said second false accusation- to activate hospital grievances process.  For Plaintiff was concerned that his transfer to the new unit was in a bad faith and that he was being humiliated and his professional reputations were being damaged by the said repeated false allegations of poor job performance in order to frustrate him as well as to force him to quit his job among other things.  This time Plaintiff was told by personnel dept.' representative at the front desk that nobody was available to speak with him.  At the time, Plaintiff's apartment was a few blocks from the hospital.  Later the same day, Plaintiff called and visited the hospital personnel department and again, Plaintiff was told that nobody was available speak with him.  Then Plaintiff called-in sick that day.  For several days, Plaintiff called and visited the hospital personnel dept. and each time Plaintiff was told that nobody was available to speak with him.  Eventually, Plaintiff was terminated.  The hospital's

personnel department refusing to allow Plaintiff to activate grievances process is a pretext to the real reason which was to frustrate Plaintiff in order to force him out among other things.

92. Then Plaintiff filled employment discrimination and retaliation complaint with EEOC against the hospital and he was issued a right-to-sue letter. Plaintiff timely filed employment discrimination and retaliation complaint against the hospital in the United States district court pro se. But Plaintiff's complaint was dismissed due to defective pleading. Exhibit "D" & "E".

Series F

93. As outlined in this complaint, terminating Plaintiff immediately after he appealed the dismissal of his complaint and at the time when it appeared that Plaintiff's claims will be revived was a pretext for the continuation of defendants' prolonged patterns and practices of interfering and punishing Plaintiff for access to court or making efforts to extricate himself from defendants' abuse among other things. In addition, terminating Plaintiff is also a pretext calculated to induce helplessness in Plaintiff, distract him, devastate his dignity, self-esteem, deny him his means of livelihood, and sabotage his rights to practice his chosen profession among other interference and deprivations. The involvement of the entire hospital unit in Plaintiff's false accusation of poor performance issues not only created a hostile work environment, isolated Plaintiff, humiliated and defamed him professionally, and made him vulnerable to be abuse by other employees among other abuse as well as impose extreme hardship on Plaintiff and his family. Furthermore, transferring Plaintiff to another unit and the eventual termination changed the terms and conditions of Plaintiff's employment and punished him for refusal to comply with defendants' demand and for engaging in legal activities among other things.

94. Even after Plaintiff was terminated, defendants continued to surveil and stalk Plaintiff and use their knowledge of him gained from the said surveillance to harass, intimidate, exploit, interfere, and preempt Plaintiff from potential employment, business, social, and even family relationships among others is a pretext to continue to punish Plaintiff. See example below for details.

95. Again, when Plaintiff moved to another apartment in Indianapolis, IN, similar incidents as outlined above continued in the new apartment. In addition, on or about 2/28/11, Plaintiff moved into a new apartment in Indianapolis. On or about 3/1/11, the lock to Plaintiff's mail box was removed. Plaintiff' reported it to the apartment complex management. Plaintiff was told that United States Postal Services was responsible for mail box repair. However, when Plaintiff got to the US Postal Services, he was told that the apartment complex was responsible for their mail box. Then Plaintiff went back to

the apartment complex management and it took a very long time before the said lock was replaced. The removal of Plaintiff's mail box was a pretext for the real reason which was a continuation of frustration of Plaintiff's daily activities among other things.

96. In Indianapolis, IN, Plaintiff attempted to resume his graduate education, but the said defendants' interference, harassment, intimidation, and exploitation among other abuse made it impossible.

97. On or about 5/12/12, Plaintiff discovered a peep hole device in his garage door-a stalking device capable of being equipped with camera or other stalking device. It appeared that the defendants' were using the said peep hole to monitor Plaintiff and his movements. The said peep hole was not there when Plaintiff moved into the apartment. Also Plaintiff checked all other garage door in the apartment complex and none of them was equipped with a peep hole. Then Plaintiff requested that the said peep hole device be removed which the apartment did. However, Plaintiff was concerned for his safety and he felt violated. Because of Plaintiff's concern for his safety and the safety of his family, this ongoing organized and prolonged campaign of harassment, intimidation, and exploitation among other abuse against Plaintiff, Plaintiff moved to Virginia.

98. Again, as soon as Plaintiff arrived in Virginia, similar incidents as outlined above resumed. In addition, Plaintiff was subjected to the abuse outlined below. Example, Plaintiff had difficult time finding an apartment in Virginia. Eventually, an individual who knew some employees of S & S Properties directed Plaintiff to S & S Properties' apartment. Then Plaintiff moved into S & S Properties' apartment on 7/7/12, and S & S Properties demanded that Plaintiff give him a copy of his bank statement. Plaintiff offered to give S & S Properties a letter from his bank stating that he has enough money to cover at least two years of rent; but S & S Properties demanded Plaintiff's actual bank statement. So Plaintiff gave S & S Properties a copy of his bank statement because Plaintiff needed a place to live desperately at the time.

99. On or about 7/7/12, Plaintiff paid his first month's rent with a personal check and S & S Properties deposited it into its bank unbeknownst to Plaintiff. On 7/10/12, S & S Properties demanded that Plaintiff pay his July rent with money order on the pretense that S & S Properties does not accept personal check as first month's rent. It was not true that S & S Properties does not accept personal check as first month's rent; it was among other things, a pretext to defraud, harass, exploit, and to take advantage of Plaintiff and a continuation of using local businesses that Plaintiff has relationships with to exploit and harass Plaintiff. On the same day (7/10/12), Plaintiff issued S & S Properties $1,195.00 money order and again, S & S Properties deposited it into their bank. On or about 7/11/12, Plaintiff asked S & S Properties to return his personal check to him and S & S Properties informed Plaintiff that his personal check has been deposited into its bank. S & S Properties informed Plaintiff that his rent over payment will be refunded to him

when his check cleared in a couple of days. About a week later, Plaintiff again, asked for the refund of the said rent over payment and he was told that his check has not cleared. Later, Plaintiff made multiple demand for the said refund to no avail. The refusal of S & S Properties to refund Plaintiff his money was among other things, a pretext to defraud Plaintiff among other things. Because Plaintiff's personal check was not returned until the end of the month, Plaintiff allowed S & S Properties to credit the said rent double payment to Plaintiff's following month's rent. However, paying over $2,000.00 or double rent in one month caused financial hardship on Plaintiff.

100.                                                                                                    A few
weeks after Plaintiff moved into S & S Properties, Plaintiff started hearing constant and unusual high pitched running shower or flush like sound in his bathroom area 24 hours a day and seven days a week. This said noise prevented Plaintiff from sleeping, distracted him 24 hours a day and seven days a week among other distractions. Plaintiff repotted the said constant noise to S & S properties multiple time to no avail.

101.                                                                                                    After
Plaintiff reported above said constant noise to S & S Properties in multiple occasions, the apartment's handyman entered Plaintiff's apartment to fix the problem. After the handy claimed that the said noise has been repaired, each time Plaintiff enters his bathroom, exit, or enters his apartment, getting in and out bed, or doing something that requires concentration among others, the said sound of high pitch shower or flush will resume again. Based on Plaintiff's experiences, this constant noise was a pretexts to real which was among other things to psychologically torture Plaintiff each minutes of the day, in order to disorient him, induce fear and helplessness in him, to distract and disrupt Plaintiff's litigation activities as well as to stress-out Plaintiff. In so doing, defendants made it difficult for Plaintiff to focus on his efforts to extricated himself from defendants' abuse among others.

102.       As the said noise continued and S & S Properties did not do anything to stop it, Plaintiff reported it directly to S & S Properties' manager. The manager instructed Plaintiff to go to the Police.

103.       On 9/12/12, Plaintiff went to Senator Web's office for assistance in the ongoing exploitation, harassment, and other abuse. Because Senator Web will be retiring in a few months, Plaintiff was instructed to submit a written complaint to Senator Warner's Office. Later that day, as Plaintiff was preparing to write the said complaint, he discovered that his computer will not turn on and his printer has been damaged also. Again, Plaintiff felt vulnerable and violated because it appeared that somebody was stalking and monitoring him as well as entered into his apartment and intentionally damaged both his printer and computer in order to thwart his efforts to file a complaint with Senator Warner or seek

justice among others efforts designed and calculated to thwart and frustrate Plaintiff's efforts to seek justice or extricate himself from defendants' abuse.

104.    As stated previously, Honda manufacturers' warranty has refused to cover the repair of Plaintiff's airbag even though, Plaintiff's car was still under manufacturer's warranty. This airbag issue is not related to Honda's airbag recall. On or about 11/12/12, Plaintiff took his car to Bill Page Honda, Fairfax County, VA, for the airbag repairs. Bill Page Honda informed Plaintiff that they diagnosed and replaced malfunctioning right impact sensor. Again, Honda manufacturers warranty refused to cover the repair and Plaintiff was charged $200.00 for the repair. However, Plaintiff was told that the airbag light could not be cleared because Plaintiff's battery was low and Plaintiff was instructed to bring his car back after he buys a new battery.

105.    On or 11/28/12, Plaintiff bought a new battery and took his car back to Bill Page Honda to have them clear the said airbag's light. Bill Page Honda worked on Plaintiff's car and when they finished with the repair, Plaintiff was called to the services desk. Plaintiff was told that his airbag light has been cleared at no charge. Then, Plaintiff signed the work order ticket and he was given his key back. Plaintiff's car was brought to customers' waiting area. However, as Plaintiff was about to enter his car, he was approached by one of Bill Page Honda's mechanics and informed Plaintiff that his car has to be taken back to the garage to finish one thing. Then Plaintiff's car was taken back to the garage. Shortly thereafter, Plaintiff's car was brought to customers waiting area and Plaintiff was informed that his airbag light could not be cleared because the car needed SRS control among other things. It is highly unusual to informed Plaintiff that his airbag light has been cleared at no charge and later informed that he needed SRS control among other things. This was a pretext for the real reason which was among other things, the defendants' continuation of mafia like tactics to frustrate Plaintiff and interfere with his business relationships among abuse interference.

106.    On or about 1/29/13, Plaintiff went to Fairfax Police Dept. for assistance. Although, no assistance was given to Plaintiff, but when he got home, his water has been turned off. Also, on 8/6/13, Plaintiff went to Human Rights Watch for assistance and when Plaintiff got home his water has been turned off again. The interference with Plaintiff's water service is again, a pretext to the continuation of the said punishment against Plaintiff for seeking assistance from the police and advocates groups among other things.

107.                                                    On or about
07/20/13, Plaintiff filed a complaint against Honda with Fairfax County Dept. of cable and customers' Services (County government office that deals with public complaint against local businesses in Fairfax County). After Honda responded to Plaintiff's complaint, Honda agreed to refund Plaintiff $280.00-the money Plaintiff had paid to

Honda to repair his airbag light while Plaintiff's car was under warranty. However, Honda still refused to repair Plaintiff's airbag. On or 9/19/13, Plaintiff called Fairfax County Cable & Customer Services and informed them what Honda said and Plaintiff was instructed to file another complaint against Honda. On 9/20/13, Plaintiff discovered that the clutch to his car has been damaged and the damage appeared to be a deliberate act. Plaintiff believed that the damage to his car was a pretext to the real reason which was to punish, silence and intimidate Plaintiff for filing a complaint against defendants among other things. Because the authorities have refused to offer Plaintiff assistance in dealing with this prolonged and organized campaign of abuse against him, Plaintiff did not file another complaint with Fairfax County Department of Cable & Customers' Service.

108.                                                                                                       1

106. As the said harassment and interference with Plaintiff's affairs continued, on or about 1/18/14, Plaintiff filed a complaint with Fairfax County PD's Internal Affairs Dept. because Fairfax County PD has refused to offer any assistance to Plaintiff. Following this complaint, Plaintiff met with two Fairfax County PD Internal Affairs personnel.

109.

At the meeting, Fairfax County PD Internal Affairs informed Plaintiff that a family member of Plaintiff had informed them that Plaintiff was getting financial support from questionable sources. This said false allegation is not true; since Plaintiff was/is not getting any financial support from any sources questionable or otherwise. This report of false information to law enforcement implicating Plaintiff was a pretext designed to not only defamed and dehumanize (that is to make Fairfax County PD see Plaintiff as a criminal instead of a crime victim) but also to thwart the investigation of defendants' wrong doing among other things; and it worked, because Fairfax County PD refused to investigate Plaintiff's complaint.

110.       To prove that Plaintiff was/is not getting financial support from any questionable or unquestionable sources, Plaintiff attempted to make an appointment with Fairfax County PD Internal Affairs in order to show them record of his finances. However, Plaintiff was referred to the Dept. Homeland Security.

111.       On or about 10/23/14, Plaintiff wrote DHS's Civil Rights & Civil Liberty Dept. and he received a letter dated 12/22/14, informing him that they have no jurisdiction over Plaintiff's concerns.

112.                                                                                              On or about 10/23/14, Plaintiff wrote Fairfax County Board of Supervisor Chairwoman (Mayor of Fairfax County), asking for her assistance and to look into Plaintiff's complaint. However, before the Chairwoman could respond to Plaintiff's request for assistance, S & S Properties (Plaintiff's landlord)'s handyman entered Plaintiff's apartment on 10/30/14,

to repair the said noise in Plaintiff's apartment. However, after the repair, the noise in Plaintiff's bathroom change from intermittent to constant sound of running water.

113.      On or about 3/9/15, Plaintiff wrote a follow-up letter to Fairfax County Board of Supervisor Chairwoman regarding Plaintiff request for assistance. For the Chairwoman has not responded to Plaintiff request for assistance. On or about 3/12/15, S & S Properties posted a flyer in the apartment complex informing the tenants including Plaintiff that any car parked in the apartment's parking lot without Virginia tag will be towed at the owner's expenses. This sudden packing lot enforcement just three days after Plaintiff wrote a follow-up complaint letter to the Chairwoman was a pretext designed to punish Plaintiff for filing the said complaint and a continuation of retaliation against Plaintiff. For Plaintiff was the only person with out of state tag and Plaintiff has been parking his car on the apartment's packing lot for over a years without any issue.

114.      On or about 3/31/15, Plaintiff asked S & S Properties to delay the said parking enforcement to give Plaintiff time to transfer his car registration to Virginia and S & S Properties declined Plaintiff's request immediately. Because of the prolonged mafia-like covert and overt harassment, intimidation, interference with Plaintiff's civil rights, and civil liberties outlined above as well as Plaintiff's inability to access the court meaningfully or extricate himself from the abuse, Plaintiff moved to Iowa.

115.      As soon as Plaintiff arrived in Iowa, similar incidents outlined above resumed. In addition, on 8/11/15, Plaintiff was staying in a hotel in Des Moines, IA area. At about 9:30 am, Plaintiff was searching for apartment using the hotel's internet, all of a sudden the internet and phone system stopped functioning. The hotel's phone and internet system were down all day. As a result, Plaintiff's apartment search was derailed for the whole day and Plaintiff had incur more hotel and related expenses. The interruption of the hotel's internet and phone systems were a pretext calculated to frustrate, hinder, and undermined Plaintiff's apartment search among others things.

116.      Plaintiff had rented a storage space from Public Storage in Virginia, to store his belongings while he was looking for apartments in Iowa. There is no Public Storage location in Iowa. Thus Plaintiff paid his Public Storage rent via check (Plaintiff give then his checking account and routing number and authorized a payment of $163.00) at the suggestion of Public storage representatives. Public Storage did not present the said check for payment. Instead, Public Storage charged Plaintiff $28.00 late payment fees and a $25,00 insufficient fund charge. Public Storage failure to present the said check for payment was a pretext to among other things to frustrate and inflict emotional distress on Plaintiff by inflating the said Public Storage rent among others.

117.                                                                                          A

About early September 2015, Plaintiff received a flyer from CenturyLink offering discounted internet connection services. So Plaintiff called the number on the flyer.

Plaintiff was offered internet services for $14.95 a month for the first six months and after that $29.00 a month over the phone. However, when Plaintiff received his CenturyLink internet bill, it was almost three time the quoted internet bill. Plaintiff called Centurylink to question his internet bill. Then Centturylink customers service representative informed Plaintiff that he was not familiar $14.95 offer. But if Plaintiff set up automatic payment that his monthly internet service bill will $20.00 a month for a year.. Because automatic payment will takes time to initiate, Plaintiff was also told to pay one month internet bill ($20.00) in advance.

118.    On 10/16/15, Plaintiff paid his CenturyLink $110.00 internet service bill. This payment includes one month advance payment. On 10/27/15, Plaintiff reported these ongoing harassment incidents against him to West Des Moines Police Dept. When Plaintiff got home the same day (10/27/15), his internet service has been disconnected. Then Plaintiff called CenturyLink and asked them why his internet service was turned off. Plaintiff was informed that his internet services were disconnected for non-payment of his bills. Plaintiff reminded the Centurylink Customers Representative that Plaintiff had paid his bill on 10/16/15, at 1:15 pm at cashier number sxg102167. Then Plaintiff was told that Centurylink has no record of his payment and Plaintiff submitted a copy of his receipt to Centurylink. On 11/4/15, Plaintiff went to Centurylink kiosk located in Marle Hay Mall, Des Moines, IA, to inquire if his payment record has been found. Plaintiff was told that their computers and internet were down just about 5 minutes before Plaintiff got there. The disconnection of Plaintiff's internet connection was among other things, a pretext to punish Plaintiff for reporting the abuse against him to the police. This retaliation and harassment against Plaintiff is a reoccurring pattern and practice of the defendants and their co-conspirators mafia like attempt to silence and punish Plaintiff for his efforts to seek justice or extricate himself from defendants' abuse among other things. In effect, if Plaintiff takes action "A" to seek justice or extricate himself from the defendants' abuse, the defendants invariably take action "B" to counter and punish Plaintiff' for making such effort among other things.

119.    On or about 9/15/15, Plaintiff went to one of his bank's branches in the area to rent a safe deposit box because his residence has been unlawfully entered in multiple occasions. Plaintiff was told that they did not have the box size he was looking for. Then the bank representatives call other branch to find out which location has the correct box size. Then Plaintiff was given the address to the branch that has the box size that Plaintiff was interested in. However, when Plaintiff got to the said address, it was an Automatic Teller Machine (ATM)'S address.

120.    On or about 10/15/15, Plaintiff went to Parish Law Firm to inquire if the law firm could represent him. After Plaintiff was interviewed, he was told that it will be a couple of days for them to make a decision. On or about 9/21/15, Plaintiff went to Parish Law

Firm to find out if they were going to take his case and he was told that Chris was not available to speak with Plaintiff. However, that day, Parish law called Plaintiff's bank and informed then that Plaintiff was planning to sue them. Parish Law Firm did not take Plaintiff's case.

121.     Also on 9/15/15, Plaintiff visited Charles Schwab Des Moines, IA, location to inquire if it was okay for him to transfer his accounts back to Schwab and to determine the specifics process, any issue that may impact the said transfer, and to know how long the transfer will take. Plaintiff was told that it was okay and that it will take a couple of days.

122.     On or about 9/20/15, Plaintiff spoke to Schwab representatives in Indianapolis, IN, about transferring his accounts to Schwab and again, Plaintiff was told that it was okay to transfer his accounts back to Schwab. Then on the same day, Plaintiff transferred his account to Schwab Des Moines, IA, location.

123.     On or about 9/21/15, Schwab wrote Plaintiff a letter welcoming him back to a Schwab and confirming his log-in ID set-up. On 9/23/15, Schwab wrote Plaintiff informing him to contact Schwab within 30 days to verify certain information. Also on the same day (9/23/15), Schwab wrote Plaintiff to inform him that his accounts were restricted and closed. In addition, Schwab order Plaintiff to liquidate his accounts immediately.

124.                                                                                         Plain

Plainttiff have not received any of the above mentioned Schwab's letters to him when he on or about 9/28/15, Plaintiff went to Schwab Des Moines, IA, location to make a trade unbeknownst to him that Schwab has closed his accounts. When Plaintiff got to Schwab office, he was unable to log-in into his accounts. So Plaintiff spoke with Schwab's agent at the front desk to find out why he, (Plaintiff) was unable to log into his accounts. Then Schwab's agent on the front desk called another individual who spoke to somebody on the phone. Eventually Plaintiff was informed that his accounts have been closed and that all they can do was to issue him a check equal to the value of his accounts. Plaintiff pleaded with Schwab agents to give him at least a week and in so doing Plaintiff will be able to trade, orderly transfer his accounts to another institution, and avoid tax implications as well as early withdrawal penalty. But Schwab insisted that Plaintiff liquidate his accounts immediately. Then Schwab's agent accused Plaintiff of never traded a stock in his life and that Plaintiff was hiding his ill-gotten money in his Schwab accounts. Schwab accusation was not true; it was a pretext to continue the pattern and practices of mafia like efforts to defame, frustrate, dehumanize, and exploit Plaintiff among other things. For Schwab has been Plaintiff's stock broker since late 1980's or early 1990's.

125.    As outlined previously in this complaint, from about 2005, to 2012, Plaintiff did not receive his bank statements and this was in Illinois, despite numerous complaints to the Post Office.  In 2012, Plaintiff moved to Virginia and he started receiving his bank statements.  However, when Plaintiff moved to Iowa, in 2015, and opened a bank account, again, US Postal Services stopped delivering Plaintiff's statements.  Then Plaintiff spoke to his bank and they gave him a copy of statement returned to the bank.  The mail was properly addressed; but US Postal Services marked it, "return to sender not deliverable as addressed unable to forward.  See exhibit "D-2".  Then Plaintiff made oral complaint to the Post Office.  The following month Plaintiff did not receive his bank statement.  So on about 12/26/15, Plaintiff filed a written complaint with Post Office.  However, the non-delivery of Plaintiff bank statements continued.

126. Plaintiff moved into Warren Properties Apartment in Iowa, in mid-September, 2015.  The pattern of similar incidents Plaintiff experienced in his previous apartments resumed in Iowa.  For example, when Plaintiff moved in into the said apartment complex, his apartment was not cleaned.  Plaintiff had to borrow cleaning supple from Warren Properties Handyman to clean his apartment.

127. Each time Plaintiff goes to the bathroom, enter/exiting his apartment, getting in or out of the bed every morning and evening, or Plaintiff is doing something that requires concentration, if he goes to the bathroom in the middle of the night among others, a loud thump, furniture dragging, or full blast of running water or the like noise will start coming from Plaintiff's neighbor side of the apartment.  The said noise is a continuation of defendant's efforts designed to frustrate, harass, intimidate, torture, and induce helplessness in Plaintiff as well as to distract him and remind him that he is being watched among other things.

128. On or about 10/27/15, Plaintiff reported above incidents to West Des Moines, IA PD and Officer Eric Donielson met with Plaintiff.  Plaintiff told him what has been happening since he moved into Warren Property apartment and the Officer stated that maybe someone has hired private investigator to harass Plaintiff.  Officer Donielson instructed Plaintiff to write down what was happen to him (Plaintiff) and the time it happened for about a week and bring it to him.  However, after a week, Plaintiff went back to Officer Danielson, but he was no longer interested.

129. On or about 5/6/16, Plaintiff was on a line to pay for his groceries in Aldi's Groceries' checkout counter.  As Plaintiff approached the cashier, a female Aldi's employee whispered something to male cashier who will be attending to Plaintiff.  After Plaintiff paid for his groceries, he was stopped by the cashier and asked to open his backpack for him to check to ensure that Plaintiff did not steal any groceries in front of everyone going through multiple checkout lines.  Plaintiff's backpack was search for any stolen groceries items and no stolen item was in Plaintiff's backpack.  However, Plaintiff was

embarrassed, humiliated, and everybody going through the checkout was looking at Plaintiff as he had stolen grocery item. There were many shoppers with backpack and large purses and none of them was searched. As stated earlier, defendants stalk Plaintiff and use their knowledge of his movements to interfere and sabotage Plaintiff's business relationships among others abuse. Thus Searching Plaintiff's backpack and events outlined above were a pretext among other things to harass, intimidate, and to frustrate Plaintiff in order to distract and disrupt his efforts to seek justice or extricate himself from the ongoing abuse against him. For at the time, Plaintiff was preparing to file a complaint against the defendants and this was one of the ways defendants use their power and influence to harass, distract, disrupt, or to stress-out Plaintiff in order to induce helplessness in Plaintiff or cause him to lose focus in his effort to seek justice among other of interference.

130. Late 2016, Plaintiff went to Iowa Civil Rights Commission seeking assistance and Plaintiff was given a list of legal assistance advocate groups in the area. Polk County Bar Legal Assistance Outreach located in a church was on the said list given to Plaintiff. On or about 12/23/16, Plaintiff went to the said church to inquire about time and requirement for the said legal assistance. When Plaintiff got to the said church, the front door to the church was locked. So Plaintiff walked to the side door and it was looked also. Then Plaintiff left for grocery. However, next day, Dept. of Homeland Security (DHS) announced that terrorists were planning to attack churches. Plaintiff was concerned because of the continued false accusations against Plaintiff. This may be among other things, a pretext by defendants to create legal problems for Plaintiff. In so doing, defendants and their co-conspirators dehumanize Plaintiff which forces the authorities to see Plaintiff as a criminal instead of a victim of criminal acts.

131. On or about 12/28/16, Plaintiff travelled from Iowa to Indianapolis, IN, to file complaint with EEOC. Plaintiff stayed in a local hotel in Indianapolis on 12/28/16, and planned to go to EEOC the next day. At the hotel, Plaintiff went to bed at about 10:00pm. But soon after loud noise that appeared to be from the next room prevented Plaintiff from sleeping; as the noise continued, at about 1:00 am, Plaintiff requested to be transferred to another room and Plaintiff did not have any problem in the said new room. Each time, Plaintiff has an import meeting or doing something that requires concentration, loud noise is used to distract and disrupt whatever Plaintiff is doing. Based on information and belief, the said noise is being used to distract and disrupt Plaintiff focus and concentration among other things.

132. On or about 12/29/16, Plaintiff went to EEOC office to file a complaint and Plaintiff got to EEOC at about 02:00 pm. EEOC attendant informed Plaintiff that he, (Plaintiff) had only ten minutes to complete the complaint form in order to be interviewed that day. Then Plaintiff informed the EEOC attendant that ten minutes may not be enough for

Plaintiff to complete the said EEOC complaint form.  Then the attendant informed
Plaintiff to come back the next day before 02:00 pm.

133. The next day, 12/30/16, Plaintiff went to EEOC and Plaintiff got to EEOC by
about12:00 pm, with a coupled EEOC complaint form.  Plaintiff was instructed by the
EEOC attendant to sign-in and wait to be called.  At about 12:30 pm, Plaintiff was told
that nobody was available to interview him and Plaintiff informed the attendant that he,
(Plaintiff) came all the way from Iowa to file the complaint and had place to stay.  The
attendant insisted that nobody was available to interview Plaintiff and Plaintiff was
instructed to come back on Tuesday.

134. As Plaintiff was writing this complaint, his printer freeze up (stopped functioning).  So
Plaintiff started using public computer at the library.  On or about 3/17/17, Plaintiff went
to Drake University to print this complaint and their printers were not working either.
Plaintiff has about three printers and multiple computers that stopped functioning when
Plaintiff was working on issues related this matter.  This continued malfunctioning of
Plaintiff's printers or computers as Plaintiff work on issues related to this matter is a
pretext to frustrate, hinder, or sabotage Plaintiff's efforts to seek justice or extricate
himself from defendants' abuse among other things.

Series E

135. On or about 5/22/17, this court received Plaintiff's complaint with three (3) copies of
each item Plaintiff filed with the court that day-summons, complaint, motions, and
attachments among others items as well as postage paid self-addressed priority mail
envelop # 9505-5117-8124-7140-1253-36.  Hon. Megan Brennan is one of the
defendants.  Defendant Brennan is also the CEO and Postmaster General of the United
States Postal Services and through her agents or employees she impeded the delivery of
legal documents which Plaintiff was going to serve her.

136. Also on the same day, 5/22/17, this court opened a docket on this case with Plaintiff's
correct address.  However, Plaintiff did not receive the summons, complaint, or any other
item from the court.  Then on 6/5/17, this court received a letter from Plaintiff informing
the court that Plaintiff did not receive summons, complaint, or any other item from the
court and the tracking number to the priority envelope Plaintiff provided to court the has
not entered into US Postal Services' system.  Again on the same day, 6/5/17, this case's
docket indicated that properly addressed mail containing summons, complaint, and other
items sent to the Plaintiff by this court were returned to the court (docket 11) by
Defendant Brennan through her agents.

137. On 6/26/17, again, properly addressed mail containing summons, complaint, and other
items sent to Plaintiff by this court was returned to the court by Defendant Brennan

through her agents. This is a continuation of interference with Plaintiff's legal and other important mails since 1999, and up the present time.

138. On or about 6/28/17, Plaintiff went to US Postal Services Inspector, General, Des Moines. IA to complain to them regarding US Postal Services return of properly addressed mail containing legal documents which Plaintiff intended to serve Defendant Brennan and other defendants. Then on or about 6/29/17, Plaintiff received mail from the court but not the three copies of each item Plaintiff sent to the court. These interference with Plaintiff's mail containing legal documents were a continuation of pattern of Defendant Brennan through her agents' willful, malicious delay, and interference with Plaintiff's mail which is a pretext among other things to avoid being served as well as intentional and unfairly sabotage of Plaintiff's ability to prepare and Present his claims to the court among abuse.

139. Because of the above said interference with Plaintiff's mail, Plaintiff decided to move back to Indianapolis, IN, to avoid the said ongoing delay and interference with Plaintiff's mail. Plaintiff drove from Iowa to Indianapolis and on or about 7/29/17, Plaintiff attempted to rent a bigger vehicle from Enterprise Rent A Car. Plaintiff verified through the internet that Enterprise location at Michigan and 465 had a van available. So Plaintiff proceeded to said Enterprise location and when he got there, he was told that they did not have a van available. Then Plaintiff asked if the attendant could verify through their reservation system if any nearby location has a van available. The attendant confirmed through their reservation system that Enterprise location at Keystone and 96 St. had a van available.

140. However, when Plaintiff got to the Keystone and 96 St. Enterprise location, Plaintiff was told that they did not have a van available. Despite the fact that there were several vans parked at their parking lot. Then Plaintiff called Enterprise Reservation center and gave them Plaintiff's payment information; Plaintiff was sent to Airport location to pick-up a van. When Plaintiff got to the Airport, he had to pay for parking and when he got to the Enterprise Desk, Plaintiff was told that they do not accept debt card. Even though Plaintiff had informed Enterprise agent that sent him to the Airport that he was going to pay with debt card.

141. Then Plaintiff called the Enterprise Customer's Services and explained to them what has happened and the Enterprise representative apologized. Then she told Plaintiff she will have a van reserved for him at Enterprise at keystone and 46 St. the next day.at 9:30am. The next day at 09:30am, when Plaintiff got to Enterprise at Keystone and 46 Street, Plaintiff was told that nobody instructed them to reserve a van for Plaintiff. But Plaintiff was told that Enterprise at Keystone and 96 St. has a van available when they open at12:30pm. When Plaintiff got to Enterprise location at Keystone and 96 Street, he was told that they did not have a van available. So Plaintiff called Enterprise Reservation

Center and one the agents told Plaintiff that Enterprise, Shadeland location has a van available. However, the location closes at 01:00pm and it was about 12:45pn at the time. The Enterprise agent added that the shadeland location will not wait for Plaintiff and that Plaintiff has to get there before 01:00pm to be able to rent the said van.

142. Plaintiff rushed to the Enterprise, Shadeland location and fortunately he got there just before 01:00pm. The attendant threw in another road block by requesting that Plaintiff give him a copy of his recent utility bill to prove that he live at the address Plaintiff gave him. As if people carry their recent utility bills with in their wallet. The attendant also demanded that plaintiff give him phone number and address of my next of kin. Luckily Plaintiff has the said information and Plaintiff gave it to him. This type of treatment is typical of Plaintiff's experiences when he tries to obtain goods and services from the local community. This was a continuation of interference with Plaintiff's ability to obtain goods and services from local community by defendants through their agents and their co-conspirators.

143. On or about 9/8/17, Plaintiff filed a motion for sanction against Defendant Brennan. The motion was based on the fact that since 1999, and up to the present time, Defendant Brennan through her agents engaged in intentional and continuous pattern of not delivering, delay, or interfering with Plaintiff's legal mails containing legal documents related to ongoing legal proceedings including this instant case in which she (Brennan)is a defendant among others. The effects of this interference are that among other things, it impede and unfairly interfere with Plaintiff's ability to prepare and present his claims to the court as well as interfere with the court's ability to impartially adjudicate this matter on its merit; as such Defendant Brennan's actions through her agents amounted to abuse of power and fraud upon the court.

144. On or about 9/12/7, Judge McKinney denied Plaintiff's motion. On or about 9/27/7, Plaintiff filed a motion for reconsideration pointing out Judge McKinney's errors and biases. See Plaintiff's motion for reconsideration filed on 9/27/17, for detail.

145. However, as Plaintiff was preparing for above said motion for reconsideration of Judge McKinney's order, pointing out his errors, biases, and calling for his recusal, he (Judge McKinney) died sudden and unexpectedly on 9/20/17. The timing and nature of Judge McKinney's death makes his dead suspicious and questionable given that similar incident had occurred in past. As outlined in series "D" of this complaint, Plaintiff had filed a complaint against Judge Chambers for unlawful relationships with Gramercy and sham judicial proceedings involving Plaintiff's claim against Gramercy's $25,000.00 surety bond, Judge Chambers died sudden and mysteriously about time Plaintiff was preparing to file the said complaint against him in similar manner that Judge McKinney died. Both death appeared questionable and suspicious and may be a means to impede Plaintiff's

complaint against the said judges-cover-up of wrong doing and efforts to thwart any investigation of the said judicial misconducts.

146. After Judge McKinney's death, Judge Pratt was assigned to this case. On 11/30/17, Judge Pratt entered multiple orders including one that gave Plaintiff only two weeks to respond; otherwise, Plaintiff's claims will be dismissed with prejudice. The court mailed Plaintiff the said order, but Defendant Brennan through her agents did not delivery the said court order to Plaintiff. Plaintiff became aware of the said 11/30/17 order by chance. Plaintiff called one of the defendants Bettinger's attorney to reminded them that Plaintiff has not receive their response when he told Plaintiff the court had entered certain orders. See Plaintiff's objection and exceptions filed on 12/28/17 for details.

147. Again, Defendant Brennan and US Postal Services through their agents intentionally and maliciously interfered with the delivery of mail containing court's order sent to Plaintiff by this court. This non-delivery of court's order by Defendant Brennan through her agents was designed to ensure that Plaintiff will not respond to said order which will in turn force the court to dismiss Plaintiff's clams and in turn avail Defendant Brennan of liability related to Plaintiff's injuries and damages among others. Defendant Brennan and US Postal Services intentional and malicious interfere with Plaintiff's mail containing the said court's order amounted to fraud on the court; because it unfairly sabotaged Plaintiff's ability to respond to the said court's order which could have led to dismissal of Plaintiff's claims with prejudice.

148. The actions of Brennan through her agents and employees were under taken under color of federal or states law.

149. Defendants through their agents and those working in concert with them actions and omissions since at least 1996, and up to present time, have enslaved, subjugated, torment and continued to enslave, subjugate and torment Plaintiff. In other words, defendants deprived and continued to deprive Plaintiff of self-autonomy, right to employment, educational opportunities, business, social, and even family relationships as well as cause Plaintiff emotional distress, grief, humiliation, reputational damage, equal protection of the law, basic freedom, liberty, right to have normal life, and meaningful access to court among other abuse and exploitation as well as interfere with Plaintiff's ability to retain a legal counsel among other abuse and deprivations.

1st Cause of Action:

Violation of Due Process and Equal Protection of the Laws-(Brennan)

150. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

151. At all times material, Defendant Brennan and Does 1-10 (her agents) were acting under federal color of laws. Does 1-10 were Defendant's agents and employees and were under her direction, supervision, and control.

152. At all times material, Plaintiff had clearly established due process and equal protection rights under Fifth and Fourteenth Amendment which prohibits any person acting under color of laws from depriving him of due process and equal protection of the laws among others.

153. Between 1999, and up to the present time, Does 1-10 knowingly, intentionally, and unlawfully violated Plaintiff's due process and equal protection of the laws rights by delaying and interfering with Plaintiff's legal mails, other important mails, and legal mails containing legal documents related to legal proceedings in which US Postal Services was defendant among others from 1999, to present.

154. Plaintiff's multiple oral and written complaints should have alerted Defendant Brennan of the interference with Plaintiff's mails related to ongoing legal proceedings among others as outlined above and in this complaint. Despite Defendant's knowledge through Plaintiff's multiple oral or written complaint, Defendant and its agents acted and continue to act with reckless and deliberate indifferent to her agents' unlawful violation of Plaintiff's rights and suffering. Because of Defendant Brennan's failure to act, she expressively and tacitly authorized her agents' intentional, unlawful conduct, and other abuse.

155. Defendant Brennan is liable for the violation of Plaintiff's due process, equal protection of the laws, and interference with Plaintiff's legal mails among others pursuant to her failure to act to avoid, correct, or prevent her agents' unlawful conduct among others abuse.

156. Defendant Brennan and Does 1-10 were direct and proximate cause of the violations of Plaintiff's substantive due process and equal protection rights as well as interference with Plaintiff's legal mails among others. Plaintiff was a foreseeable victim of these acts.

157. Defendant violation of Plaintiff's due process, equal protection of the laws, and interference with Plaintiff's mails among others rights cause Plaintiff to suffer damages and injuries, including mental and emotional pain and suffering as well as costs, expenses, and attorney's fees as well as compensatory and punitive damages in the amount to be determine at the trial.

2nd Cause of Action (Violation of 42 USC 1985(2)-All Defendants)

158. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

159. At all times material, Plaintiff had a clearly established right under the laws of the United States to the full and equal benefit of the laws, equal protection, to make and

34

enforce contract, and to enjoy equal privileges and immunities secured by the United States constitution.

160. Plaintiff is an African American and thus member of protected class.

161. In 1996, Ette and his co-conspirators conspired to defraud Plaintiff; and in furtherance of the said conspiracy, Ette and his co-conspirators solicited certain unknown US Postal Services' agents (Does 1-10) and they agreed to knowingly, intentionally, and unlawfully impede Plaintiff's meaningful access to court in furtherance of Ette's conspiracy to defraud Plaintiff.  In addition, Ette and his co-conspirators solicited Shultz and other unknown St. Vincent's agents (Does 11-20) as well as Kennedy and other unknown Schwab's agents (Does 21-30).  Both separately agreed and knowingly, intentionally, and unlawfully engaged in separate acts to punish Plaintiff for accessing the court in furtherance of Ette's conspiracy to defraud Plaintiff.

162. By Defendants, conspiring for the purpose of impeding, hindering, obstructing, or defeating Plaintiff's meaningful access to justice with the intent to deprive Plaintiff of equal protection of the law, equal privileges and immunities secured by the laws and constitution of the United States as well as conspire to retaliate against Plaintiff for attempting to protect his rights, liberty, and property, Plaintiff suffered injuries to his person and property in violation 42 USC 1985(2& 3).

165.  As a direct and proximate result of the above described unlawful acts or omissions of the defendants and their co-conspirators, Plaintiff suffered severe and grievous injuries as outlined in the above count for which Plaintiff is entitled for relief.

3rd Cause of Action (Violation of 42 USC 1985(3)-All Defendants)

163.  Plaintiff re-alleges and incorporates herein by reference all allegation and arguments in this complaint as if set forth herein in full.

164. By virtue of the foregoing, at least two  or of the defendants through their respective agents and their co-conspirators conspired for the purpose of depriving Plaintiff of a) equal protection of the laws; and b) equal  privileges and immunities under the law; and c) for the purpose of exploiting, retaliating, preventing, impeding, or hindering the constituted authorities from giving and securing to Plaintiff equal protection of the law and deprivation of liberty and property without due process of law, Defendants and their co-conspirators violated 42 USC section 1985(2 & 3).

165. Defendants, through their respective agents or employees, and their co-conspirators each one of them, did and caused to be done, an act or acts in furtherance of the objective of the conspiracy, whereby Plaintiff was deprived of his properties, liberty, rights, and privileges as set forth above.

166. As direct proximate result of the foregoing, Plaintiff has been damaged as recited above and demands and is entitled to the damages and injuries, recited the first Cause of Action,

but not limited to, general and punitive damages in the amount to be determine at the trial.

4th Cause of Action (Violation of 42 USC 1986 -All Defendants)

167. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments as if set forth herein in full.

168. Commencing from 1996, to present, defendants agents or employees, their co-conspirators, each one of them knew and understood that Plaintiff was being subjected to deprivation of constitutional rights under 42 USC 1985 and each one the defendant and their co-conspirators had the power to frustrate or prevent its commission, and each one of them neglected or refused to prevent it.

169. As direct and proximate result of defendants' agents or employees' inaction, Plaintiff has been damaged as recited above and demands and is entitled to the damages recited in the First Cause of Action, including but not limited general and punitive damages.

5th Cause of Action (Common Law Duty of Care-Schwab)

170. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

171. Plaintiff has been a client of Schwab since late 1980's or early 1990's.

172. Charles Schwab owed Plaintiff a common law duty of care which includes, but not limited to a) duty of suitability-to ensure recommendation are suitable to Plaintiff in terms of his financial needs, objectives, and unique circumstances; b) duty of candor, good faith, and honest dealing; c) duty of disclosure-inform Plaintiff of potential risk and reward regarding investment recommendations; and d) duty to avoid self-dealing and misrepresentation of material fact related to particular recommendation among others. Plaintiff and Defendant Schwab had a client broker relationship in which Plaintiff placed special confidence in Schwab and its agent's financial knowledge as broker and financial adviser. Schwab and its agents owed Plaintiff a heightened common law duty of care to ensure suitability especially when making specific recommendation designed specifically for Plaintiff among other under common law duties of care and suitability.

173. Plaintiff relied on Defendant Schwab at all times material, to deal with him fairly, honesty, in good faith, candor, integrity, and in an equitable manner. On or about 1/25/08 and 9/15/15, Defendant Schwab's agents, Howie Kennedy, and other unknown agents of Schwab (Does 21-30) has a duty to exercise above said common law duty of care and duty of suitability as well as to educate Plaintiff regarding foreseeable risk and reward associated with the recommendations specially designed and prepared specifically for Plaintiff.

174. Defendant Schwab's agents, Howie Kennedy, and other unknown agents of Schwab (Does 21-30) breached the said common law duty of care and suitability when they made the recommendation to Plaintiff. This breach was evidenced by the fact that each investment recommendation especially designed for Plaintiff had a negative return and Plaintiff will not break even for at least ten years and Schwab through its agent's retaliation against Plaintiff. Defendant and his agents wrongful conduct, lack of fairness, honest dealings, and lack of concern for Plaintiff's financial wellbeing and loss of opportunities to trade or sell certain stock during the 2008's severe market down turn, prejudice Plaintiff and breached the said common law duty of care and duty of suitability among others.

175. Defendants' actions and omissions were intentional, malicious, reckless, and foreseeable.

176. As direct and proximate result of breach of the said common law duty of care and duty of suitability, Plaintiff has suffered injuries and damages to his person and property for which he is entitled for relief including but not limited compensatory and punitive damages among others.

6th Cause of Action (Negligence-Schwab)

177. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

178. By staffing and operating a financial corporation, through its branch and subsidiaries, providing brokerage services, assets management, custody, and financial advisory services among others financial services. Also by advertising and accepting new and existing accounts, Schwab is holding itself out as safe environment for investment and wealth building company. In doing so, Defendant Schwab entered into an express common law duty of care to provide honest and safe place for wealth building among others. In addition, when Schwab, through its agents and employees designed a special investment recommendation for Plaintiff, Defendants assumed a heightened duty of suitability and duty of care.

179. Defendant Schwab further assumed common law duty of care when by holding out its agents and employees, including Howie and others as competent experienced financial experts and counselors among others. Schwab, Howie Kennedy, and others (Does 11-20) Schwab's agents breached the said duties described above. See White Paper, Suitability Obligation in Online Investing, submitted by W. Hardy Caltcot, Sr. Vice President and General Counsel, Charles Schwan & Co. submitted to NASAA Round Table on Internet Investing Issues, November 1, 1999,; Gochnauer v. A.G Edward & Son, Inc., 810 F.2d 1042, 1046-47 (11th Cir. 1987); Lieb v. Meril, Lynch, Pierce, fenner, & Smitt inc., 461 F.

Supp. 951, 953 (E.D Mich. 1978); Thompson v. Smith barney, Hariss Uphan & Co. Inc. 709 F.2d 413, 418 (11th Cir. 1983); and Dupuy v. Dupuy, 551 F.2d 1005 (5th Cir. 1977).

180. As direct and proximate result of Schwab, and its agents and employees' negligent conduct, Plaintiff has suffered injuries and damages to his person and property for which he is entitled for relief in the amount to be determined at the trial.

### 7th Cause of Action-Vicarious Liability Defendant St. Vincent Hospital

181. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

182. At all times material, St. Vincent Hospital employed Shultz and other unknown agents of St. Vincent (Does 11-20). Shultz and Does 11-20 were under Vincent Hospital's direct supervision, employ, and control when they committed the wrongful and negligent acts or omissions described herein. Shultz and other unknown individual engaged in these conduct while acting in the course and scope of their respective employment with St. Vincent Hospital and /or accomplished the wrongful and negligent acts or omissions by virtue their respective job-created authority.

183. Therefore, Defendant St. Vincent Hospital is liable for the wrongful conduct of Shultz and Does 11-20 under the law of vicarious liability, including the Doctrine of Respondeat Superior.

184. As direct result of conduct described herein, Plaintiff has suffered injuries and damages described herein.

### 8th Cause of Action-Vicarious liability-Brennan

185. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

186. At all times material, Defendant Brennan and US Postal Services employed the unknown agents US postal Services (Does 1-10). The Does 1-10 were under Brennan's direct supervision, employ, and control when they committed the wrongful acts alleged herein. The Does 1-10 engaged in these wrongful conducts while acting in the course and scope of their respective employment with Defendant Brennan and US Postal Services and /or accomplished the wrongful conduct by virtue of their respective job-created authority.

187. Therefore, Defendant Brennan is liable for the wrongful conduct of Does 1-10 under the law of vicarious liability, including the Doctrine of Respondeat Superior.

188. As direct result of the conduct described herein, Plaintiff has suffered the injuries and damages described herein.

### 9th Cause of Action-Vicarious Liability Charles Schwab

189. Plaintiff re-alleges and incorporates herein by reference all allegation and arguments in this complaint as if set forth herein in full.

190. At all times material, Defendant Schwab employed Howie Kennedy, and other unknown agents of Schwab (Does 21-30). Howie Kennedy and Does 21-30 were under the direct supervision, employ, and /or control of Schwab when they engaged in the wrongful conduct and/ or while acting in the course and scope of their employment with Defendant Schwab and /or accomplished the wrongful conduct by virtue of their job created authority.

191. Therefore, defendant Charles Schwab is liable for the wrongful conduct of Howie Kennedy and Does 21-30 under vicarious liability, including the Doctrine of Respondeat and under Superior.

192. As direct result of conduct described herein, Plaintiff has suffered the injuries and damages described herein.

10th Cause of Action-Negligence-Brennan

193. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

194. By establishing, staffing, or operating US Post Offices, accepting mails and offering related services to the public, Brennan hold itself out to provide a safe mail delivery services. Thus Defendant entered into an express and implied duty to provide reasonably safe mail and related deliveries and assumed the common law duty of care to protect and handle mails and other items with care.

195. Defendant further assumed this duty by holding mail careers and her other employees out to the public, including the unknown agents of hers as competent and honest employees or agents of the Postal Services.

196. Defendant and Does 1-10 breached this common law duty of care by knowingly, intentionally, and maliciously sabotage or interfere with Plaintiff's mails as described in this complaint, including mails containing legal documents related to legal proceedings in which US Postal Services, Brennan or Brennan's agents were defendant

197. As direct and proximate result of defendant Brennan's action and omissions through her unknown agents' acts or omissions, Plaintiff has suffered injuries and damages for which he is entitle for relief in the amount to be determined at the trial.

11th Cause of Action: Negligent Supervision and Training-Brennan

198. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

199. At all times material, Defendant Brennan employed Does1-10. Does 1-10 were under direct supervision and control of Defendant Brennan when the wrongful acts or omissions

39

alleged herein were committed.  Does 1-10 engaged in the wrongful conduct while acting in the course and scope of their respective employment with Defendant or accomplished the wrongful acts or omissions described herein by virtue of their respective job-created authority as employees of US Postal Services.

200. Defendant Brennan had a duty to train and supervise the said unknown agents of hers not to discriminate against any of its customers, including Plaintiff or intentionally delayed or interfere with normal delivery process.

201. Defendant Brennan breached that duty when the said Does 1-10 intentionally and maliciously discriminated against Plaintiff or failed to exercise ordinary care while handling Plaintiff's mails from at least 1999, to present and delayed and interfered with the delivery of Plaintiff's mails causing Plaintiff injuries and damages.

202. Defendant Brennan failed to prevent the foreseeable misconduct of her agents, Does 1-10.

203. As direct and proximate result of defendant's acts or omissions, Plaintiff has suffered injuries and damages described herein for which he entitled for relief in the amount to be determined at the trial.

   12th cause of Action: Negligent Supervision and Training-Charles Schwab

204.  Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

205. At all times material, Defendant Schwab employed Howie Kennedy and other unknown agents of Schwab (Does 11-20).  Howie and Does 11-20 were under direct control, supervision, employees of defendant Schwab while the wrongful conducts alleged herein were committed and/ or the wrongful acts or omissions were committed while acting in the course and scope of their respective employment with Defendant Schwab and/ or accomplished the wrongful conduct by virtue of their respective job-created authority as financial advisor among others.

206. Defendant Schwab had a duty to train and supervise defendant Howie Kennedy and other of its employees not to discriminate or treat Plaintiff differently.

207. Defendant Schwab breached that duty when it failed to exercise ordinary care in training and supervising Howie Kennedy and Does 11-20 not to treat Plaintiff differently.

208. Defendant Schwab failed to prevent the foreseeable misconduct of Howie Kennedy and Does 11-20's wrongful conducts described herein.

209. As direct and proximate result of defendants' acts or omissions, Plaintiff has suffered injuries and damages which he is entitled for relief in the amount to be determined at the trial.

   13th Cause of Action: Interference with Plaintiff's meaningful access to Court-Brennan

210. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

211. Plaintiff is entitled to meaningful access to court and any act or omission that interferes or rendered such access to court ineffective, inadequate, or meaningless violated Plaintiff's meaningful access to court and free speech guaranteed by First, Fifth, and Fourteenth Amendment among others.

212. Plaintiff has existing, pending or probable litigations and Defendant Brennan through her agents was aware of such existing, probable or pending legal proceedings or should have known that such litigation exists or is probable. In fact, Defendant Brennan was a defendant some of the cases alleged herein.

213. Defendant Brennan through agents (Does 1-10) knowingly, intentionally, and maliciously interfered with Plaintiff's legal mails from at least 1999, to present, with the intent to impede or sabotage Plaintiff's claims which has resulted in dismissal of Plaintiff's otherwise meritorious claims. In turn causing injuries and damages to Plaintiff, in his property, freedom, and liberty as well as emotional pain and anguish among others. In fact some of interferences alleged were calculated by defendant Brennan through her agents (Does 1-10) to impede Plaintiff's meaningful access to court in order to gain legal advantage over Plaintiff, including this instant case.

214. Defendants' wrongful, intentional, and malicious acts and omissions through her agents rendered Plaintiff's meaningful access to court ineffective, inadequate, and meaningless and amounted to interference with Plaintiff's meaningful access to court.

215. As proximate and direct result of the defendants' intentional, unlawful, and malicious acts and omissions, Plaintiff has suffered injuries and damages in his property, freedom, and liberty for which he is entitled for relief in the amount to be determined at the trial, including compensatory, punitive, and a court appointed counsel to ensure that Plaintiff accessed the court meaningfully.

14th Cause of Action: Infliction of Emotional Distress-All Defendants

216. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

217. Defendants' acts or omissions set forth herein are extreme and outrageous, beyond all bounds of human decency, and are to be regarded as utterly intolerable in a civilized society. The defendants intended to cause severe emotional and mental anguish in Plaintiff, or acted with disregard of high probability that their respective actions or omissions would inflict such harm on Plaintiff.

218. Plaintiff suffered severe humiliation, emotional and mental anguish as a result of defendants' intentional, unlawful, and malicious acts or omissions. The defendants'

41

outrageous conducts constituted intentional infliction of emotional pain, severe mental anguish, and emotional distress in Plaintiff and it is actionable under Unites States laws.

219. As proximate and direct result of defendants' acts or omissions, Plaintiff suffered injuries and damages including emotional distress, mental anguish, and other damages. He will continue to suffer such injuries until this court intervene. Plaintiff is entitled for relief in the amount to be determined at trial.

    15th Cause of Action: Interference with Prospective Contractual Employment and Other Beneficial Contractual Relationships (All Defendants)

220. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

221. Pursuant to and in furtherance of the scheme to defraud, impede, and to punish Plaintiff for seeking justice, defendants and those working in concert with them stalked and continued to stalk Plaintiff and use their knowledge of Plaintiff's activities and movement to impede, preempt, and sabotage Plaintiff's ability to secure employment, legal counsel, business and other beneficial contractual relationships.

222. Defendants and their co-conspirator have knowledge that Plaintiff was/ is looking a job, a legal counsel, business, and other beneficial contractual relationships and defendants defeated Plaintiff's efforts singly, and in any combination.

223. Defendants' actions or omissions are intentional, unlawful, malicious, and unethical and were designed to punish Plaintiff for his litigation activities against defendants to protect Plaintiff's property, freedom, and liberty among others.

224. As proximate and direct result of defendants' action and omissions, Plaintiff was and will continue to be injured and damages in his property and liberty for which he is entitled for relief in the amount to be determined at the trial, including a court appointed counsel to help Plaintiff protect his liberty among others.

    16TH Cause of Action: Retaliation in violation of Indiana Law against Employment Discrimination (Indiana Code 22-9-1-16) (St. Vincent Hospital)

225. Plaintiff re-alleges and incorporates herein by reference all allegations and Arguments in this Complaint as if set forth herein in full.

226. Indiana's law against employment discrimination makes it unlawful for an employer to take adverse action against any employee for engaging in a protected activity or interfere with any person in the exercise or enjoyment thereof, or having participated in such protected activity.

227. Plaintiff engaged in or participated in a protected activity and St. Vincent Hospital through its agents, Shultz and unknown of St. Vincent were aware of it.

228. As a result of Plaintiff participation in such protected activity, Defendant St. Vincent, through Shultz, and others of its agents took adverse action against Plaintiff. The adverse actions include but not limited to the followings, threat of termination, harassment, unjustified reprimand, overly critical of Plaintiff's work, unjust transfer, hostile work environment, false report of poor job performances, not allowing Plaintiff to enter grievances process, and wrongful termination among others abuse.

229. There is a casual connection between Plaintiff's participation in the protected activity and defendants' adverse action against Plaintiff.

230. As direct legal and proximate result of Defendants' adverse actions against Plaintiff, Plaintiff has sustained injuries and damages and Plaintiff will continue to sustain emotional and economics injuries in the amount to be determined at the trial.

17th Cause of Action: Violation of Title VII 42 USC 2000e-2a

National Origin and Race Discrimination (Against Defendant, St. Vincent Hospital)

231. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

232. Plaintiff is an African American and based on his race and national origin is a member of protected citizens under Title VII.

233. At all times material, Plaintiff performed the function of his job competently and was qualified for his position with Defendant St. Vincent Hospital.

234. St. Vincent Hospital, through its agents, Shultz, and other unknown agents of St. Vincent Hospital treated Plaintiff less favorably than his similarly situated non-African Americans.

235. Plaintiff was subjected to adverse treatment because of his race and national origin, including but not limited to hostile work environment, fabricated reprimands, threatened termination, overly critical of Plaintiff's job performance, unjustified transfer, not allowing him to enter employees' grievance process, denial of continue employment with Defendant based on his race and national origin as detailed above.

236. Defendant, its agents and employees' conduct were not welcomed by Plaintiff. The said conducts were undertaken because of Plaintiff's race and national origin. The effect of the practices complained of above has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affected Plaintiff statues as an employee and led to the eventual wrongful termination.

237. The unlawful employment practices complained of above were intentional, malicious, and done with reckless disregard to federally protected rights of Plaintiff. Under Title VII.

238. Management level employees knew or should have known, of the abusive conduct. Plaintiff provided management level employees including personnel dept. with information sufficient to raise a probability of national origin and race based harassment in the mind of reasonable employer. Moreover, the harassment was overt and open that a reasonable employer would have had to have been aware of it. Indeed, management level employees were themselves complicit in the adverse and discriminative conduct.

239. Defendant did not exercise reasonable care to prevent harassment in the workplace on the basis of national origin and race, and did not exercise reasonable care to promptly correct any harassing behavior that did occur.

240. Defendant's action and omission did cause and will continue to cause Plaintiff to suffer economic losses as well as severe emotional distress and other significant irreparable, damages and losses.

241. The unlawful employment practices of St. Vincent and its agents, supervisors, and associates directors, and employees directly and proximately resulted in such injuries and damages as may be proven at the trial, including but not limited to lost income and benefits, lost employment opportunities, psychological, emotional, and mental anguish, distress, humiliation, embarrassment, and degradation, pain, and suffering; attorney's fees, cost, expenses and other damages.

   18th Cause of Action: Violation 42 USC Section 1981 as Amended (Race Discrimination against St. Vincent Hospital and Its Agents

242. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

243. Plaintiff is an African American and thus a member of protected class under 42 USC 1981. See Francis Coll. v. Al-Khazraji, 481 US. 604, 611(1987); Monzannares v. Safeway Stores, Inc. 593 F.2d 968, 970 (10th Cir. 1979); Zapata v. BP, Inc. No. Civ. A. 93-2366-EEO, 1998 WL 717621, at *3(D. Kan. Sept. 1998).

244. Defendant St. Vincent through its agents and employees, Shultz, and other unknown St. Vincent's agents discriminated against Plaintiff in violation of 42 USC 1981 based on Plaintiff's race.

245. Defendant's agents and employees, Shultz, and other unknown St. Vincent's agents denied Plaintiff benefits, privileges, promotional opportunities, and terms and condition of his employment as well as eventual wrongful termination of Plaintiff. Plaintiff was also subjected to adverse treatment because of his race, including but not limited to fabricated written reprimands, threatened termination, overly critical of Plaintiff's job performances and evaluations, and denial of continued employment based on his race, as detailed above.

246. Defendants, St. Vincent Hospital, Shultz, and other unknown agents of St. Vincent Hospital treated Plaintiff less favorably than his similarly situated non-African Americans counterparts.

247. The effects of the practices complained of above has been to deprive Plaintiff of equal employment opportunities, otherwise adversely affect his status as employee, deprive him of his right to make and enforce contract, and deprive him of full and equal benefits of the laws, because of his race.

248. The unlawful employment practices complained of above were malicious, intentional, done with reckless indifference to the federally protected rights of Plaintiff.

249. Defendant's agents and employees, Shultz, and other unknown agents of St. Vincent Hospital discriminatory actions and omissions did cause and will continue to cause Plaintiff to suffer economic losses as well as severe emotional distress and other significant injuries, damages, and losses.

250. The unlawful practices of Defendant, St. Vincent Hospital through its agents and employees, Shultz, and other unknown St. Vincent's agents directly and proximately resulted in such damages as may be proven at the trail, including but not limited to lost income, and benefits; lost employment opportunities; psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and degradation; pain, and suffering; and attorney's fees, cost, and expenses.

   19th Cause of Action: .42 USC Section, 1981 Retaliation (St. Vincent Hospital

251. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

252. Defendant, St. Vincent Hospital, through its agents and employees, Shultz, and other unknown agents of St. Vincent retaliated against Plaintiff in violation of 42 USC, section 1981.

253. Plaintiff engaged in a protected activity by filing a lawsuit against Schwab, US Postal Services and others to protect his property, liberty, and self-autonomy. Plaintiff other protected activities includes, calling St. Vincent's Employees Legal Refer Services 1800 number and requested to be referred to a civil rights attorney and requested a few days' vacation to deal with said legal issues.

254. In response, to Plaintiff's protected conduct, Defendant's agents and employees, Shultz and other unknown agent of St. Vincent retaliated against Plaintiff through adverse employment actions. This adverse action, is a continuation of Defendants and their co-conspirators' pattern and practice of impeding and punishing Plaintiff each time he attempts to access the court or justice

255. Defendant through its agents and employees, Shultz, and other unknown agents of St. Vincent's agents adverse actions includes, false accusation of poor job performance, threatened termination, transfer to another unit, not allowing Plaintiff to enter grievances process, hostile work environment, overly critical of Plaintiff's work and eventual wrongful termination among other discriminative acts.

256. Defendant through its agents and employees, Shultz and unknown agents of St. Vincent treated Plaintiff more adversely than similarly situated non-African Americans counter parts who did not participate in in protected activities.

257. The unlawful employment practices complained of above were intentional and were done with malice or reckless indifferent to the federally protected rights of Plaintiff.

258. Defendant's agents and employees, Shultz and other unknown agents of St. Vincent's retaliatory actions and omissions did cause and will continue to cause Plaintiff to suffer economic losses as well as severe emotional distress, significant injuries, damages, and losses among others.

259. The unlawful retaliatory practices and other acts or omissions of Defendant's agents and employees, Shultz, and other unknown agents of St. Vincent directly and proximately resulted in such damages as may be proven at trial, including but not limited to loss income, and benefits: lost employment opportunities: psychological, emotional, and mental anguish, distress, humiliation, embarrassment, and degradation: pain and suffering; attorney's fees, cost, and expenses among other damages.

20[tht] Cause of Action: Retaliation in Violation of Title VII, 42 USC Section 2000e-3(a)
(St. Vincent Hospital)

260. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

261. Plaintiff also, re-alleges and incorporates herein Plaintiff's retaliation claim under 42 USC section 1981 outlined in count 19th above as if set forth herein in full.

262. Defendants' action and omissions as outlined in count 19th above, constituted retaliatory workplace harassment under Title VII, 42 USC 2000e-3(a).

263. Defendant's adverse actions constituted retaliatory workplace harassment.

264. Defendants' retaliatory actions and omissions were sufficient to deter a reasonable person from engaging in protected activity under Title VII.

265. There were causal connection between Plaintiff's protected actions and the defendants' adverse actions under Title VII.

266. As direct and proximate result of Defendants' retaliation, Plaintiff have sustained and will continue to sustain, economic and emotional injuries as outlined in 42 USC section 1981 retaliatory claim above for which is entitled for relief.

21st cause of Action: Violation of Civil Rights Act of 1866, 42 USC Section 1981as Amended (Race Discrimination-Brennan)

267. Plaintiff re-alleges and incorporates herein by reference allegations and arguments in this complaint as if set forth herein in full.

268. Plaintiff is an African American and thus member of protected class under 42 USC Section 1981. See, Kinnon v. Arcoup, Gopman, & Associates, Inc., F.3d 866 (11 Cir. 2007).

269. At all times material, Defendant Brennan and her unknown agents were acting under the color of law.

270. Plaintiff had a clearly established right under the law of the United States to the full and equal benefit of the laws, including making and enforcing contract.

271. Defendant Brennan through her unknown agents intentionally and systematically discriminated and continue to discriminate against Plaintiff by interfering, delay, or non-delivery of Plaintiff's mails from at least 1999, to present in violation of 42 USC section 1981-race based discrimination. For example: a) on or about 7/6/1999, a certified mail containing legal documents was delayed for more than 30 days; b) on or about 8/23/99, Plaintiff certified mail was not delivered at all; c) from 2005 to the end of 2017, Plaintiff's financial statements correctly addressed were not being delivered to Plaintiff and were marked return to the sender and unable to deliver as addressed; d) On 3/10/10, legal documents sent to Plaintiff by US Seventh Court of Appeal was not delivered; e) On 5/22//17, US Postal Services' priority mail paid by Plaintiff and sent to him by this court was not delivered by Brennan's agents; f) on 6/5/17, and 6/26/17, properly addressed mails sent to Plaintiff by this court were returned to the court and marked "return to sender, unable to deliver as addressed; even though the said mails were properly addressed; and g) on 11/30/17, this court sent Plaintiff its 11/30/17's order via US Postal Services' mail and this mail was not delivered to Plaintiff.

272. By Paying Brennan through US Postal Post Office to deliver mail or package and Brennan accepting the same through Postal Services is a contractual relationship. Defendant Brennan through some her agents unknown to Plaintiff deprived Plaintiff of his right to make, enforce, and to enjoy the benefit of suck contractual relationship and full and equal benefits of the laws in violation of 42 USC section 1981; by intentionally and maliciously interfering with the delivery of Plaintiff's mails or accepting payment from Plaintiff for mail delivery and intentionally failed to accomplish the services which Plaintiff had pay for.   Plaintiff's race is a major contributing factor.

273. Defendant Brennan through her agents' discriminatory actions did cause and will continue to cause Plaintiff to suffer economic loss, as well as emotional and other

significant injuries and damages.  More importantly, it impeded Plaintiff's meaningful access to court in multiple occasions including this instant case.

274. Defendant Brennan through some her agents' discriminatory actions directly and proximately resulted in such damages as may be proven at the trial, including but not limited to economic loss, psychological, emotional, and mental anguish, and  distress.; pain and suffering, attorney's fees, cost and expenses among others.

22nd Cause of Action: Schwab and Its Agents Violation of the Civil Rights Act of 1866, 42 USC Section 1981, as Amended (Retaliation)

275. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

276. Plaintiff is an African American and thus a member of protected class under 42 USC section 1981, as amended.

277. Defendant Schwab through its agents Howie Kennedy and other unknown agents of Schwab retaliated against Plaintiff in violation of 42 USC section 1981.

278. Plaintiff engaged in a protected activity by refusing to invest in unsolicited, worthless, and potentially money losing investment offer from Howie Kennedy that was not suitable for plaintiff financial objectives.

279. In response to Plaintiff's protected activity conduct (refusing to invest), Defendants, Schwab through Howie and other unknown Schwab's agents blocked Plaintiff's trading activities in retaliation.  This was during the 2008, bear market under false pretext and as a result Plaintiff lost money and investment opportunities.

280. Defendant Schwab through Howie Kennedy and other unknown agents of Schwab's adverse actions or retaliatory acts were intentional and done with malice or reckless indifferent to the federally protected right of Plaintiff in violation of 42 USC section 11981.

281. Defendant Schwab through Howie Kennedy and other unknown Schwab's agents' retaliatory actions did cause and will continue to cause Plaintiff to suffer economic losses and severe emotional distress and other significant injuries.

282. The retaliatory practices and acts or omissions of Defendant Schwab through its agents directly and proximate result in such damages as may be proven at trial including lost of investment and investment opportunities, psychological, emotional, and mental anguish, attorney's fees, costs, and expenses as well as compensatory and punitive damages.

23rd Cause of Action: Psychological Torture of Plaintiff-(All Defendants)

283. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

284. Defendants through their respective agents and employees and other unknown or unnamed subjected Plaintiff to psychological torture and inhuman treatment in violation of customary international law banning torture.  The intended result of this psychological torture through noise harassment, sleep deprivations, and frustration of Plaintiff's daily activities among other acts, designed to strike fear in Plaintiff, induce helplessness in him, disorient him, and to stress him out in an effort to silence him, cover-up defendants and their co-conspirator's unlawful conduct as well as to retain Plaintiff's property among other abuse.

285. Defendants' psychological torture of Plaintiff from at least 2001, and up to the present time, was intentional, malicious, unlawful, inhuman, degrading, oppressive, and subjugated Plaintiff among other abuse including interference with Plaintiff's ability to live normal live and self-actualized.

286. As proximate and direct result of Defendants' action and omissions, Plaintiff suffered suffer injuries and damages including but not limited to emotional and mental anguish and distress as well as economic loss among others and should be punished by award of punitive or exemplary damages in the amount to be determine at the trial.

24th Cause of Action: Retaliation against Plaintiff in violation of Plaintiff's First Amendment Right-(All Defendants)

287. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

288. At all times material, Plaintiff had a clearly established right to access the court which is grounded in First Amendment and petition clause to petition the government for redress.

289. In 1996, Ette and his co-conspirators conspired to defraud Plaintiff.  As Plaintiff started to accessing the court or justice to at least recover part his proper and to protect his liberty and property, Ette and his conspirators solicited certain unknown agents of Brennan (US Postal Services' agents) and they agreed and conspired with them to impede Plaintiff's meaningful access to court as well to retaliate against Plaintiff starting from at least 1999, and up to the present time.  Ette and his co-conspirators also solicited Kennedy and other unknown Schwab's agents as well as Shultz and other unknown St. Vincent's agents to retaliate against Plaintiff as described in this complaint i.e they all agreed and did took adverse actions against Plaintiff as described in this complaint in furtherance of Ette's scheme.

290. Plaintiff engaged in a series of protected activities from at least 1996, to present and Ette and his co-conspirators conspired with the named defendants through their respective agents to intentionally, knowingly, and maliciously took adverse action against Plaintiff in a continuous and series of wheel and spoke conspiracies as described in this complaint. The conspiracies were linked and coordinated by Ette and his co-conspirators.

49

291. The adverse actions constituted retaliatory actions against Plaintiff for accessing the court in violation of Plaintiff's First Amendment rights to petition the court for redress.

292. The defendants' retaliatory acts and omissions were intentional, willful, malicious, and unlawful and done with reckless disregard to for Plaintiff's rights.

293. There were causal connections between each of the Plaintiff's protected conduct and Defendants' respective adverse actions against him. If Plaintiff did not engage the said protected acts, defendants will not have taken their respective retaliatory adverse action against him.

294. Defendants' retaliatory adverse actions and omissions were sufficient to deter a reasonable person from engaging in such protected conduct or activity under First Amendment.

295. As direct legal and proximate result of Defendants' retaliatory adverse actions and omissions, Plaintiff have sustained and will continue to sustain such injuries and damages, including but not limited to economic, emotional, and psychological anguish, distress, and pain as well as punitive and compensatory damages in the amount to be determine at the trial.

### 25th Cause of Action: Regulatory Taking-(Brennan)

296. Plaintiff re-alleges and incorporates herein by reference all allegations and Arguments in this complaint as if set forth herein in full.

297. At all times material, Plaintiff had a clearly established property, due process, and equal protection rights under Fifth and Fourteenth Amendment to the US constitution which prohibits any person acting under color of laws from depriving any person of life, liberty, or property in absence of due process. Plaintiff had also clearly established rights to meaningfully access the court under First Amendment's free speech protection and rights to petition the court for redress.

298. Regulatory taking is a situation in which government regulation limits the use of private property to such a degree that the regulation effectively deprives the property owner of economically reasonably use or value of their property to such extent that it deprive them of utility or value of the given property. Under Fifth and Fourteenth Amendment, the state shall not deprive any person of life, liberty, and property with due process and just compensation.

299. Professional license is a valuable property right, reflected in the money, efforts, and loss of opportunity for employment expended in its acquisition, and also it afford its holder certain rights or privileges, which may not be taken away without due process. Bender v. Board of Regent, 262 App. Div. 627, 631 (NY Supreme Court, 1941).

300. As described in complaint, Ette and his co-conspirators defrauded Plaintiff of his property under color of law and conspired with the Brennan through her agents and others named defendants among others to not only impede Plaintiff Plaintiff's meaningful access to court to recover his property but also retaliated against Plaintiff from at least 1999, to present.  The said retaliatory acts and its effects are as follows:

   a)  impede or hinder Plaintiff's access to court to recover his property;

   b)  retaliate against Plaintiff by for accessing the court by sabotaging and preempting from employment, educational, and business opportunities as well as prevented Plaintiff from practicing or working under his professional license; and

   c)  Interfere with Plaintiff's business, social and even family relationships among others deprivations.

301. In effect, Defendants' action amounted to regulatory taking or enslavement of Plaintiff in that Defendants' deprived Plaintiff of his property, deprived and continue to deprive him of right to practice or work under his professional license without due process.  In other words, defendants' adverse actions rendered Plaintiff's professional license useless which interfered with ability make a living or self-actualize (subjugation of Plaintiff).

302. Defendants' actions and omissions are intentional, willful, unlawful, and malicious and it amounted to regulatory taking, abuse power, and subjugation of Plaintiff in violation Fifth and Fourteenth Amendment.

303. As direct and proximate result of Defendants' actions and omissions, Plaintiff have suffered injuries and damages to his person and property for which he is entitle for relief in the amount to be determined at the trial.  Plaintiff also request compensatory and punitive damages.

26th Cause of Action: Defamation- Per se (St.  Vincent and Schwab)

304. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

305. Defendant Schwab on or about 9/28/15, through its agent unknown to Plaintiff intentionally, maliciously, and negligently made the following false statements about Plaintiff, a private individual: that Plaintiff was "hiding his ill-gotten money in Plaintiff's Schwab account" among other things.

306. Defendant, St. Vincent through its agent, Shultz on or about 3/15/10, intentionally, maliciously, and negligently made the following false statement about Plaintiff, a private individual: that Plaintiff was not meeting his job requirements among others things.  Also unknown defendant intentionally and malicious made the following false statements to the authorities, Plaintiff's family members and others: that Plaintiff was getting financial support from questionable sources.

51

307. Schwab, St. Vincent, and others' statements through their respective agents were intentional, maliciously made and were defamatory, libel, and slandered Plaintiff with the knowledge that their respective statements were false or made with reckless disregard to the truthfulness of their statements.

308. The words of the defendants were defamatory, libel, and slanderous per se in that they degraded Plaintiff, rendered him odious, subject him to public ridicules, and put him in legal problems among others difficulties. The Defendants through their respective agents intended to and indeed did, has injured and damaged him in his trade, professional work, trade, reputation, business, exposed him to contempt, and deprived and continue to deprive him of his public confidence among others.

309. The said per se defamatory, slanderous, and libel statements were intentional and maliciously made with the intent to damage Plaintiff's good name, character, professional work, and to lower his reputations in the relevant community and the statements were knowingly false. The Defendants have cause false statements to be made to a variety of third party.

310. The false and defamatory statements or communications of the Defendants were not privileged; or in the alternative, if they were subjected to privileges, the privileges were exceeded or abused in that the actions of the defendants went far beyond their respective duty, if any and were done in a manner not justified by the occasion(s) and continued after Defendants through their respective agents knew or should have known that the defamatory statements or communications were unjustified.

311. The damages and injuries to Plaintiff's reputations maybe implied by law from the nature of the defamatory statements or communications made by the defendants regarding Plaintiff.

312. As direct and proximate result of the above said defamatory, slender, and libel statements, Plaintiff suffered loss of professional work, reputation, and injuries to his feelings, person, and property for which his entitled for relief in the amount to be determined at the trial.

27th Cause of Action: Defamation (St. Vincent and Schwab)

313. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as well as 26th cause of action above as if set forth herein in full.

314. Upon information and believe, members of medical and financial communities reasonably understood that the statements of St. Vincent and Schwab's respective agents outlined above and in this complaint were about Plaintiff as the statement were made of, concerning, and mentioned him expressly.

315. All the statements were entirely false as they pertain to Plaintiff and are defamatory, slanderous on their face, and expose Plaintiff to hatred, contempt, ridicule, and obloquy

because Plaintiff is neither getting financial from questionable sources nor performing his professional job poorly or hiding any money from any one. These statements were understood by those who heard and saw them as a way to defame the reputation of Plaintiff as well as damage his good professional work, name, and character as well as to put him into legal trouble among others.

316. The statements were heard by members of the medical, financial, law enforcement communities and they were intentionally and maliciously made.

317. As direct and proximate result of Defendants' statements and communications, Plaintiff was injured and damaged in his reputations, shamed, mortified, and his feelings hurt, all to his general damages and is entitled to compensatory and punitive damages in the amount to be determined at trial.

### 28th Cause of Action: Punitive Damages

318. Plaintiff re-alleges and incorporates herein by reference all allegations and arguments in this complaint as if set forth herein in full.

319. The defendants and those working in concert with them continuing acts or omissions, singly, or in any combinations starting at least from 1996, to present (over 20 years) were willful, malicious, outrageous, oppressive, in a bad faith and wanton disregard to Plaintiff's rights and were calculated to cause maximum injury and damages to Plaintiff and his family. Thus Plaintiff is entitled to maximum award of punitive damages allowed by law. Public interest will be served by such award in that it will deter defendants from engaging in similar acts or omissions in future.

### 29th Cause of Action: Individual, Joint, and Several Liabilities

320. Plaintiff re-alleges and incorporates herein by reference all allegation and arguments in this complaint as if set forth herein in full.

321. Plaintiff's injuries and damages as set forth herein were proximate result of the defendants' actions or omissions. Defendants, each one of them, named, unknown, or unknown intentionally, maliciously, and unlawfully acted in concert to commit at least one of the acts or omissions outlined in this complaint in pursuit of their common goal, plan, design, purpose, and understanding to exploit, harass, intimidate, torture, and deprive Plaintiff of his liberty, freedom, and to subjugate Plaintiff as well as impede his meaningful access to court, and to punish Plaintiff for accessing the court among other abuse. In engaging in such acts or omissions, defendants, named, unnamed, or unknown who acted in concert, aided and abetted, encouraged, lend a hand, or those who ratify and adopted the acts or omissions for their benefit, are equally, individually, jointly, or severally liable for the acts or omissions of their fellow wrongdoers' committed in furtherance their joint undertakings. Therefore each defendant are individually, jointly, or severally liable for Plaintiff's injuries and damages outlined herein.

322. Plaintiff's injuries and damages as set forth herein are direct and proximate result defendants, named, unnamed, or unknown and each one of them is liable for Plaintiff's injuries individually, jointly, or severally.

### Status of Limitation

323. The status of limitation in a conspiracy claim or tort action claim begins to run on the last overt act in furtherance of such conspiracy. The conspiracy giving rise to this action is still on going.

### Declaratory Relief Allegations

324. A present and actual controversy exists between Plaintiff and defendants concerning their rights and respective duties. Plaintiff contend that Defendant violated his rights under at least Fifth and Fourteenth Amendment, 42 USC 1981, 1983, 1985 (2 & 3), and 1986 as well as under RICO among other violations. Defendants have denied these allegations. Declaratory relief is therefore necessary and appropriate.

325. Plaintiff seeks a judicial declaration of the rights and duties of the respective parties.

### Injunctive Relief Allegation

326. No plain, adequate, or complete remedy at law is available to Plaintiff to redress the wrong addressed herein. If the court does not grant the injunctive relief sought herein, Plaintiff will continued to be irreparably harmed. Thus Plaintiff resubmit his injunctive relief, motion for a court appointed counsel, and a master previously filed to investigate Defendants' wrong doing.

### Prayer for Relief

WHEREFORE, Plaintiff pry for relief as follows:

a)  For a declaration and injunctive relief as well as a court appointed counsel and a court appointed master;

b)  Reinstatement, actual economic damages, including but limited to back pay, front pay, lost benefits;

c)  Compensatory damages, including but not limited to those future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and other non- pecuniary losses;

d)  Liquidated damages for all claims as allowed by law, in an amount to be determined at trial;

e)  Punitive damages and liquidated damages in the amount to be determined at the trial;

f)  For lost interest on wages, compensation, and damages including pre- and post – judgment and upward adjustment of for inflation;

g) Imposing upon the defendants the payment of all costs and expenses associated with this lawsuit and all other equitable reliefs;

h) For an order enjoining defendants from engaging in the unlawful acts complained herein, appoint Plaintiff a legal counsel, and a court appointed master.

Plaintiff demands jury trial on all issues so trialble.

Respectfully submitted on this __29th__ ———of ——— March——— 2018.

W. Egwuenu
Wilson Egwuenu

P.O. Box 88394

Indianapolis, IN 46208



## Part III

**Postmaster** *(Office of Address)*
Indicate disposition of the Certified article described in Part II-B below.

1. a. If Records Indicate Delivery, Show Delivery Date: _____

   b. State Name of Individual, Company, or Organization Accepting Article: _____

2. If No Record of Delivery, Forward Parts I and II-C to Addressee:  Date: _____

3. If No Response Is Received in 15 Days From Addressee, Check ☐ and Return Part III to the Postmaster, Office of Origin.

4. If Addressee Responds, Return All Parts of Form 1510 to Office of Origin.

5. If No Record of Delivery and Addressee Denies Receipt, Conduct Search for Article Before Returning Form to Office of Origin.

PS Form **1510**, April 1992

## Part IV

Superintendent Dead Letter or Parcel Branch
Conduct search for article described in Part II-B below.

| Branch Serving Mailing Office | | |
|---|---|---|
| 1. a. Conducted Search On *(Date)* | b. Search Conducted By *(Name)* | c. Article Was ☐ Located  ☐ Not Located |

| Branch Serving Addressee Office | | |
|---|---|---|
| 2. a. Conducted Search On *(Date)* | b. Search Conducted By *(Name)* | c. Article Was ☐ Located  ☐ Not Located |

3. If Article Was Located, It Was Forwarded to   ☐ Sender   ☐ Addressee

S Form **1510**, April 1992

## Part II-B

U.S. Postal Service
**Mail Loss/Rifling Report**

| 1. Complaint Date | 2. Office Accepting Complaint *(City and State)* | 3. Complaint |
|---|---|---|
| 8-23-99 | ARLINGTON, Texas — M.O. | ☐ Loss  ☐ Rifling |

| 4. Article Was Mailed By | 5. Article Was Addressed To |
|---|---|
| a. Name  WILSON EGWUENU | a. Name  COUNTY Court At LAW #1 |
| b. Return Address As On Article Mailed  700 S. Center #T235 | b. Address As On Article Mailed  301 FANNIN Rm 101 |
| c. City ARLington  d. State TX  e. ZIP+4 76010. | c. City HOUSTON  d. State TX  e. ZIP+4 77002 |
| f. Day Telephone Number *(Include Area Code)*  (817) 276 1549 | f. Day Telephone Number *(Include Area Code)* |

| 6. Article Was Mailed | 7. Article Was Sent | 8. Type of Mail |
|---|---|---|
| a. Date  Month 08  Day 13  Year 99 | ☒ 1st-Class  ☐ Parcel Post | ☒ Letter  ☐ Parcel |
| b. Time  ☒ AM ☐ PM *(Hour)* | ☐ Other *(Specify)* | ☒ Other *(Specify)* FLAT |

| 9. Special Services | | |
|---|---|---|
| ☐ Special Handling  ☐ Special Delivery | ☒ Certified No. 2 383-909-360 | ☐ Return Receipt for Merchandise No. |

| 10. Place of Mailing | 11. Name and/or Address of Location Checked  300 E. South Street |
|---|---|
| ☒ Main Post Office  ☐ Station or Branch  ☐ Contract Station  ☐ Collection Box  ☐ Residence or Business | City and State of Location Checked  ARLington  TX    ZIP+4 for Location Checked  76004 |
| | 12. Value |

Case 1:17-cv-01691-TWP-MPB   Document 75-1   Filed 03/20/18   Page 2 of 10 PageID #: 730

4. 27.5

**Name**
Wilson Equipment

**Mailing Address (No. and Street, Apt. or Box No.)**
700 S. Center Street #235

**City or Town**
Arlington

**State**
TX

**ZIP Code**
76010

**Date (Month, Day, Year)**
8-13-99

**No.** G19 711 530

**Customer Phone (8 a.m. - 5 p.m.)**
276-1940

Is This □ Information Request  □ Suggestion  X□ Problem  □ Compliment

**Did It Involve**
- □ Delay
- □ Nonreceipt (Prepare 1510)
- □ Damage
- □ Misdelivery
- □ Improperly Returned
- □ Change of Address
- □ Vending Equipment
- □ Window Services
- □ Personnel
- □ Other

If This Is A Problem With A Specific Mailing,
Please Complete The Following:

**Was It**
- □ Letter
- ☒ Flat / Large Envelope
- □ Package
- □ Newspaper / Magazine
- □ Advertisement

**Was Mailing**
- □ First-Class
- □ Priority Mail
- ☒ Certified
- □ Registered
- □ Insured
- □ Express Mail
- □ Other

**USPS USE ONLY**

Recording Employee Name

Customer Contacted  Customer (Contacted By)

□ Customer (USPS)/Client

FF Wall

**Please Give Essential Facts (If change of address problem, please include previous address.)**

Customer States that certified flat #Z 264 180 461 was never notified on 7-6-99, so
mailpiece indicates. Customer received around notice on 8-5-99: this mailpiece contained
legal documents and a court hearing date. Customer missed court hearing because of
untimeliness of delivery.

After noting customer contact, mail this copy under cover to the address on reverse.

PS Form 4314-C, January 1985

ACTION COPY - 3



1 of 2

POSTAGE
HOUSTON
TX 77064  $3.660
$3.660 $3.660 $3.660
$3.660 # METER
JUL 02 99   3615.

MAIL

DAVID K. VALLANCE
Attorney at Law

3700 Veterans Memorial Dr., Suite 140
Houston, Texas 77014

Mr. Wilson Eguwuenu
700 S. Center #T235
Arlington, Texas 76010

625-3400

Wilson Egwuenu

P.O. Box 3691

Urbandale, IA 50323

12/23/15

To Postmaster

Urbandale, IA 50323

Dear Postmaster:

This is to inform you that my bank statements addressed to above post office box are being returned and marked as "not deliverable as addressed and unable to forward." The address on the statements are correct. This is third time and the third month that I am bringing this problem to your attention. Yet I am still having the same problem.

Please, it will be very much appreciated if you could correct this problem. I am looking forward to hearing from you.

Sincerely,

Wilson Egwuenu



Case 1:17-cv-01691-TWP-MPB   Document 75-1   Filed 03/30/18   Page 5 of 10 PageID #: 554



US POSTAGE
$00.391
OCT 02 2015
ZIP 55126
21 3004841

PRESORTED
FIRST CLASS

WELLS
FARGO

For Return Mail Purposes Only
PO Box 5190
Sioux Falls, SD 57117-5190

DCD411DTGD 008075

WILSON E EGWUENU
PO BOX 3691
URBANDALE IA 50323-0691

NIXIE    503    FE 1260    0010/08/15

RETURN TO SENDER
NOT DELIVERABLE AS ADDRESSED
UNABLE TO FORWARD

BC: 57117519090    *1567-07278-06-19

# State Commission on Judicial Conduct



**Officers**
Bud Arnot, Chairman
Scott Mann, Vice-Chairman
Michael O'Neal, Secretary

**Members**
Jean Birmingham
Martin Chiuminatto
Blake Tartt
Keith Baker
Dee Coats
Gilbert M. Martinez
Wallace Jefferson
Kathleen Olivares

**Executive Director**
Margaret J. Reaves

June 20, 2000

**CONFIDENTIAL**

Mr. Wilson Egwuenu
700 S. Center #235
Arlington TX 76010

Re: CJC # 00-0652-DI

Dear Mr. Egwuenu:

Upon investigation of the allegations you presented in your complaint, the staff attorney of the State Commission on Judicial Conduct assigned to your case learned the judge against whom you complained died in February of this year. Therefore, without considering the appropriateness of the judge's actions or specific merits of the case, the Commission dismissed your complaint at its last scheduled meeting.

We sincerely thank you for your participation in this process. Your involvement makes a difference and is invaluable in our efforts to maintain the integrity of the Texas judiciary.

Sincerely,

Margaret J. Reaves
Executive Director

MJR/et

P O Box 12265
Austin TX 78711-2265

(512)463-
1(877)228-

... day with burns and smoke inhalation injuries suffered in a fire that killed two other children and an adult in southeast Houston.

The blaze was reported just before 1 a.m. in the 9600 block of Doxia, where firefighters found a small wood frame house engulfed in flames.

Firefighters had to cut burglar bars away from the windows to get to the four victims inside.

It appeared the victims had been aware of the fire and had tried to escape, firefighters said.

But the fire started in the front of the ... the fire apparent ... ...vive them.

Dead at the ...ne of the fire was Dwayne Gilliam, 38.

Tyree Taylor, 10, Pearl Gilliam, 4, and Dystkary Hibert, 16 months, were rushed to Hermann Hospital, where Taylor and Pearl Gilliam were pronounced dead.

Hibert suffered smoke inhalation and third degree burns on more than 16 percent of her body and was in critical condition in the hospital's burn unit.

The children's mother, who neighbors said was across the street when the fire erupted, was at the hospital with her ...

See FIRE on Page 14A.

# Longtime Harris County judge Chambers dies at age

**By RON NISSIMOV**
Houston Chronicle

Harris County Civil Court-at-Law Judge Eugene Chambers, 79, who also formerly served as a state district judge and county law librarian, was found dead at his Houston home Monday morning after he did not show up for work.

"Judge Chambers gave about 60 years to Harris County as the librarian for the Harris County Law Library and as a judge," said Harris County Civil Court-at-Law Judge Lynn Bradshaw-Hull.

"Many times Judge Chambers seemed to have a gruffy demeanor, but underneath he was a real gentle soul with a great sense of humor."

Bradshaw-Hull said she went to Chambers' home with firefighters after he did not report to work. No foul play seemed to be involved in the death. She said Chambers had a history of heart problems, but no cause of death had yet been determined.

"Judge Chambers was like clockwork, by the time he came to court every morning at 8:30, he had already breakfasted and walked three miles," Bradshaw-Hull said. "We knew something was wrong when he didn't show up."

Bradshaw-Hull said Chambers lived alone. She said she believed he is a widower with two adult children.

No family members could be con-

... to violating the civil rights of an inmate without causing injury," said Guy Womack, a defense attorney.

Arnold, former Deputy David Cisneros, former jailer Robert Percival and former Capital Correctional Resources Inc. employee Wilton David Wallace were accused of abusing inmates at the county detention facility.

A video camera captured a 1996 jail shakedown showing the four kicking, shocking and turning a dog on prisoners.

Each was charged with violating former inmate Toby Haw-

Cisneros ...rney.

Arnold, 30, was the sentenced, on Jan. 18, lengthy proceeding, t edly said, "As we st couple of the trials, ther to what those law enfor ficers will do to avoid r ily. They will lie, they they will steal, they wi ever it takes."

Womack said he wa when a colleague to Hoyt's alleged statem sounded like he was sa

See RECUSAL on f

...tected Monday, and no funeral tion was available.

Former state District Cou David West said Chambers fir state district judge in 1984 aft served as law librarian for n 20 years.

He said Chambers, a Repub the judgeship with the he Ronald Reagan landslide that was re-elected in 1988 and 19

See CHAMBERS on F



Moore has been working as a consultant for Prairie View A&M University to help the nursing school search for a new dean.

She became the interim dean of the nursing school last year after leaving the hospital district but had to give up that $93,000-a-year

The hospital's funding comes from the Texas Department of Mental Health and Mental Retardation and Harris County. Its 1999 budget was $30.7 million.

The hospital treats 43 percent of all psychiatric in-patients in Harris County.

J. Beltway 8 East: North- and southbound lanes closed 7 a.m.-5 p.m.

K. FM 529: Eastbound, Jackrabbit Road a.m.-3 p.m.

L. FM 1093: East- and westbound, Texas p.m.

M. FM 2920: Westbound at North Freew

N. Downtown Clawson — northbound, C 24 hours, Hamilton — southbound, Run a.m.-5 p.m. McKee — north- and southb — east- and westbound, Chartres to H eastbound, Hamilton to Chartres, total c

O. NASA Road 1: East- and westbound closed 7:30 a.m.-5 p.m. (eastbound) an

P. North Post Oak: North- and south: closed 24 hours.

Q. Wayside: Northbound, Cisten to Ma

# Chambers

**Continued from Page 13A.**

In 1995, Chambers resigned as state district judge to run as county judge because he would have had to retire at age 75 as state district judge, West said.

West said he presided over a 1993 recusal hearing in which plaintiffs claimed Chambers was sleeping during a trial involving a chemical leak at an Amarillo train wreck.

West said he found no cause to dismiss Chambers as presiding judge from the case, and after that two plaintiffs dropped their lawsuits because Chambers was allegedly sleeping and unfair to them.



**Chambers**

"Even though I found him not guilty of sleeping on the bench, after that we always called him 'Sleepy,'" West said.

In 1995, Chambers reportedly cursed at security guards who asked him to show his identification at the downtown courthouse.

"He was a gruff but very lovable man," West said. "He always brought his staff to dinner once a week at the courthouse club."

Harris County Commissioners Court will have responsibility for appointing Chambers' replacement.

# Recusal

**Continued from Page 13A.**

who testified (Cisneros and a c defendant) had lied at the fir trial," Womack said. "It sound like the judge had made a de sion in his own mind that Ci neros was lying."

Womack said Hoyt's case ma ager told him Friday she did r recall if the judge had made t remarks. He said he respond that he would ask Hoyt about t remarks in open court today the date set for Cisneros' seco trial — and ask Hoyt to recu himself if the remarks were ac rate.

By the end of Friday, Wom was notified that Hoyt l stepped down from the case w out giving any reason.

"In looking at it objectively, judge must have found by the the case had developed tha outside observer would think had lost his objectivity," Wom said. "Judge Hoyt, being an

## Improvements for Tamina studied

CONROE — Montgomery County commissioners Monday agreed to vote on bringing water and sewerage to one of the county's poorest communities after hearing a plea from the neighborhood's supporters.

The Friends of Tamina, a group of residents from more prosperous communities surrounding Tamina, urged commissioners to ignore a recommendation by a county official to scuttle a plan to use federal funds for the improvements.

Commissioners agreed to put Tamina funding on their agenda in two weeks after hearing presentations backing the plan from the neighboring city of Oak Ridge North and state Sen. David Bernsen, R-Beaumont, whose district includes Tamina.

# Fire

**Continued from Page 13A.**

daughter Monday.

At Fairchild Elementary School, the flag flew at half staff for Taylor, who was a student there. Officials said counselors were at the school to talk with any of Taylor's classmates who might be upset over the boy's death. Many of the family's neighbors were distraught as well.

In the minutes before firefight-

ers arrived, several neighbors tried desperately to save Dwayne Gilliam and the children from the burning house.

Gilbert Dancy, who lives in the 8500 block of Dosia, said he could hear the victims' voices from the burning house.

"I could hear them, but I couldn't reach them," Dancy said.

Dancy and Charles Thompson, who lives nearby, ran a garden hose to the window of the house to try to soak and cool the victims until help got there.

When none of the home's win-

dows could be opened, a fr Thompson found a hatchet tried to chop through a wall no success.

Fire Department Assi: Chief Rick Flanagan said th cial saws that firefighters us cut burglar bars easily — "b until we get there."

"It doesn't take long to l phyxiated from toxic sm Flanagan said.

Those considering burgla for their homes should i; sort with mechanisms tha them to be opened easily fr

3/26/2018  Senior federal judge Larry McKinney dies at age 73 | Indiana News | tribstar.com



Get your local daily news, special offers & more delivered right to your inbox!
SIGN UP NOW >

http://www.tribstar.com/news/indiana_news/senior-federal-judge-larry-mckinney-dies-at-age/article_0255ae2b-0070-54f9-b20e-255bb028ec38.html

# Senior federal judge Larry McKinney dies at age 73

Sep 21, 2017



INDIANAPOLIS (AP) — Federal court officials in Indianapolis say senior U.S. District Judge Larry J. McKinney has died at age 73.

Court spokeswoman Doria Lynch says McKinney died overnight but the time of his death has not yet been determined.

Lynch says McKinney's death was "very unexpected and very sudden and a shock to all of us."

The court announced McKinney's death in a statement Thursday asking for prayers for his wife, children and grandchildren.

McKinney was appointed a district court judge for the Southern District of Indiana in July 1987. He became a senior judge in July 2009.

Prior to joining the federal court McKinney served more than eight years as a Johnson Circuit Court judge. He previously was a state deputy attorney general and had worked in private practice.

**1 comment**

Sign in                                                        1 person listening

|   |   | + Follow |   | Share | Post comment as... |
|---|---|---|---|---|---|

  (http://www.graycommunications.com)      PRINT THIS
Powered by Limelight

## Accused judge in Kentucky disability fraud case attempts suicide

By: Miranda Combs (http://www.wkyt.com/station/bios/news/227239421.html) -
Email (http://www.wkyt.com/news/headlines/mailto:miranda.combs@wkyt.com)
Updated: Tue 6:04 PM, Oct 22, 2013

Home (http://www.wkyt.com/home) / News (http://www.wkyt.com/news) / Headlines List (http://www.wkyt.com/news/headlines) / Article

BARBOURSVILLE, WV. (WKYT) - Former Judge David Daugherty was found unconscious in a car in a church parking lot last week. Police say he was attempting to commit suicide.

Daugherty and attorney Eric Conn are the targets of a congressional investigation.

They're accused of teaming up to bilk the nation's social security system by getting bogus disability claims approved.

A West Virginia police report states the former judge tried to commit suicide in a church parking lot.

Police in Barboursville, West Virginia found former Daugherty passed out inside a car.

The report says the car had a hose running from the exhaust to the passenger side window. Nearby they found an empty vodka bottle and empty pill container.


MGN Online

Daugherty along with attorney Eric Conn of Floyd County are the targets of a scathing report on disability and fraud.

Earlier this month, a Senate committee report detailed how Conn built, what it calls, one of the largest and most lucrative disability practices in the nation, wracking up millions of dollars in legal fees.

But the report says he didn't do it all alone. Conn is accused of inappropriate collusion with the now-retired judge.

The report says Conn and the judge had collaborated a scheme that enabled the judge to approve, in assembly-line fashion, hundreds of clients for disability benefits using manufactured medical evidence.

Daugherty was taken to a West Virginia hospital.

He retired in 2011 after investigators first started asking questions in the case.

Find this article at:
http://www.wkyt.com/news/headlines/Accused-judge-in-Kentucky-disability-fraud-case-attempts-suicide-228638351.html

☐ Check the box to include the list of links referenced in the article.

Copyright © 2002-2013 - Gray Television Group, Inc.

D₃



**$7.25**

Origin: 46204
Destination: 46204
1 Lb 14.90 Oz
Mar 29, 18
PM

IS-GOODBOX

PRIORITY MAIL 1-DAY

1005

Expected Delivery Day: 03/30/2018

USPS TRACKING NUMBER

9505 5122 3073 8086 1535 64

UNITED STATES
POSTAL SERVICE®

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

PRIORITY
★ MAIL ★

FROM:

FROM: P.O. Box 88394
Indianapolis, IN 46208

TO:
US District Court
Clerk
46 E. Ohio St. #105
Indianapolis, IN
46204

UNITED STATES MARSHAL
PACKAGE SCREENED BY
X-RAY/MAGNETOMETER

U.S. Marshal Service
INDIANAPOLIS, INDIANA

Label 228, March 2016

USPS TRACKING™ INCLUDED®

INSURANCE INCLUDED®

PICKUP AVAILABLE
• Domestic only

! USED INTERNATIONALLY,
CUSTOMS DECLARATION
BEL MAY BE REQUIRED.